**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 3:15CR155 (RNC) |
| | : | |
| v. | : | |
| | : | |
| ROSS SHAPIRO, | : | February 26, 2016 |
| MICHAEL GRAMINS, and | : | |
| TYLER PETERS, | : | |
| Defendants. | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT PETERS'**
**MOTION TO SEVER**

The Government respectfully submits this Memorandum in Opposition to Defendant

Peters' Motion to Sever (Doc. 113). Peters has failed to meet the "extremely difficult burden"

required for severance, and his motion fails on a number of grounds: (1) if co-defendant Shapiro

does not testify at this trial, he is unlikely to testify at a separate trial for Peters; (2) the evidence

that Peters wants to present through Shapiro would be cumulative; (3) Shapiro would be subject

to significant impeachment if he did testify; (4) the interests of judicial economy strongly weigh

against severance; and (5) Peters' good faith arguments are unpersuasive.

**Governing Law**

"If the joinder of offenses or defendants in an indictment . . . appears to prejudice a

defendant or the government, the court may order separate trials of counts, sever the defendants'

trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14. As the Supreme

Court has made clear, "when defendants properly have been joined under Rule 8(b), a district

court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would

compromise a specific trial right of one of the defendants, or prevent the jury from making a

reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993).

"A defendant seeking severance must show that the prejudice to him from joinder is sufficiently

severe to outweigh the judicial economy that would be realized by avoiding multiple lengthy

trials." *United States v. Walker*, 142 F.3d 103, 110 (2d Cir. 1998). "Rule 14 does not require

severance even if prejudice is shown." *Zafiro*, 506 U.S. at 538-39. Instead, the Second Circuit

reviews a decision on a severance motion for abuse of discretion, and to establish such an abuse,

the defendant must show "prejudice so substantial as to amount to a miscarriage of justice."

*United States v. Friedman*, 854 F.2d 535, 563 (2d Cir. 1988).

      The preference for joint trials is based on a number of considerations. The Supreme Court

has explained:

> Joint trials play a vital role in the criminal justice system . . . . It would impair
> both the efficiency and fairness of the criminal justice system to require . . . that
> prosecutors bring separate proceedings, presenting the same evidence again and
> again, requiring victims and witnesses to repeat the inconvenience (and
> sometimes trauma) of testifying, and randomly favoring the last-tried defendants
> who have the advantage of knowing the prosecution's case beforehand. Joint trials
> generally serve the interests of justice by avoiding inconsistent verdicts and
> enabling more accurate assessment of relative culpability–advantages which
> sometimes operate to the defendant's benefit. Even apart from these tactical
> considerations, joint trials generally serve the interests of justice by avoiding the
> scandal and inequity of inconsistent verdicts.

*Richardson v. Marsh*, 481 U.S. 200, 210 (1987). While Fed. R. Crim. P. 14 does provide a

mechanism for discretionary severance upon a showing of substantial prejudice, a defendant

seeking such a severance bears a heavy burden of persuasion. *See United States v. Tutino*, 883

F.2d 1125, 1130 (2d Cir. 1989) ("To challenge the denial of a severance motion, a defendant

must sustain an extremely difficult burden."); *United States v. Alvarado*, 882 F.2d 645, 655 (2d

Cir. 1989) (overruled on other grounds) ("substantial prejudice does not simply mean a better

chance for acquittal . . . defendant must establish a miscarriage of justice"). *See also United*

*States v. Toner*, 728 F.2d 115, 129 (2d Cir. 1984) ("It is immaterial whether the defendant would have had a better chance of acquittal."); *United States v. Torres*, 901 F.2d 205, 230 (2d Cir. 1990) (overruled on other grounds). As another court put it:

> Judicial economy is the primary factor to be considered by the district court in the exercise of this discretion. Even assuming that a particular defendant is somehow prejudiced by joinder, the issue under Fed. R. Crim. P. 14 is whether the prejudice is sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials. The risks of prejudice attendant in a joint trial are presumptively outweighed by the conservation of time, money, and scarce judicial resources that a joint trial permits.

*United States v. Jimenez*, 824 F. Supp. 351, 366 (S.D.N.Y. 1993) (internal quotation marks and citations omitted).

The standards to be met by a defendant seeking to justify the tremendous burdens separate trials create thus require a showing by the defendant that he would be so prejudiced by the joinder that denial of a constitutionally fair trial would result. *See United States v. Burke*, 700 F.2d 70, 83 (2d Cir. 1983); *United States v. Jimenez*, 824 F. Supp. 351, 367 (S.D.N.Y. 1993). The preference for joint trials is "particularly strong where, as here, the defendants are alleged to have participated in a common plan or scheme." *United States v. Salameh*, 152 F.3d 88, 115 (2d Cir. 1998). In light of this strong preference, "a district court should grant severance *only if* there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *United States v. Harwood*, 998 F.2d 91, 95 (2d Cir. 1993) (quotation marks and first alteration omitted).

In determining whether a defendant has met his or her burden, the Court should balance, among other factors, the cost to the Government of separate trials against the prejudice to the defendant. *See Richardson*, 481 U.S. at 209-10. Consistent with *Zafiro*, the Second Circuit has long held that a defendant is not entitled to severance of his trial from his co-defendant's trial

3

simply because the evidence against the co-defendant is more damaging than the evidence against the defendant. *See, e.g., United States v. Cardascia*, 951 F.2d 474, 483 (2d Cir. 1991); *United States v. Chang An-Lo*, 851 F.2d 547, 556 (2d Cir. 1988); *United States v. Ciambrone*, 787 F.2d 799, 811 (2d Cir. 1986). Nor is severance warranted by "the fact that in a joint trial there will be evidence against one defendant which is not evidence against another defendant." *Hanger v. United States*, 398 F.2d 91, 100 (8th Cir. 1968).

"There is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro*, 506 U.S. at 537. Rule 8(b) of the Federal Rules of Criminal Procedure provides:

> the indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of transactions, constituting an offense or offenses. The defendants may be charged on one or more counts together or separately. All defendants need not be charged in each count.

Fed.R.Crim.P. 8(b). Under the plain text of the rule, it is not necessary that the defendants be charged together in any or all counts of the indictment. Rather, "joinder is proper where two or more persons' criminal acts are 'unified by some substantial identity of facts or participants' or 'arise out of a common plan or scheme.'" *United States v. Cervone,* 907 F.2d 332, 341 (2d Cir. 1990) (citations omitted). The mere allegation of a conspiracy presumptively satisfies Rule 8(b) because the allegation implies that the defendants engaged in the same series of acts or transactions constituting an offense. *See United States v. Friedman*, 854 F.2d 535, 561 (2d Cir. 1988); *United States v. Nerlinger*, 862 F.2d 967, 973 (2d Cir. 1988) ("The established rule is that a non-frivolous conspiracy charge is sufficient to support joinder of the defendants under Fed. R. Crim. P. 8(b)."); *United States v. Castellano*, 610 F. Supp. 1359, 1396 (S.D.N.Y. 1985) (conspiracy charge "presumptively satisfies Rule 8(b)").

4

## Argument

### I.   If Shapiro Does Not Testify at This Trial, He is Unlikely to Testify at a Separate Trial for Peters

#### a.   Shapiro's Testimony is Not "Likely"

In his Motion, Peters writes that Shapiro is "likely" to testify at a separate trial of Peters. Counsel for Shapiro is decidedly less committal, saying only that it is "foreseeable" that Shapiro "might" testify for Peters or that such an outcome is simply "possible."[1] While a host of outcomes are "possible," the facts indicate that it is significantly unlikely that Shapiro would testify at trial for Peters.

The right to a speedy trial is a right that belongs to a defendant and to the public in general. *Zedner v. United States*, 547 U.S. 489, 500-01 (2006). If Shapiro is convicted, any trial of Peters would have to occur while Shapiro was pursuing an appeal – a process that normally takes months, from briefing to argument to decision. It is altogether unlikely that Shapiro would testify at Peters' trial while his own conviction was still under appellate review. Moreover, in *United States v. Litvak,* the Second Circuit recently unanimously held that the type of misrepresentations that form the basis for the charges against Shapiro can be the basis for a securities fraud conviction. Therefore Shapiro would face little hope of relief at the Second Circuit if he were to challenge the sufficiency of the evidence (as did the defendant in *Litvak*),

---

[1] Counsel for Shapiro's full statement on the issue:

> You inquired whether circumstances exist in which our client Ross Shapiro would consider testifying were Peters' trial to be held following a trial of Shapiro. Such circumstances are foreseeable. Once a verdict is received and analyzed, even if Shapiro had not testified at trial, Shapiro might determine that he would testify if called at a trial of Peters. It is also possible that during his own trial, Shapiro might elect to testify based on developments at trial notwithstanding that he had not intended to do so at the outset of trial. In such a circumstance, Shapiro would then likely be prepared to testify at a subsequent trial of Peters.

and further delay would likely ensue if his conviction were affirmed on appeal, and he sought a writ of certiorari from the Supreme Court. This process would be even lengthier than a simple appeal, and the public interest would weigh favorably on holding Peters' trial in the intervening time period. During this period, Shapiro would most likely continue to assert his Fifth Amendment right against self-incrimination, if he had not testified at his own trial. And even if he had testified, he would face the prospect that a successful appeal might only yield a retrial; it is unlikely that Shapiro would willingly expose himself to further cross-examination by the Government if he faced the prospect of yet another trial.

Even if Shapiro were to be acquitted of the criminal charges, it is unlikely he would testify at trial for Peters. Shapiro faces significant other collateral consequences if he testifies. The Securities and Exchange Commission ("SEC") has filed suit against him and any testimony he would give for Peters would have ramifications for his SEC case. The Financial Industry Regulatory Authority ("FINRA") could also use Shapiro's statements against him in its licensing procedure. Finally, there is currently an ongoing criminal investigation into the trading practices of Nomura's commercial mortgage backed securities ("CMBS"). Evidence indicates that a number of the fraudulent tactics used by the RMBS traders were also used by the CMBS traders—traders who Shapiro eventually rose to supervise by June 2012. Shapiro has criminal exposure in that case and any testimony he would give would be relevant to any potential CMBS-related prosecution. In short, unless Shapiro testifies at this trial—in which case Peters would have his testimony available to him—he will likely not testify in any other case against Peters.

### b.  Defendant Peters Misapplies *Gilbert*

Peters writes that *United States v. Gilbert,* 504 F. Supp. 565 (S.D.N.Y. 1980), is

instructive in analyzing his petition. The Government agrees. In *Gilbert,* Judge Haight

highlighted that the main defendant, Gilbert, was charged in 34 counts of a 36-count indictment.

His co-defendants Revson and Cserhat were charged in only 8 and 7 counts, respectively. Judge

Haight determined that co-defendant Revson had a minor role in the conspiracy and,

accordingly, could suffer great prejudice if tried alongside Gilbert. Moreover, Gilbert had

already testified before the SEC and indicated that he had met Revson only twice.

> Both Revson and Cserhat contend that they are peripheral defendants who would
> be prejudiced by a "spillover" from the Government's proof against Gilbert, the
> main architect of the alleged scheme and, by reason of a prior securities fraud
> conviction, other legal proceedings, and a much publicized flight to Brazil, a
> notorious character. Revson and Cserhat argue that much of the Government's
> evidence in a projected six-week trial will implicate only Gilbert, thereby giving
> rise to that "slow but inexorable accumulation of evidence of fraudulent
> practices" by major conspirators which was held to have fatally prejudiced minor
> participants in *United States v. Kelly*, 349 F.2d 720, 759 (2d Cir. 1965), *cert.
> denied*, 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966). In addition, both
> defendants claim that they require Gilbert's exculpatory testimony, foreclosed if
> they are tried together and Gilbert does not take the stand, or purchased at
> intolerable "spillover" cost if Gilbert testifies and is cross-examined on his
> checkered past.

*Gilbert*, 504 F. Supp. at 566.

In this case, Peters is not a "minor" or "peripheral" defendant. As alleged in the

Superseding Indictment, Peters was the senior-most Vice President focusing on prime and Alt-A

loans at Nomura. He, along with Shapiro and Gramins, were the most senior and most well-

compensated traders on the RMBS desk. A cooperating witness in the investigation, Alejandro

Feely, informed the Government that Peters reprimanded him when he attempted to trade

without the deceitful tactics employed by the Nomura desk. When Feely challenged Peters'

authority over him, Shapiro informed Feely that Peters was his superior and that Feely should do as Peters instructed. NOM USAOCT 000598.

Peters' seniority is also reflected in the pay-distribution on the RMBS trading desk. Peters' total compensation in 2010, 2011 and 2012 was $800,000, $1.4 million and $700,000, respectively. Amongst Nomura's RMBS traders, Peters' compensation was exceeded only by the compensation of Shapiro and Gramins. Over that same time period, the next two most compensated members of the RMBS desk after Peters were paid (1) $500,000, $700,000, and $175,000 and (2) $300,000, $800,000, and $400,000.  NSI00089405.

The Second Circuit has stated that "[w]hen 'a continuing, chain-relationship' between all defendants is proven, and 'the evidence against the particular defendants who request severance is not 'so little or so vastly disproportionate' in comparison to that admitted against the remainder of the defendants,' severance is not required." *Gilbert*, 504 F. Supp. at 566 (citing *United States v. Capra*, 501 F.2d 267, 281 (2d Cir. 1974)). In contrast to the facts before the Court in *Gilbert*, the facts in this case fail to support Peters' motion to sever. Unlike the two co-defendants in *Gilbert*, Peters and his co-defendants are charged in all the counts of the Superseding Indictment. And unlike in *Gilbert* where one defendant had met another on only two occasions, Peters, Shapiro and Gramins have worked together for years. Their common employment spanned Lehman Brothers, Barclays and Nomura.

The indictment charges that they engaged in a joint enterprise, whereby they lied to their clients in order to force their customers to pay higher prices in bond purchases or to sell at lower prices in bond sales, and they taught their underling to do the same. Peters was not a minor participant in this endeavor. Severance is accordingly unwarranted.

II.     **The Evidence that Shapiro Could Offer Would Be Cumulative**

    a.   **Peters has Significant Other Sources of the Same Evidence**

    In his motion, Peters posits that Shapiro would testify that he trained Peters in the ways
of trading. In his motion, Peters states that the Government's cooperating "witnesses also
testified that Shapiro's training of Peters included instructing him as to the trading practices at
issue in this case." Doc. 113 at 5. There are four such witnesses who will likely testify at trial for
the Government, and who could be called by the defense to provide such testimony. Moreover,
there are other witnesses at Nomura who could undoubtedly testify that Shapiro trained Peters.
Similarly, there are Nomura's personnel records and organizational charts that could show that
Peters was subordinate to Shapiro.

    b.   **Peters is Notably Vague About What Shapiro's Testimony Would Be**

    Peters euphemistically states in his motion that Shapiro would testify about the trading
practices "at issue in this case," *id.*, without clarifying what those "practices" are. The practices
alleged in the Superseding Indictment are a pattern of lies and deceit. The cooperating witnesses
are expected to testify that they—and the three defendants—intentionally lied to clients in order
to make more money from their clients. The Government will present evidence, as noted in
Peters' motion, that Shapiro trained his subordinates in these practices, including Peters.
However, Peters, in his motion, does not outright admit that he engaged in this conduct.
Moreover, he does not claim—nor does Shapiro admit—that Shapiro lied and deceived clients
about the prices at which bonds were bought or sold. There is no guarantee that Shapiro would
provide this testimony for Peters, whereas Peters already has this testimony from the
Government's other witnesses. Testimony that Shapiro "trained" Peters is irrelevant without an
admission that he trained him to lie. As noted above, such an admission has far reaching

9

consequences for Shapiro, and there is good reason to doubt that he would make such an inculpatory admission in open court.

**III.**      **Shapiro Would Be Subject to Significant Impeachment if He Testified**

If Shapiro were to take the stand and assert a good faith argument on his behalf – or somehow detail one on Peters' behalf – he would open himself up to significant cross-impeachment on cross examination.

Shapiro oversaw a desk of RMBS traders who, as a business practice, engaged in a systematic scheme to deceive their clients by lying to them about the prices of the bonds that they were buying and selling on their behalf. He did this not once, but continually, over the course of many years. He trained his subordinates in the practice and critiqued their execution of it. He eventually took over supervision of a CMBS trading desk that engaged in the same practices. Finally, Shapiro maintained friendships with some of the clients he was deceiving, maintaining a veneer of trust with them, while simultaneously defrauding them. *E.g.* NSI00013949 (Victim to Shapiro, "I hope you realize that nothing he has said or can say will change my opinion of how much I trust diff people at your firm." Shapiro: "Good I appreciate that and just to reiterate, i'm [sic] all ears if we fall off in some way [.] open to constructive criticism always" ). Shapiro's serial and systematic lie-telling will expose him to significant impeachment at any trial, dramatically undermining any potential utility he might have as a potential witness for Peters.

**IV.**      **The Interest of Judicial Economy Weigh Strongly Against a Separate Trial of Peters**

The Government estimates that the trial of all three defendants jointly will take approximately three weeks. A trial of Peters separately will likely be just as long. Proving a case

against Peters separately will require virtually all the same proof as a case against the defendants jointly would require, particularly because Peters is charged in a conspiracy count that includes 24 over acts. Granting Peters' motion would significantly burden the Court, while doing little to aid Peters' case. When jury selection and deliberations are accounted for, separate trials would effectively tie up the Court's calendar for two or more months. This is an unnecessary waste of the Court's time, when Peters and his co-conspirators are charged jointly in all counts of the Superseding Indictment and a single trial can efficiently resolve the charges against all three defendants.

### V.      Peters' Good Faith Argument is Unpersuasive

The thrust of Peters' argument is that Shapiro could prove that Peters believed in good faith that he could deceive his customers—specifically that his deceit lacked criminal intent. This is unpersuasive. Peters was well aware that he was prohibited from engaging in deceptive and manipulative practices and that his clients considered the misrepresentations that Nomura employed to be material to their trades.

Peters received his Series Seven certification from the Financial Industry Regulatory Authority. Series Seven certifications require training in the Securities and Exchange Act of 1934 and the prohibition against employing manipulative and deceptive practices. Peters was well aware from his training that he was not permitted to engage in deceptive and manipulative practices toward his clients.

Moreover, in February 2012, Peters was involved in the sale of a bond, WAMU 2007-HY1 5A1, which was purchased by Nomura on February 7 and sold to Victim 3 on February 8. Victim 3 subsequently learned that Nomura had purchased the bond on the seventh and not on the eighth, as he had been led to believe. Victim 3 immediately complained to Nomura, a

complaint that was widely discussed on the RMBS desk. Victim 3 initially threatened to put Nomura "in the box" – that is, refuse to trade with Nomura. Nomura executives eventually appeased Victim 3 by crediting them all profit that Nomura had made on the bond.

Peters' knowledge of the importance of these facts to his clients is evidenced by the actions of subordinate RMBS traders. For example, his subordinate, Trader 1, spoke to another Nomura employee about avoiding "getting caught" in a lie by one of their clients**.** Superseding Indictment ¶ 34(o). Another colleague asked whether a trade was exclusive to Nomura because he had "marked up 2 pts," ostensibly not wanting to get caught by their client. *Id.* ¶ 34(p). This type of subterfuge was necessary only because the traders were not, in fact, acting in good faith; they knew that their lies affected the decision-making process of their clients, and they were attempting to prevent their victims from learning the truth.

Additionally, in January 2013, Peters learned of the Indictment filed against Jesse Litvak alleging conduct similar to the misrepresentations Peters and his co-defendants were making in violation of 15 U.S.C. § 78j(b). The Government's cooperating witnesses all indicate that Litvak's arrest was widely discussed on Nomura's RMBS desk and throughout the industry. Peters, however, continued his deceptive practices, notwithstanding the fact that the Government was bringing criminal charges against Litvak for similar fraudulent conduct. *Id.* ¶ 34(t). Shapiro's testimony would be unable to save Peters from the fact that he continued to make misrepresentations after Litvak's arrest, seriously undermining Peters' good faith defense.

### Conclusion

It is unlikely that Shapiro would testify at a separate trial against Peters and, if he did, his testimony would be cumulative and subject to significant impeachment. The interests of judicial

economy and the unreliability of the (vague) testimony that Peters argues Shapiro could provide

weigh heavily against severance. Peters has failed to meet the heavy burden required for

severance.

WHEREFORE, the Government respectfully requests that the Court deny Defendant

Peters' Motion for Severance.

Respectfully submitted,

DEIRDRE M. DALY
ACTING UNITED STATES ATTORNEY

_____

LIAM BRENNAN
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NO. CT27924

HEATHER CHERRY
ASSTANT UNITED STATES ATTORNEY

U.S. Attorney's Office
157 Church Street
New Haven, CT 06510
(203) 821-3835

13

**<u>Certificate of Service</u>**

I hereby certify that on February 26, 2016, a copy of the foregoing was filed on the Court's ECF electronic filing system from which counsel for Ross Shapiro, Michael Gramins, and Tyler Peters can receive a copy.

_____/s/_____
LIAM BRENNAN
ASSISTANT UNITED STATES ATTORNEY