Case 3:15-cr-00155-RNC   Document 172-1   Filed 07/22/16   Page 1 of 10

EXHIBIT 1



Marc L. Mukasey
Tel 212.801.9200
Fax 212.801.6400
mukaseym@gtlaw.com

June 13, 2016

BY EXPRESS MAIL AND EMAIL

Liam Brennan, Esq.
Heather L. Cherry, Esq.
Assistant United States Attorneys
United States Attorney's Office
District of Connecticut
157 Church Street, 25th Floor
New Haven, CT 06510

Re: *United States v. Shapiro, et al.*, No. 3:15-CR-00155 (RNC) (D. Conn.)

Dear Counsel:

Defendants Ross Shapiro, Michael Gramins, and Tyler Peters provide this letter to notify the government, pursuant to Federal Rule of Criminal Procedure 16(b)(1)(C)(i), that they may call the expert witnesses described herein if a defense case is presented. Pursuant to our agreement, Defendants intend to disclose one additional potential expert on or before June 27, 2016, and it is anticipated that the *in limine* motion schedule, as pertaining to experts, shall be adjusted accordingly, as agreed.

This summary of testimony is provided without prejudice to the Defendants' rights to amend, supplement, or otherwise modify this disclosure depending on, among other things, whether the government designates any experts in its case in chief, the nature and scope of any such experts' testimony and opinions, the testimony and exhibits to be offered by the government in its case in chief, and/or the receipt of documents or other evidence from the government or third parties prior to trial. Defendants expressly reserve the right to supplement this disclosure with exhibits and demonstratives, including, without limitation, those reflecting the fair market value and profitability of any trades that will be the subject of proof by the government in its case in chief.

1.  Frank J. Fabozzi, Ph.D.

    a.  Qualifications

    Frank J. Fabozzi has over 40 years of industry and academic experience, has authored hundreds of articles and other scholarly works, and is a widely recognized authority in the areas of structured finance, fixed-income securities, and portfolio management. He is Professor of Finance at EDHEC Business School, and Senior Scientific Adviser and co-head of the fixed-income

EXHIBIT 1

research program at the EDHEC-Risk Institute.[1]  Dr. Fabozzi is also a Teaching Fellow in Executive Programs at the Yale School of Management.

In the Spring 2016 semester, he was a visiting professor in the Department of Operations Research and Financial Engineering at Princeton University where he taught a graduate course in quantitative asset management. From 2014 to 2015, Dr. Fabozzi was Visiting Fellow for the Department of Operations Research and Financial Engineering at Princeton University, and for the 2013-2014 academic year was the James Wei Visiting Professor in Entrepreneurship in Princeton's School of Engineering and Applied Science.  Prior to that, from 1994 through 2011, Dr. Fabozzi held multiple professorial positions in finance at the Yale University School of Management.  From July 2003 to June 2011, Dr. Fabozzi served on the Advisory Council for the Department of Operations Research and Financial Engineering at Princeton University.  From 1986 to1992, he was a Visiting Professor of Finance in the MIT Sloan School of Management.  In addition, Dr. Fabozzi has held professorships in finance and economics at Queens College (CUNY), Lafayette College, and Fordham University.

Dr. Fabozzi is the editor of the *Journal of Portfolio Management* and an associate editor of several other journals related to structured finance and the trading and valuation of fixed-income securities.  He is the editor of *The Handbook of Fixed Income Securities*, a definitive and trusted resource in the world of fixed-income investing, and *The Handbook of Mortgage-Backed Securities*.

Dr. Fabozzi frequently consults for and presents on topics in fixed income securities and portfolio management to government agencies.  This has included, among others, the U.S. Securities and Exchange Commission, U.S. Department of Justice, Federal Home Loan Bank of Atlanta, Federal Reserve Board, Federal Home Loan Bank of New York, as well as major financial institutions.  Dr. Fabozzi has been a trustee for a complex of funds sponsored by BlackRock Inc. (the closed-end funds) since its inception in 1988.  He also served for two years as a trustee for the BlackRock Inc. equity-liquidity funds complex.  He was previously a trustee for the Guardian family of open-end funds and variable annuities.

In 2002, Dr. Fabozzi was inducted into the Fixed Income Analysts Society Hall of Fame, which recognizes lifetime achievements of outstanding practitioners in the advancement of the analysis of fixed-income securities and portfolios.  In 2015, Dr. Fabozzi was awarded the James R. Vertin Award by the CFA Institute, in acknowledgement of his contributions to the profession of investment management.  In 2007, he received the C. Stewart Sheppard Award

---

[1] EDHEC is a French institution of higher learning, known as a "grande ecole" with campuses in France, London and Singapore.

from the CFA Institute for his leadership and education efforts in the investment management profession.

Dr. Fabozzi graduated from City College of New York with a B.A. and M.A. in Economics in 1970. Dr. Fabozzi obtained his doctorate in economics from the City University of New York in 1972. He earned the designation of Chartered Financial Analyst in 1977 and Certified Public Accountant in 1982. Dr. Fabozzi received an Honorary Doctorate of Humane Letter from Nova Southeastern University in June 1994.

b. <u>Summary of Opinions and Bases:</u>  It is anticipated that Dr. Fabozzi, if called as a witness, would testify, all based on his education, training and experience, as to his opinion on the following issues:

   i. <u>Explanation of RMBS</u>.  How RMBS are structured, how they perform, and how they are evaluated as investments, including specifically during the time period covered by the Superseding Indictment, when RMBS were viewed as distressed assets. What a non-agency RMBS is and how its expected value to an investor is driven by assumptions about the underlying mortgage pool and other factors such as default rates, recovery rates, prepayment rates, housing market conditions, and geographical factors.

   ii. <u>The RMBS Market.</u>  The structure and unique features of the non-agency RMBS market, and, in particular, the market as it existed during the time period relevant to the Superseding Indictment. The market was and remains opaque and illiquid, and during periods of market stress, such as the period relevant to the indictment, investors executed non-agency RMBS transactions within a wide price range, and expected non-agency RMBS transactions to be executed within a wide price range.

   iii. The non-agency RMBS market is dominated by sophisticated institutional investors, such as hedge funds and large asset managers, who invest heavily in research, modeling, and other kinds of qualitative and quantitative analytics. A reasonable investor in this market would conduct rigorous, independent research, analysis, and due diligence, including making a determination of the price range in which the investor would or would not buy RMBS, before entering the market to buy or sell non-agency RMBS.

   iv. <u>Relationship between Investors and Traders</u>. The nature of the relationship between traders and investors in the non-agency RMBS market, the difference between agency and principal trades, the rules and conventions governing these respective trades, and the manner in which dealers are compensated for their trading activities. Dealers

3

|     |     |
| --- | --- |
| | have different obligations depending on whether they are transacting with Qualified Institutional Buyers ("QIBs") or non-QIBs. |
| v. | In the RMBS market, trades are typically done on a principal-to-principal basis, and constitute arms-length transactions between sophisticated parties whose economic interests are in direct conflict with one another.  Dealers are exposed to risk in this market in every kind of RMBS trading scenario, whether they are acting as a proprietary buyer or seller in a proposed RMBS transaction, or acting as a dealer between a counterparty buyer and seller in a proposed RMBS transaction. |
| vi. | The dealer owes no duty of "best execution" to counterparties in principal-to-principal trades in the non-agency RMBS market.  The dealer has no obligation to disclose the dealer's acquisition price or profit in principal-to-principal trades of non-agency RMBS.  In principal-to-principal trades, the dealer's profit on a trade consists of the difference between the prices at which the firm purchases and sells a bond, which prices incorporate any mark-up on the bond in issue.  There are no separate commissions.  Certain of the trade confirmations relating to the charged offenses illustrate Dr. Fabozzi's opinions regarding the principal-principal nature of these trades. |
| vii. | <u>Analysis of Counterparty Models</u>.  The complexity of certain models used by buy-side firms (and obtained by Defendants through discovery), their importance to investors, the assumptions used in the models, the variance of such assumptions, and the relative sensitivity of the models to those assumptions. |
| viii. | <u>Process that Non-Agency RMBS Investors Use to Make Investment Decisions</u>.  The manner in which sophisticated investors in the non-agency RMBS market make decisions about whether to buy, sell, or hold a bond, including the role of proprietary modeling in the decision-making process, as well as other relevant market information, and how reasonable investors go about acquiring, compiling, evaluating and verifying such information.  A reasonable investor, such as the sophisticated counterparties identified in the Superseding Indictment, would give little, if any, weight to statements made by a dealer in the course of negotiations, including the dealer's representations about the price at which the dealer previously purchased the RMBS, whether the RMBS was being sold from the dealer's inventory, or whether the dealer was acting as an intermediary.  It would be a breach of the counterparties' duties to their own investors to rely on such representations in making a decision whether to purchase an RMBS and, if so, at what price.  As an economic matter, the dealer profit as a |

4

       principal on a given trade has no effect on the future cash flows from the bond.

   ix.      The market roles of investors and dealers, what information they typically exchange, and how dealers are compensated.  The typical dynamics of negotiations in the non-agency RMBS space and, in particular, that reasonable investors treat unverifiable information with skepticism.  The counterparty's unverified acquisition price would not affect a reasonable investor's decision about whether to purchase a non-agency RMBS and at what price.

   x.      <u>Range of Prices Paid for Non-Agency RMBS.</u>  Since non-agency RMBS were viewed as distressed assets during the time period covered by the Superseding Indictment, reasonable investors were willing to pay, and did pay, a range of prices for the same RMBS during the same periods of time.  Dr. Fabozzi may further explain, based on his review of the trade confirmations obtained by Defendants during discovery, the amount of profit or loss realized by the counterparties identified in the Superseding Indictment through their prior or subsequent trades of the RMBS they bought from or sold to Nomura.

2.   Andrew Favret

   a.   <u>Qualifications</u>

      Since September 2015, Andrew Favret has been a Managing Director of Oyster Consulting, LLC, a firm located in Richmond, Virginia.  Oyster provides comprehensive audit, compliance, operations, technology, trading and strategic management consulting to financial services firms.

      Mr. Favret has over 25 years of experience in the financial services industry.  The bulk of his experience was acquired during his employment with the Financial Industry Regulatory Authority (FINRA) (formerly known as the National Association of Securities Dealers or NASD).  FINRA is the largest self-regulatory organization for the securities industry in the United States, and is responsible for the regulation of broker-dealers and their associated persons.  At FINRA, Mr. Favret was employed as an Enforcement attorney in the New Orleans district office from 1991 until 2014, and from 1998 until 2012, he was Regional Chief Counsel, responsible for the supervision of Enforcement personnel in the New Orleans, Dallas, Atlanta and Boca Raton offices.

      More specifically, as Regional Chief Counsel, Mr. Favret was responsible for the review and approval of all settlements resulting from Enforcement actions, and all complaints authorized against registered firms and their associated persons.  These disciplinary actions arose out of investigations of sales practice and trading practices abuses, and involved a wide range of violations of

EXHIBIT 1

FINRA rules, as well as SEC and Municipal Securities Rulemaking Board (MSRB) rules. Enforcement cases would routinely require an analysis of whether the underlying conduct warranted charges of fraud, under either SEC or FINRA rules, against a firm or an individual associated with a firm.

During his employment at FINRA, Mr. Favret also had significant involvement in the development of new rules and policies, particularly with respect to variable annuities, fixed income products, day trading and structured products. He was a frequent speaker on these and other topics at industry conferences.

Mr. Favret has a Bachelor of Arts degree from the Catholic University of America, a Master of Arts degree from St. John's College and a Juris Doctor from the Catholic University of America. He retired from FINRA in January 2014. Prior to his employment with FINRA, Mr. Favret was an associate with the Dechert law firm in Washington, D.C., in the firm's securities and banking practices. He has been an active member of the District of Columbia bar since 1987.

b. <u>Summary of Opinions and Bases:</u>  It is anticipated that Mr. Favret, if called as a witness, would testify, all based on his education, training and experience, as to his opinion on the following issues:

   i. <u>Securities Industry Terminology and Practices</u>: Concerning certain terms relevant to RMBS trading, and related industry practices cited in the Superseding Indictment:

      1. A broker-dealer is a securities firm that is in the business of buying and selling securities. "Broker" refers to a broker-dealer effecting securities transactions, in an agency capacity for others. When acting as agent, broker-dealers charge a commission to their customers. "Dealer" refers to a broker-dealer acting as "principal," which means buying securities for and selling securities from its own account. When acting as a principal, in fixed-income markets, a broker-dealer is compensated through mark-ups or mark-downs to the price of the security itself. No commission is charged when a broker-dealer acts as principal. In the institutional fixed income market, principal trades are viewed as arms-length transactions between counterparties whose interests diverge and who owe no fiduciary duties to each other. That view is consistent with the FINRA mark-up rule that applies to non-investment grade fixed income instruments that trade between dealers and qualified institutional buyers ("QIBs").

      2. Furthermore, when acting as a principal and negotiating with QIBs over the purchase of RMBS, a dealer has no customer

6

      responsibilities to the QIB regarding price. Therefore, the dealer has no obligation to bid an amount conveyed by a potential buyer to the seller and there is no FINRA rule to the contrary.

  ii. <u>The Superseding Indictment's references to "commissions" are misplaced</u>. Nomura did not charge commissions on any of the trades referenced in the Superseding Indictment. The term "commission" applies when a broker-dealer is acting in the capacity of agent and is not relevant in the fixed-income market (which includes RMBS). Relevant trade tickets and confirmations indicate Nomura, acting as principal and trading for its own account, earned compensation by selling RMBS bonds to counterparties at prices higher than its acquisition costs, and Nomura did not receive any other remuneration or charge any other fee for the execution of these principal transactions.

  iii. <u>The terms "all-in" and "on-top" referenced in the Superseding Indictment are not terms that are derived from, or recognized by, securities industry regulation</u>. Strictly speaking, all trades with a broker-dealer acting as principal are "all in" because when an agreement is reached, the transaction is always memorialized on the confirmation with a single price to the customer. There are no other separate fees or charges for the transaction. The terms "all-in" and "on-top" are jargon used by market participants in RMBS markets as part of price negotiations.

      1. <u>Trade confirmations reflect this "all in" understanding</u>. As governed by SEC Rule 10b-10, in the context of fixed income transactions, a broker-dealer, when acting in the capacity of principal on a fixed income transaction, is under no duty to disclose its cost or the amount of mark-up or mark-down that it charges on the purchase or sale of a bond. Consistent with applicable disclosure requirements, when acting as principal, dealers in debt securities are under no obligation to disclose their costs or mark-ups or mark-downs.

      2. Buy-side bond market participants such as asset managers, investment funds, and hedge funds do not regard disclosure of a dealer's costs or profits as important; rather institutional bond buyers focus on total price and yield, which necessarily take into account any embedded profit in the price quoted by a dealer; these buy-side firms are equipped to evaluate the fairness of a price and negotiate accordingly. Attempts on the regulatory level to require dealers to disclose mark-ups and require greater price transparency have been opposed by both the "sell side" and the "buy side."

7

EXHIBIT 1

3. The Superseding Indictment's description of what purports to be "on-top commission" does not comport with industry disclosure requirements and fixed income trading practices. Since a broker-dealer typically does not disclose its acquisition costs (*i.e.*, the "price the broker-dealer paid to the seller") and does not quote prices in relation to its acquisition costs, the customer typically has no way of knowing how much additional compensation might be "on top" of a broker-dealer's cost. The applicable regulations do not require dealers to disclose this information. Rather, a more typical negotiation would involve a buyer's agreement to pay some price greater than its bid. It is incorrect to assume that a buyer's bid depends upon, or is the equivalent of, a broker-dealer's acquisition cost.

4. "Best execution" is a term that encompasses a number of components including, among other things, speed of execution, size of execution, market depth, commitment of capital, recent order flow, confidentiality/anonymity, certainty of execution, and price. Institutional market participants routinely choose to trade with dealers that offer the best execution in terms of the size of the negotiated order without regard to achieving the lowest price at which a particular bond may trade at a given time.

5. Broker-dealers owe a duty of "best execution" to "customers" (as "customers" is defined in the applicable FINRA regulations). However, the duty of best execution is inapplicable to the situation in which a broker-dealer is transacting with a QIB in non-investment grade bonds. The duty of best execution is subsumed by the QIB exemption for non-investment grade bonds, as set forth in FINRA Rule 2121.02, as that exception in effect puts broker-dealers and their QIB customers in the role of arms-length counter-parties concerning the pricing of non-investment grade bonds. Nomura and the defendants had no duty to offer better prices to their QIB counter-parties, or otherwise assist those counter-parties in executing at a better price. Rather, they were free to negotiate any price with a QIB, irrespective of the profit earned on the trade. The point of the QIB exemption is that the sophistication of the QIB in negotiating the transaction is the sole check on the price of the transaction. By definition, "the QIB has the capacity to evaluate independently the investment risk and in fact is exercising independent judgment in deciding to enter into the transaction." FINRA Rule 2121.02(b)(9).

6. Furthermore, in some segments of the bond market, including the RMBS market in 2009 through 2013, there was no consolidated or listed market that was available to market participants. There were no alternative exchanges or electronic trading platforms. RMBS markets are negotiated, not order driven, lack robust pre-trade price discovery mechanisms, and lack electronic access to firm quotes. Accordingly, the assessment of best execution in real time, let alone after the fact, is a much different process for an RMBS dealer than for an equities dealer. In the stock market, where the markets are transparent, the duty of best execution is more straightforward and easier to apply. With respect to equity brokerage, a brokerage firm has an obligation to review its executions to ensure that it is routing its order flow to the markets and other trading venues where it has the highest likelihood of achieving the best price. Thus, instead of simply filling an order at the first available quoted price, it must check around to other markets and route the order accordingly. An RMBS dealer, by contrast, does not have the same pre-trade price quote discovery that an equities dealer has and therefore cannot conduct a similar review of post-trade executions to determine if, in fact, best execution was achieved. In any event, the RMBS dealer has no obligation to conduct such a review.

7. From the QIB buy-side perspective, there is a different duty of best execution: that of the investment manager to his clients to get the most favorable execution price for his client under the circumstances. This is typically done by comparing quotes from various dealers and negotiating with one or more dealers. Again, price is not the sole consideration. Speed, size, certainty, and other factors with respect to a transaction of institutional size may also be relevant, as well as relationships that an investment manager may have with dealers that may benefit its client.

iv. A buy-side account is not required to transact with a particular dealer. Nothing that the defendants did prevented any buyer from seeking price and other information from other dealers. Given the fiduciary duties these sophisticated buy-side professional investment firms owed their clients, which are assumed to have been satisfied, there is nothing that the defendants did that caused their counter-parties to transact with Nomura at prices higher than the prices available from other firms unless it was in the interest of these buy-side firms to do so. If lower prices were available, the buy-side accounts likely would have traded away from Nomura. The fact that the buy-side account chose to transact with Nomura indicates that Nomura in all likelihood had the

EXHIBIT 1

    best price (or only price) for an RMBS of the relevant size in the market at the time.

v. From the buy-side account's perspective, one could only say that the price component of a trade execution was "poor" in terms of a comparison to what was available from other broker-dealers. If the price negotiated was the only price available in the market there would be no basis to conclude that the execution was "poor" and that the price should have been better.

vi. <u>Trade Specific Opinions</u>: Concerning each of Nomura's counterparties to the charged trades, the relevant firm is a QIB.

    Sincerely,

    GREENBERG TRAURIG LLP

    By: /s/ Marc L. Mukasey
        Marc L. Mukasey
        *Attorneys for Michael Gramins*

    PETRILLO KLEIN & BOXER LLP

    By: /s/ Guy Petrillo
        Guy Petrillo
        *Attorneys for Ross Shapiro*

    ALSTON & BIRD LLP

    By: /s/ Brett D. Jaffe
        Brett D. Jaffe
        *Attorneys for Tyler Peters*