EXHIBIT 2

# PETRILLO KLEIN & BOXER LLP

655 Third Avenue
22nd Floor
New York, NY 10017
Telephone: (212) 370-0330
www.pkbllp.com

Guy Petrillo
Direct Dial: (212) 370-0331
Cell:      (646) 385-1479
gpetrillo@pkbllp.com

June 27, 2016

BY E-MAIL

Liam Brennan, Esq.
Assistant United States Attorney
Heather Cherry
Assistant United States Attorney
Office of the U.S. Attorney
  for the District of Connecticut
Connecticut Financial Center
157 Church Street, 25th Floor
New Haven, CT 06510

Re:    *United States v. Shapiro et al.,*
Case No. 15-CR-00155 (RNC)

Dear AUSAs Brennan and Cherry:

Pursuant to Fed.R.Crim.P. 16(b)(1)(C)(i), the defendants provide notice that, should there be a defense case, they may call the below-listed expert witnesses.  Defendants reserve all rights, including the right to update, amend and/or supplement the summaries of testimony set forth below based on further developments, including additional documents received or Court orders. In particular, we note that we are awaiting the production of trade data and model documentation and that, on the basis of such data, we may offer amended opinion summaries that the trades in issue were highly profitable and done at fair market value.

Brian P. Vahey, Jr.  Mr. Vahey is a Director with Berkeley Research Group, LLC.

I.    Education:

- Mr. Vahey earned a Bachelor of Science in Aerospace Engineering at the University of Notre Dame, and a degree in Nuclear Engineering at the Naval Nuclear Power School.

- Mr. Vahey is a Chartered Financial Analyst, a member of the CFA Institute, and has held a Series 7 License.

AUSA Liam Brennan
AUSA Heather Cherry
June 27, 2016
Page 2

II.    Experience:

Following seven years of service as a Lieutenant Commander in the U.S. Navy submarine force, Mr. Vahey held the following positions:

- From 1999 to 2006, Mr. Vahey was a Portfolio Manager and Trader for GE Asset Management.  In this position, he co-managed a $30 billion structured product portfolio, and traded fixed and floating ABS, CMBS and MBS for multiple insurance, total return and CDO portfolios.  He also helped lead GEAM's initiation of a CDO platform including in the issuance of its first CDO, a $400 million mezzanine issuance.  At GEAM, he oversaw credit underwriting of securities, worked with underwriters on CDO structure and economics, conducted trading of cash and synthetic securities and hedges and worked on the expansion of the CDO portfolio through the issuance of an additional $1.6 billion of high grade and mezzanine CDOs.  He also collaborated with a total return portfolio management team on strategic and tactical trading decisions to create alpha for the portfolio.  In addition, he led the development of a structured product credit research team, which involved, among other things, conducting originator, servicer, issuer and conduit due diligence for all securities (including ABS, RMBS and CMBS)  and encompassed issuer, originator and servicer strength, prospectus review and deal underwriting, developing pre-payment and default models, monthly surveillance of the securities portfolio and assessment of the securitization process including loan pricing and valuation.

- During the same period, as a portfolio manager, Mr. Vahey, on behalf of GE Financial Assurance, directed the composition of $100 billion in fixed income insurance portfolios backing a variety of insurance liabilities.  In this role, he coordinated and managed all variables affecting the portfolio and directed investments in numerous asset classes, including structured products such as ABS, RMBS and CMBS; created a methodology for portfolio pricing  versus a liability stream; introduced high yield CMBS and levered loans as client investment options; and developed and executed an industry first by using a forward-starting swap strategy to create synthetic duration in an $8.0 billion long-term care insurance portfolio.

- From 2006 to 2008, Mr. Vahey was a Trader with King Street Capital.  At King Street, he conducted all strategy, underwriting and trading for the structured product portfolio.   He initiated the MBS, ABS and CMBS strategy for a $9.0 billion portfolio hedge fund.  He also developed loan-level valuation models for subprime and Alt-A loans to evaluate investments.   Mr. Vahey traded and managed up to approximately $1 billion in exposure in ABX, CMBX, single name CDS for subprime bonds and CDOs, residual/equity pieces of mortgage securities, CDO equity, aircraft bonds,

2

AUSA Liam Brennan
AUSA Heather Cherry
June 27, 2016
Page 3

> distressed home equity ABS, and conducted financial analysis, including in-depth business model and balance sheet strength on several firms in the financial sector, including REITs, thrifts, monolines and mortgage insurers.
>
> A copy of Mr. Vahey's curriculum vitae is attached.

III.   Summary of Expert Opinion: If called as an expert witness in a defense case, Mr. Vahey would be prepared to testify as summarized below.  All of Mr. Vahey's opinions are based on his education, training and experience in the fixed income and RMBS markets.

    A.   Non-Agency RMBS Trading during the relevant period (2009-2013): In the relevant period, the non-agency RMBS market was opaque, illiquid and distressed.  As distressed assets, non-agency RMBS traded at large discounts to par, and trading exhibited wide bid-ask prices.  The non-agency RMBS market was dominated by financially sophisticated institutional investors, such as asset management firms and hedge funds ("investment firms" or "investors"), which committed substantial resources to the research and analysis of non-agency RMBS.  These investors were routinely staffed with highly educated and trained analytic professionals, including with advanced graduate degrees in fields such as mathematics, finance, science and engineering.

        In the relevant period, these sophisticated investors came to view the securities as investment opportunities with the potential for sizeable appreciation.  As such, demand for non-agency RMBS generally increased during the period.  This increase in demand tended to decrease price sensitivity in the competitive market to acquire non-agency RMBS, and reasonable investors did not focus on a single price that they would pay for a non-agency RMBS but rather a threshold  price that would allow them to achieve a target yield or return.  In addition, reasonable investors when determining to trade at a given price level would also consider other factors, such as, for example, liquidity, ease of execution, confidentiality of execution, and the size of the trade.

        Whether a specific non-agency RMBS was an attractive investment opportunity depended on the unique characteristics of the bond and the assumptions the reasonable investors made about both the bond and market.  Reasonable investors would consider among other things (i) cash flow data for recent periods including information concerning prepayments, defaults, recoveries, and loan modifications; (ii) characteristics of the underlying mortgages, borrowers, lenders and servicers (including mortgage type, loan sizes, loan purposes, geographic distribution of loans, home price information, loan-to-value ratios,

AUSA Liam Brennan
AUSA Heather Cherry
June 27, 2016
Page 4

mortgage coupons, mortgage structure and private mortgage insurance, if any); and (iii) characteristics of the security, including size of issuance, coupon, security structure, credit and external enhancements, and current factor.

Reasonable investors would also conduct rigorous, independent analysis and modeling using INTEX and/or a Bloomberg valuation tool or a customized proprietary version thereof. Such analytic tools generate cash-flows and yields based on multiple assumptions, allowing the investors to determine the price range at which they would be willing to transact, given their yield objective. Mr. Vahey will explain that the reasonable investor's model of the potential yield of a subject non-agency RMBS is sensitive to changes in the model's core assumptions, including prepayments, defaults, and loss severity, and that changes in these assumptions have more influence on yield than minor changes in trade price. Reasonable investors would have viewed minor price differences within the range of prices corresponding to the investor's target yield as unimportant. Furthermore, the seller's historic acquisition price of a non-agency RMBS does not affect the future cash flows to the subsequent purchaser of the security, thus rendering any historic acquisition price insignificant in the value analysis.

In addition, reasonable investors, who possessed a sophisticated view of the market, considered a number of factors in evaluating non-agency RMBS pricing, including transaction prices and marks to market of identical and comparable securities (to the extent known), bids received with respect to non-agency RMBS that they offered for sale, lists of non-agency RMBS offered for sale, the status of their investment portfolio, industry research, general market trends, and communications with other dealers and market participants.

In their modeling and analysis, reasonable investors used information that they could confirm and gave little weight to information that was unverifiable. Statements made by traders in negotiating to buy or sell non-agency RMBS, to the extent they could not be verified, were not useful and were not relied upon by reasonable investors in their analysis. Moreover, the mark-up achieved by a dealer in trading a non-agency RMBS was also not used in the valuation analysis because it did not bear on, or factor into, (a) the security analysis that was the subject of the investor's analytical value modeling, or (b) the investor's investment thesis; that is, the factors that informed the investor's professional opinion of the potential investment.

EXHIBIT 2

AUSA Liam Brennan
AUSA Heather Cherry
June 27, 2016
Page 5

B.    <u>Analysis of Counter-Party Models Used by Investors in the Relevant
Period of the Non-Agency RMBS Market and Subject Trades</u>: Mr. Vahey
will evaluate and testify as to investor models received through discovery
in this case, and whether they are versions of the above-described
modeling tools; whether the models, in content, are consistent with Mr.
Vahey's experience in the non-agency RMBS market; the types of
assumptions made in the models, and how they impact the output of the
models; and the sensitivity of the models' analysis to changes in the these
assumptions.   Mr. Vahey, in view of this assessment, would apply the
above-summarized opinions to the trades that are the subject of the
Superseding Indictment and the government's disclosure of June 13, 2016
("Subject Trades").

C.    <u>Investor-Trader Relationship</u>:

1.    Trades in the non-agency RMBS market are principal-to-principal
trades.  They are arms-length transactions between sophisticated
institutions whose economic interests are not aligned.  The dealer also
has no duty to disclose its acquisition price or mark-up on a trade.  The
dealer's profit (or loss) is the difference between the price at which it
purchased the non-agency RMBS and the price at which it sold the
security.  There are no commissions associated with non-agency
RMBS principal-to principal trades.  The trade confirmations relating
to the Subject Trades – NSI00007174, NSI00017608, NSI00017609,
NSI00007166 , NSI00007178, NSI00007179 , NSI00017803,
NSI00007864, NSI00007865, NSI00007866, NSI00015428,
NSI00015432, NSI00007981,  NSI00007982, NSI00013408,
NSI00013411, NSI00013413, NSI00021872, NSI00021871,
NSISEC00088646 , NSI00011104, NSI00011101,
NSIUSAO00000153, NSIUSAO00000206, NSIUSAO00000210,
NSI00024626, NSI00024631, NSI00029424, NSI00029423,
NSISEC00090965, NSISEC00090973, NSI00029425,
NSISEC00090974, NSI00032006, NSI00032009, NSISEC00104729,
NSISEC00104716, NSISEC00104739 , NSISEC00104739,
NSISEC00104623, NSISEC00104626, NSISEC00104625,
NSI00009984, NSI00010027, NSI00010117, NSI00010160,
NSI00031087, NSI00031094, NSI00035206, NSI00035208,
NSI00012987, NSI00012983, NSI00010848, NSI00010776,
NSI00010777, NSI00010778, NSI00013323, NSI00013330 – confirm
that the relevant trades were principal-to-principal trades, that the
dealer had no obligation to disclose a markup or markdown, and that
the trades were all effectuated at a single, all-in price.

EXHIBIT 2

AUSA Liam Brennan
AUSA Heather Cherry
June 27, 2016
Page 6

2. The determination by an institutional investor to trade on a repeat basis with a non-agency RMBS dealer is influenced by a number of factors, including the record of that dealer in demonstrating access to sources of non-agency RMBS in which the investor held investment interest; the ability of the dealer to execute trades; and price. In periods of greater demand for an asset such as non-agency RMBs, investors may place less emphasis on price and more emphasis on access of the dealer to the product and trade execution. Institutional investors in the non-agency RMBS market engaged in repeat transactions with a specific dealer when that dealer repeatedly offered an attractive combination of all of these elements.

3. Institutional investors in the non-agency RMBS market gave little or no weight to unverified information communicated by non-agency RMBS traders and salespersons and did not view these communications as important to their investment decisions to transact in non-agency RMBS. A counter-party's non-verified purchase price would not affect a reasonable investor's decision about whether to purchase that security from that counter-party and at what price. Such an approach was prudent, because (i) investment decisions were independently and reasonably determined when based on investor analysis using verified information, (ii) dealers and investors had opposing economic interests, and (iii) information disclosed in dealer-investor communications could be incomplete, inaccurate or false. As a result, a reasonable investor would not place importance on unverified, limited information such as the dealer's acquisition price or whether the non-agency RMBS had been held by the dealer in inventory, communicated to the investor by a dealer in a price negotiation to buy or sell a non-agency RMBS.

D. Charged Non-Agency RMBS Trades Executed at Fair Value: Subject to ongoing analysis, as additional documents and information are received, Mr. Vahey will assess whether the Subject Trades were executed at fair value.

As an initial matter, the fact that dealers and sophisticated institutional investors in non-agency RMBS transacted at arm's length to arrive at the prices at which the subject non-agency RMBs trades were executed itself corroborates that the execution prices were within the range of fair value at the time of each transaction. The institutional investors regularly dealt and communicated with multiple dealers, both major and regional, and routinely surveyed these dealers for pricing and market information. The multiple dealers were sources of pricing and marking information concerning the specific non-agency RMBS in issue as well as comparable non-agency RMBS. Additionally, institutional investors, through dealers, offered non-agency RMBS through competitive, market-wide bidding

AUSA Liam Brennan
AUSA Heather Cherry
June 27, 2016
Page 7

procedures known as "BWICs" or "bids wanted in competition." The results of these bidding contests provided information to institutional investors concerning the prevailing market prices for specific non-agency RMBS and comparable securities. The analytic valuation models used by the investors also provided a basis to determine fair value.

For their part, the dealers learned non-agency RMBS price information from multiple counter-parties in transactions, including purchases and sales of securities for the dealer's book, and through discussions about trades in the market. They also observed bids they received from accounts in BWICs, and cover bids from counterparties running BWICs.

In these conditions, the readiness of the parties, each with access to multiple sources of information, to trade the subject securities at the subject execution prices confirms fair value pricing. The fact that the same non-agency RMBS traded at different prices, often at wide spreads, during the relevant period, reflects that different investors, based on their own independent value analyses and market views, would determine value based on varying assumptions, and would further underscore that the Subject Trades were consummated at fair value.

Mr. Vahey will also evaluate the models received in discovery to assess the reasonableness of the models, their assumptions and output. For example, in the case of the models received in discovery labeled ELL001447 to ELL001450, HIMCO-PT-00000004, HIMCO-PT-00000009, and HIMCO-PT-00000010, based on Mr. Vahey's review, experience and training, the models' components reflect the incorporation of qualitative and quantitative factors that reasonable investors would consider in determining value. Comparing the models' output to the price(s) at which the relevant non-agency RMBS trade(s) were executed confirms that these prices were consistent with fair value as determined by the model.

As indicated above, Mr. Vahey's opportunity to expand on his analysis of fair value is expressly reserved, pending receipt and review of additional discovery, specifically concerning trade data, trade profitability, and model documentation. In particular, Mr. Vahey reserves the right to offer amended opinion summaries that the trades in issue were highly profitable and done at fair market value.

EXHIBIT 2

AUSA Liam Brennan
AUSA Heather Cherry
June 27, 2016
Page 8

<u>Richard Ellson, Ph. D.</u>

I.    <u>Professional Experience</u>:

- Dr. Ellson has broad experience in MBS, ABS, and Structured Products. He served as head of MBS research at two major Wall Street banks, head of fixed-income trading at a major insurance company, and senior portfolio manager at a top-tier bank in the United States.

- From 1986 to 1990, Dr. Ellson served as Associate Director and co-head of MBS Research for Bear Stearns. During this time, Dr. Ellson created a first of its kind prepayment model, developed investment approaches for clients and advised on risk and hedging strategies on the trading desk.

- Between 1990 and 1994, Dr. Ellson was Senior Vice President at Donaldson, Lufkin, and Jenrette. Dr. Ellson provided portfolio analysis and strategies for money managers and banks, and created models to value agency and non-agency MBS.

- From 1994 to 1995, Dr. Ellson served as the Director of MBS/ABS Research and Strategy at CS First Boston, building a research department responsible for modeling and market research. Dr. Ellson managed the development of analytics and models for the MBS Department. Dr. Ellson also developed and proposed proprietary trades.

- From 1995 to 1996, Dr. Ellson served as the Director of Trading at Hartford Investment Management Co., where he headed a trading desk that managed over $40 billion in MBS/ABS fixed income assets, including personal responsibility for the proprietary trading of below investment grade MBS and MBS derivatives. In that role, Dr. Ellson traded MBS, CMBS and some ABS.

- From 1997 to 1998, Dr. Ellson served as the Director of MBS Research and Asset Finance at UBS, where he was responsible for building an MBS research team. Dr. Ellson also managed and developed proprietary models and trading strategies.

- From 1999 to 2003, Dr. Ellson served as the Director of Structured Fixed Income Products at HypoVereinsbank, where he was responsible for evaluating and pricing asset-backed structures and helped to bring to market a first-of-its-kind synthetic German RMBS transaction.

- From 2003 to 2005, Dr. Ellson was a Senior Vice President at Amherst Securities Group, where he managed corporate bond structured finance and participated in non-agency MBS research.

EXHIBIT 2

AUSA Liam Brennan
AUSA Heather Cherry
June 27, 2016
Page 9

- From 2005 to 2007, Dr. Ellson was a Senior Vice President at Washington Mutual, and the senior manager for the $90 billion prime single-family loan portfolio, which included managing a CMO portfolio and overseeing six analysts and portfolio managers. Trading responsibilities included non-agency MBS mezzanine bonds and non-performing loan sales.

- From 2007 to 2015, Dr. Ellson was a Director at Andrew Davidson & Company, where Dr. Ellson managed residential whole loan analytical development and ran the other-than-temporary-impairment consulting service for a broad spectrum of institutional investors. For two years during this period, Dr. Ellson served as a portfolio manager and credit MBS trader at Vectors Research Management, an affiliated hedge fund.

- Mr. Ellson presently serves as an Adjunct Associate Professor at North Carolina State University, where he teaches portfolio management.

II.   Education:

- University of Florida, Ph.D., Economics

- University of Florida, M.A., Economics

- Bucknell University, B.A., Economics and International Relations

  A copy of Dr. Ellson's resume is attached.

III.   Summary of Testimony and Foundation for Conclusions: If called as an expert witness in a defense case, Dr. Ellson would be prepared to testify as summarized below.  All of Dr. Ellson's opinions would be based on his education, training and experience in the fixed income and MBS markets:

A.   Explanation of RMBS:

- What an RMBS is, how it is created and how it performs.

- The differences between Non-Agency RMBS and other types of investments, as well as the different types of Non-Agency RMBS.

B.   Participants in the RMBS Market:

- The various participants in the Non-Agency RMBS market and the difference between the "buy-side" and the "sell-side."

EXHIBIT 2

AUSA Liam Brennan
AUSA Heather Cherry
June 27, 2016
Page 10

- That the buy-side of the market primarily consists of institutional asset managers and sophisticated hedge funds, and the sell-side of market consists of dealers.

- The structure of the buy-side firms, and their emphasis on research, modeling and analytics, as well as the structure of sell-side firms and the roles of traders, salespersons, analysts, and compliance officers.

C.  <u>No Agency Relationship in RMBS Market</u>:

- The nature of the relationship between buy-side and sell-side firms when they negotiate and effect Non-Agency RMBS transactions.

- That the transactions are arm's-length transactions and a reasonable buy-side firm would know or should know that the sell-side firm's economic interests are adverse to its own in these principal-to-principal transactions.

- That there is no agency relationship between the sell-side and buy-side firms, and that, when the counterparty is a qualified institutional buyer, the sell-side firms do not have a duty of "best execution."

D.  <u>Compensation in the RMBS Market</u>:

- The way that dealers in the Non-Agency RMBS market earn their compensation.

- That sell-side firms do not earn a "commission" on any trade, but rather that they take risk by purchasing and owning the RMBS and then attempting to sell the RMBS for a higher price.

- That the compensation for a sell-side firm is determined by the difference between the price at which the firm bought the RMBS and the price at which it sold the RMBS.

- That a buy-side firm would be aware that any price given by a sell-side firm is the amount that the sell-side firm is willing to pay or accept, and that it does not necessarily reflect the actual price a third party would be willing to pay or accept, despite statements by the sell-side firm to the contrary, and that a buy-side firm would not be influenced by such statements.

- That a sell-side firm is not obligated to reveal its compensation or "all-in" markup to a buy-side firm.

AUSA Liam Brennan
AUSA Heather Cherry
June 27, 2016
Page 11

E.  <u>RMBS and Liquidity</u>:

- The liquidity of the Non-Agency RMBS market and the level of price transparency compared to other securities markets.

- That certain RMBS bonds are broadly understood to trade at higher spreads, such as Re-REMIC Mezzanine bonds and credit sensitive RMBS.

- The reasons that the low levels of liquidity and transparency exist in the Non-Agency RMBS market.

- That, during the time period relevant to the Superseding Indictment, Non-Agency RMBS traded in a distressed market and, generally, at large discounts to their par value.

- That, as with assets in any distressed market, a reasonable investor in Non-Agency RMBS would have been relatively insensitive to small price differences within a reasonable range of value for that asset.

F.  <u>Valuing RMBS</u>:

- The process that buy-side participants in the Non-Agency RMBS market undergo to decide what prices to pay for Non-Agency RMBS.

- The use of INTEX, Bloomberg, and proprietary valuation models by buy-side firms to conduct thorough and independent valuations and cash flow analyses on Non-Agency RMBS.

- The independent due diligence conducted, and their use of assumptions about the collateral loan pools to value the RMBS, and the sensitivity of attempted RMBS valuation to small changes in those assumptions.

- The meaning of "par value," as well as the relationship between the price paid for an RMBS and its par value, particularly during the turbulent time period at issue in the Superseding Indictment.

- That any statement made by a sell-side firm during negotiations would not impact the underlying loan pool or cash flows associated with the RMBS, and that a buy-side firm would place negligible or no value on a statement by the sell-side firm that cannot be confirmed with data.

- That, in valuing an RMBS and deciding an appropriate price to pay, a reasonable buy-side firm would not rely on any sell-side stated amount of compensation that a sell-side firm would earn in any transaction.

11

EXHIBIT 2

AUSA Liam Brennan
AUSA Heather Cherry
June 27, 2016
Page 12

G.  Trading RMBS:

- The process of executing a trade in the Non-Agency RMBS market.

- The "bids wanted in competition" or "BWIC" process.

- That a reasonable buy-side firm would place negligible value on statements of a sell-side trader, including, among other things, statements about the price at which the trader could purchase a given RMBS, based on the reasonable buy-side firm's knowledge that RMBS market participants (including both buy-side and sell-side firms) regularly misstate price information.

- The range of values at which a buy-side firm determines of its own accord that it would be willing to invest in RMBS and the satisfaction of a buy-side firm to the extent it trades within that range.

- The other factors that form part of the decision by a buy-side firm to trade an RMBS, such as among other things, the relationship of the relevant parties, based on, *inter alia*, past performance, as well as the desire to trade anonymously in the market, the desire to trade in size, and the ability to consummate the trade in a timely fashion.

H.  RMBS Transactions at Issue:

- The negotiation of and prices paid for the particular RMBS at issue in this case.

- The effect of the volatile market for RMBS during the relevant period, characterized by historically wide price spreads on the prices paid for the RMBS at issue.

- That a reasonable investor would not have incorporated the alleged misstatements into its own investment analysis, an opinion based on Dr. Ellson's analysis of the actual valuation models used by buy-side firms, as well as other documents, such as, for example, trade confirmations, emails, or chats relating to the trades at issue in this case and testify that a reasonable investor.

- The reasonable range of values at which a buy-side firm would have been willing to invest and that all trades at issue in this case occurred at the fair value for the RMBS. Dr. Ellson reserves the right to expand on his analysis of fair value pending receipt and review of additional discovery, including trade data and model documentation. Dr. Ellson may offer

AUSA Liam Brennan
AUSA Heather Cherry
June 27, 2016
Page 13

amended opinion summaries regarding the profitability of the Subject Trades and the fact that the trades occurred at fair value.

I.    Compliance:

- The role of compliance officers and compliance departments at sell-side firms.

- That, if a compliance officer monitors or becomes aware of certain conduct involving a sell-side trade and does not raise any issues with it, the sell-side trader would have no reason to believe that his conduct was wrongful.

Sincerely,

PETRILLO KLEIN & BOXER LLP

By: _____
Guy Petrillo
Josh Klein
655 Third Avenue, 22nd Floor
New York, New York 10017
Telephone: (212) 370-0330
Facsimile: (212) 370-0391
*Attorneys for Ross Shapiro*

EXHIBIT 2

**Curriculum Vitae**



**Brian P. Vahey, Jr.**
BERKELEY RESEARCH GROUP, LLC
810 Seventh Avenue, Suite 600
New York, NY 10019

Direct: 646.862.0954 ext. 9954
bvahey@thinkbrg.com


## EDUCATION

B.S., Aerospace Engineering            University of Notre Dame
B.S. equivalent, Nuclear Engineering   Naval Nuclear Power School


## PRESENT EMPLOYMENT

Director, Berkeley Research Group


## PREVIOUS POSITIONS

*Mesirow Financial Consulting*, New York, NY
Managing director, Restructuring and Litigation Consulting Practice, 2008–2012

*King Street Capital,* New York, NY
Trader, 2006–2008

*GE Asset Management/GE Capital*, Stamford, CT
Portfolio Manager and Trader, 1999–2006

*U.S. Navy*
Lieutenant Commander, Submarine Force, 1991–1998


## LICENSES AND CERTIFICATIONS

Chartered Financial Analyst
CFA Institute, member
FINRA Series 7 License
Certified Six Sigma Black Belt


## PRESENTATIONS AND SPEAKING ENGAGEMENTS

(1)   "Mezz/CMBS Workouts: What Makes Them Different?" co-panelist, IMN's 3rd Annual
Bank and Financial Institutions Special Asset Executive Conference on Real Estate
Workouts, March 2012

EXHIBIT 2



## PROFESSIONAL EXPERIENCE

Brian Vahey provides financial services matter expertise in litigation, restructuring, and valuation matters. He has over 12 years of experience as an institutional investor in the analysis, management, and trading of fixed income and derivatives. He was a portfolio manager for pension, mutual fund, insurance, CDO, and segregated account investors. Mr. Vahey also managed and traded positions for a large hedge fund that specialized in distressed assets. As a consultant, he has been active in investigating and supporting litigation involving asset management, financial services, and securities, including secured financial products of all types, including RMBS, ABS, CDOs, and CMBS.

Mr. Vahey has:

- Collected and analyzed observable market data for high-yield, illiquid, distressed, and esoteric securities involved in litigation including bonds, CDS, and structured products.
- Testified to underwriting standards and FASB accounting treatment of hedge fund assets involving private asset backed loans, settlements, and other assets.
- Led consulting expert efforts in several multibillion-dollar litigations involving disputes between institutional investors and the mortgage backed security originators, underwriters, and officers.
- Analyzed pricing and modeling of various financial instruments for accounting or bankruptcy/solvency purposes, including advising on an annual audit of a bank with a large mortgage operation. Created modeling assumptions and verified accounting adjustments for mortgage portfolio assets consisting of Prime, Alt-A, and HELOC loans.
- Conducted forensic work in multiple sectors within financial services. Mr. Vahey has investigated officers and operations at different types of financial institutions including a major mortgage originator, a major residential mortgage servicer, a Futures Commission Merchant, a money management firm, an RMBS issuer, and multiple hedge funds.
- Consulted on counterparty risk and litigation issues, including loan and security analysis for both a large bond insurer facing mortgage originators and an RMBS/CDO investors in a matter involving major investment banks.
- Conducted collateral analysis and valued several CDO portfolios in connection with an indentured trustee to determine proper asset disposition strategies.
- Calculated damage estimates in multiple disputes including individual security losses, portfolio losses, Ponzi schemes, and losses due to inadequate servicing.
- Negotiated recoveries in restructuring efforts such as working on behalf of a group of unsecured creditors to a $4.0 billion commercial real estate REIT. Mr. Vahey led the analysis and investigation into the lending agreements, indentures, collateral values, and securities to facilitate a settlement that avoided bankruptcy.

Before working as a consultant, Mr. Vahey was a trader at King Street Capital Management, LLC, in New York City. In this role, Mr. Vahey conducted all strategy, underwriting, and trading for the structured product portfolio, and:

- Initiated the MBS, ABS, CMBS strategy for this $9.0 billion portfolio hedge fund.

EXHIBIT 2



- Developed loan-level valuation models for subprime and Alt-A loans to evaluate investments.
- Utilized CDS in the creation of multiple synthetic custom credit portfolios to strategically maximize short exposure to CDOs and subprime assets.
- Conducted financial analysis, including in-depth business model and balance sheet strength, on several firms in the financial sector including REITs, thrifts, monolines, and mortgage insurers.
- Traded and managed up to $1 billion in exposure in ABX, CMBX, single name CDS for subprime bonds and CDOs, residual/equity pieces of mortgage securities, CDO equity, aircraft bonds, and distressed home equity ABS.

Mr. Vahey also previously worked for the General Electric Company, where he served as a portfolio manager for General Electric Asset Management (GEAM) and General Electric Financial Assurance. In his role at GEAM, Mr. Vahey:

- Co-managed a $30.0 billion structured product portfolio for investors.
- Traded fixed and floating ABS, CMBS, and MBS, for multiple insurance, total return, and CDO portfolios.
- Helped lead efforts to create GEAM's CDO platform including issuing its first CDO, the $400 million mezzanine *Summer Street I*. Mr. Vahey:
  - Oversaw credit underwriting of both securities and the issuers/underwriters.
  - Worked with underwriters on CDO structure and economics.
  - Conducted the majority of trading of cash and synthetic securities and hedges.
  - Expanded the size of the CDO portfolio by issuing an additional $1.6 billion of both high grade and mezzanine CDOs under the Summer Street label.
- Collaborated with total return portfolio management team on strategic and tactical trading decisions to create alpha for portfolio. Most funds managed were in second quartile for peer group over three- and one-year horizons.
- Led the development of the structured product credit research team. The development effort included:
  - Conducting originator, servicer, issuer, and conduit due diligence for all securities, including ABS, RMBS and CMBS.
  - Analysis included:
    - Issuer, originator and servicer financial strength
    - Deal underwriting, including prospectus review
    - Developing pre-payment and default models
    - Monthly surveillance of the securities portfolio
    - Analysis of the entire securitization process including originator and servicer visits, examination of lending personnel and processes, loan pricing, securitization creation, and valuation.

At GE Financial Assurance, Mr. Vahey directed the composition and performance of $100 billion in fixed income insurance portfolios backing a variety of insurance liabilities as a portfolio manager. In this role, he:

- Coordinated and managed all variables impacting the portfolio and company, including:
  - GAAP/STAT/TAX issues

EXHIBIT 2



- o   Regulatory capital efficiency
- o   ALM strategies
- o   Risk strategies
- o   New product development
- o   Portfolio optimization
- o   Asset allocation strategies
- o   Cash flow management
- o   New asset class introductions
- Directed investments in the following asset classes:
  - o   Treasuries
  - o   Agencies
  - o   Corporates
  - o   High yield
  - o   Private placements
  - o   Commercial real estate
  - o   Structured products, including ABS, RMBS, CMBS
  - o   Municipals
  - o   Emerging markets debt
  - o   Levered loans
  - o   Interest rate and credit synthetics
  - o   Private equity, Hedge funds, and equities
- Created a methodology for portfolio pricing versus a liability stream that resulted in a measurable increase in the company's net income.
- Expanded clients' investing options by introducing high-yield CMBS and Levered Loans.
- Developed and executed an industry first by utilizing a forward-starting swap strategy to create synthetic duration in an $8.0 billion long-term-care insurance portfolio.

Mr. Vahey served as a Lieutenant Commander in the U.S. Navy submarine force, where he ranked at the top of his peer group during his years of service and earned a number of leadership and performance awards.

EXHIBIT 2

# Richard W. Ellson, Ph. D

1403 Van Page Blvd., Raleigh, NC 27607
(914) 262-9251 | ellcon2016@outlook.com
http://www.ellsonconsulting.com

## Background

I have broad experience in MBS, ABS, and Structured Products—domestically and internationally.  My experience includes head of MBS/ABS research at two major Wall Street banks, head of trading at a major insurance company, senior portfolio manager at a top ten U. S. bank, regulatory analysis, and credit risk transfer transactions.

## Education

### Ph. D. Economics, University of Florida, 1977
M.A. Economics, University of Florida, 1975
B.A. Economics and International Relations, Bucknell University, 1973

## Experience

| | |
|---|---|
| August 2007-<br>October 2015 | **Andrew Davidson & Company\| Director: Enhanced Solutions Group (NY, NY)**<br>*Set up and managed the satellite office in Raleigh NC*<br>- Product manager for a residential whole loan analytics & valuation platform (LoanKinetics); elements included credit performance, valuation, loan loss analysis/ALLL, and CCAR/DFAST<br>- Directed the portfolio credit (OTTI) and Level 3 pricing analysis consulting service to major banks, federal agencies, credit unions, and insurance companies using proprietary AD&Co. analytics<br>- Worked directly with clients' auditors (when appropriate)<br>- Litigation analysis/expert witness on CDOs and Credit MBS Hedge Funds<br><br>**Vectors Research Management\| Portfolio Manager/Trader: Credit Strategies (NY, NY)**<br>*Traded sub-prime and Alt-A floating rate MBS/ABS; including Option ARMs* |
| June 2005-<br>July 2007 | **Washington Mutual\| Senior Vice President (New York, NY)**<br>*Senior manager for prime single-family mortgage loan portfolio ($100 billion)*<br>- Responsible for internal warehouse transfers and external pool purchases<br>- Conducted quarterly NPA sales to dealers<br>- Assisted in pricing of portfolio loan products (lot loans, custom construction, super jumbos, etc.)<br>- Conducted portfolio analysis & projections of expected and realized returns, losses, & relative value<br>- Directed portfolio loan sales (when possible) to improve risk profile & portfolio returns<br>- Purchased & managed a $500 mm whole loan CMO portfolio with investment-grade subordinate securities<br>- Managed a group of 6 analysts and portfolio managers (3 in Seattle headquarters & 3 in New York) |
| April 2003-<br>June 2005 | **Amherst Securities Group\| Senior Vice President (Greenwich, CT)**<br>*Product Development and Research*<br>- Completed the shelf registration of Freedom Certificates—$1 billion dollar shelf registration for the execution of ITRs (institution to retail structured finance); the program was rated by 3 rating agencies<br>- Conducted marketing/distribution meetings & completed one transaction: USAutos 2004-1<br>- Non-agency MBS research effort |
| January 1999-<br>February 2003 | **HypoVereinsbank\| Director of Structured Fixed Income Products (NY, NY)**<br>*ABS/CMBS and structured transactions; domestic and international*<br>- Evaluated and priced asset-backed structures for ABCP conduits<br>- Completed Provide-A 2001-1 PLC (1st synthetic German RMBS transaction with KfW wrap; €1 billion)<br>- Created a SPV (Lilienthal Capital Corporation in November 2001) for the funding of aircraft leases with the objective of a term structure take-out ($225 million was funded in 2002) |

The information contained in this presentation is proprietary to IMS ExpertServices™



EXHIBIT 2

- Created GRIP 1999-F1, the first re-securitization of Future Flow transactions
- Completed MAED 1991-C1 (€297 million)—a repackaging of 11 U.S. dollars denominated CMBS tranches, issued through a SPV in Jersey as a Euro-denominated security with fixed and floating rate tranches & a soft bullet final maturity

| | |
|---|---|
| January 1997-<br>December 1998 | **UBS\| Director of MBS Research and Asset Finance (NY, NY)**<br>*Responsible for building a MBS research team & analytics*<br>- Managed and developed proprietary prepayment and Option Adjusted Spread (OAS) models<br>- Established trading strategies in pass-through sector—formulated innovative price-spread analytics<br>- Planned and successfully executed Aeltus CBO II—a $600 mm market value transaction<br>- Worked on the development of Shared Appreciation Mortgages (SAMS) for the U.S. market<br>- Completed housing price index-linked notes for the UK market |
| July 1995-<br>December 1996 | **Hartford Investment Mgmt Co.\| Senior Vice President & Director of Trading (Hartford, CT)**<br>*Headed trading desk—involved in investment grade corporate bonds, MBS/ABS/CMBS, the Treasury market, & derivatives*<br>- Managed over $40 billion in fixed income assets and oversaw a staff of 9 professionals<br>- Personally conducted trading of MBS/CMOs, CMBS, and some ABS<br>- Managed proprietary trading responsibilities for below investment grade MBS ($50 mm) & MBS derivatives ($150 mm)<br>- Participated in investment strategy development and the investment systems committees |
| January 1994-<br>July 1995 | **CS First Boston\| Director of MBS Research & Strategy (NY, NY)**<br>*Built a research department responsible for models, databases, & market research; managed a staff of 25*<br>- Developed an extensive list of client contacts and publications & contributed to proprietary trades<br>- Managed and contributed to the development of analytics, models, and databases for the department<br>- Achieved the objective of consistency across fixed income users (trading, research, & sales)<br>- Created strategies in model portfolios, specific trade recommendations, & publications |
| December 1990-<br>January 1994 | **Donaldson, Lufkin, and Jenrette\| Senior Vice President; 2nd ranking member of the dept. (NY, NY)**<br>*Provided portfolio analysis and strategies for money managers, insurance companies, and banks*<br>- MBS modeling included prepayment models, portfolio systems, and MBS default models<br>- MBS credit research included whole loan CMOs, B/C credit mortgages, and CMBS |
| January 1986-<br>December 1990 | **Bear Stearns and Company\| Associate Director and Co-Head of MBS Research (NY, NY)**<br>*Developed all prepayment models and developed investment strategies that were presented to clients*<br>-First to focus on regional prepayment differentials<br>- Conducted risk management and hedging strategies on the trading desk<br>- Involved in the international securitization of MBS and ABS |
| August 1979-<br>January 1986 | **University of South Carolina, Columbia\| Associate Professor of Economics w/ Tenure (Columbia, SC)**<br>**University of South Carolina, Columbia\| Associate Director in Division of Research (Columbia, SC)**<br>*(Publications provided upon request)* |
| August 1977-<br>August 1979 | **The National Association of Home Builders\| Assistant Director (Washington, DC)**<br>*Lobbied on housing related issues at the federal level*<br>- Developed proprietary urban development models of urban/regional economies to negotiate land development strategies between developers and planning agencies |

The information contained in this presentation is proprietary to IMS ExpertServices™

