UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED N-15-1

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | | CRIMINAL NO. 3:15CR155(RNC) |

UNITED STATES OF AMERICA    PM 2:12    CRIMINAL NO. 3:15CR155(RNC)
:
v.     U.S. DISTRICT COURT    VIOLATIONS:
NEW HAVEN CT. :
ROSS SHAPIRO,                  :    18 U.S.C. § 371 (Conspiracy);
MICHAEL GRAMINS and       :    15 U.S.C. §§ 78j(b), 78ff; 17 C.F.R.
TYLER PETERS                    :    240.10b-5 (Securities Fraud);
                           :    18 U.S.C. § 1343 (Wire Fraud)
                           :    18 U.S.C. § 2 (Aiding and Abetting)
                           :

SECOND SUPERSEDING INDICTMENT

The Grand Jury charges that at all times relevant to this Indictment:

The Defendants

1.      Defendant ROSS SHAPIRO ("SHAPIRO") was a Managing Director of Nomura Securities International, Inc. ("Nomura") in charge of Nomura's Residential Mortgage Backed Securities Desk.  In that capacity, SHAPIRO oversaw all of Nomura's trading in Residential Mortgage Backed Securities ("RMBS").

2.      Defendant MICHAEL GRAMINS ("GRAMINS") was the Executive Director of Nomura's RMBS Desk.  In that capacity, he principally oversaw Nomura's trading of bonds composed of sub-prime and option adjustable rate mortgage loans.

3.      Defendant TYLER PETERS ("PETERS") was the senior-most Vice President of Nomura's RMBS Desk and focused primarily on Nomura's trading of bonds composed of prime and alt-A loans.

4.      SHAPIRO, GRAMINS, and PETERS (collectively "the defendants") were the most senior and highly compensated traders on Nomura's RMBS trading

desk.  Prior to joining Nomura, the defendants worked together trading RMBS bonds at Lehman Brothers.  After joining Nomura, the defendants oversaw the expansion of RMBS trading at Nomura, and supervised the trading activity of subordinate traders.  As part of that supervision, the defendants provided subordinate traders with language to use in negotiations with clients, and critiqued subordinate traders' trading practices after they had executed trades.

<u>Relevant Entities and Individuals</u>

5.      Nomura was a securities and investment banking company.  Nomura was registered with the Securities and Exchange Commission as a broker-dealer and was a subsidiary of Nomura Holdings, Inc., a Japanese banking group with operations in New York City.  Nomura Holdings, Inc. trades American Depositary Receipts ("ADRs") on the New York Stock Exchange under the ticker NMR. Among other things, Nomura engaged in the purchase, sale and brokering of RMBS.  Nomura had RMBS clients throughout the United States, including, among other places, the District of Connecticut.

6.      Trader 1 worked on Nomura's RMBS desk from approximately 2009 to approximately 2012.

7.      Trader 2 worked on Nomura's RMBS desk from approximately 2009 to approximately 2012.

8.      Trader 3 worked on Nomura's RMBS desk from approximately 2010 to approximately 2013.

9.      Trader 4 worked on Nomura's RMBS desk from approximately 2010 to approximately 2014.

10.     Trader 5 was a salesperson working at Nomura from 2010 to 2011. He began working on Nomura's RMBS desk in approximately 2011.

11.     Salesperson 1 was a salesperson working at Nomura.

12.     Salesperson 2 was a salesperson working at Nomura.

13.     Salesperson 3 was a salesperson working at Nomura.

14.     Salesperson 4 was a salesperson working at Nomura.

15.     Salesperson 5 was a salesperson working at Nomura.

16.     Victim 1 is an investment fund headquartered in New York, with affiliated offices around the world.

17.     Victim 2 is a private investment firm with offices in New York and London.

18.     Victim 3 is a global investment management and research firm headquartered in New York. Victim 3 also managed a Public Private Investment Program ("PPIP") that managed a mixture of taxpayer money and private investments.

19.     Victim 4 is a global asset manager and retirement plan provider headquartered in Boston, Massachusetts.

20.     Victim 5 is an investment and advisory firm headquartered in Connecticut.

21.     Victim 6 is an asset management firm and investment advisor headquartered in Connecticut.

22.     Victim 7 is a privately owned investment manager headquartered in California.

23.     Victim 8 is a global asset management fund headquartered in California.

Relevant Terms

24.     RMBS bonds were collections of mortgages and home equity loans, which were grouped together and sold as packages between and among banks, money managers, pension funds and others.  Investors in RMBS received payments on a monthly basis.  Those payments were based on the extent to which homeowners, who had originally taken out the mortgages or loans, repaid their lenders.  The payments to RMBS investors continued until the homeowners repaid their debt, refinanced or defaulted.  Unlike stocks that trade on the New York Stock Exchange or the NASDAQ, RMBS were not publicly traded on an exchange and pricing information was not publicly available.  Instead, buyers and sellers of RMBS used broker-dealers, like Nomura, to execute individually negotiated transactions.

25.     RMBS were typically sold in three ways:

a.  "Inventory" – An inventory sale is a sale from a broker-dealer's inventory, in which a broker-dealer like Nomura sells a bond that it has owned for a period of time;

b.  "Order" – An order is a sale in which the seller engages a broker-dealer like Nomura to seek a buyer, or the buyer engages the broker-dealer to seek a seller, for a particular bond;

c.  "BWIC/Bid List" – A "Bid List" or "BWIC" ("bids wanted in competition") sale is a sale in which the seller circulates a list of specific RMBS it is interested in selling to broker-dealers, so that the

broker-dealers may seek a potential buyer willing to negotiate terms for the trade. It is similar to an auction, in which clients submit bids and the highest bid "wins" and buys the bond.

26.     In each of the foregoing types of trades, the buyer and the seller do not know each other's identity and must communicate through the broker-dealer's traders and salespeople.

27.     In "Order" and "BWIC" trades, the broker-dealer fundamentally acts as a broker or conduit, match-making between the buyer and seller, taking little to no financial risk and often being paid a negotiated commission for executing the trade.

28.     In inventory trades, the broker-dealer hopes to profit by buying low, holding the security for a period of time, and eventually selling high. Broker-dealers are not commonly paid an additional commission by the buyer for facilitating the purchase of a security from the broker-dealer's inventory.

29.     A "tick" is common price term in the industry. A tick refers to $1/32^{nd}$ of one percent of a bond's face value. For instance, if a broker-dealer buys a bond for 65.25 (meaning 65.25% of the current face value of the security), the price can be expressed as "65 and 8," "65 dollars and 8 ticks," or simply "65-8." If the broker-dealer then sells that bond for 65.50 (meaning 65.50% of the face value), the price can be expressed as "65 and 16," "65 dollars and 16 ticks," or "65-16."

30.     A broker-dealer profits from a trade in one of two ways:

      a. The buyer or seller makes an agreement with the broker-dealer to pay a commission to the broker-dealer for facilitating the trade. This

agreement typically occurs in Order or BWIC trades, and is commonly referred to as a payment "on top."

b. The broker-dealer and the buyer agree on a purchase price without reference to the price the broker-dealer paid to the seller; the difference between the amount the buyer paid to the broker-dealer and the amount the broker-dealer paid to the seller is the broker-dealer's profit. This is commonly referred to as an "all in" trade and the buyer does not know the broker-dealer's profit.

<u>COUNT ONE</u>
(Conspiracy to Commit Offenses Against the United States)

31.    Beginning in approximately 2009 and continuing through approximately 2013, the exact dates being unknown to the Grand Jury, in the District of Connecticut and elsewhere, the defendants SHAPIRO, GRAMINS, and PETERS, and others known and unknown to the Grand Jury, did unlawfully, knowingly and intentionally conspire, combine, confederate and agree with each other and others, both known and unknown to the Grand Jury to:

a.    devise and participate in a scheme and artifice to defraud Nomura's victim-customers and to obtain money and property from them, including the deprivation of the right to make a discretionary economic decision, by means of materially false and fraudulent pretenses, representations, promises and omissions, and, for the purpose of executing and attempting to execute the scheme and artifice, to knowingly transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce writings, signs, signals, pictures and sounds, in

violation of Title 18, United States Code, Section 1343; and

        b.    use and employ manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 ("Rule 10b-5"), in connection with the purchase and sale of RMBS, by use of the means and instrumentalities of interstate commerce and the mails, directly and indirectly, and by (i) employing devices, schemes, and artifices to defraud; (ii) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit on purchasers and sellers of RMBS, in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a) and Title 17, Code of Federal Regulations, Section 240.10b-5.

Purpose of the Conspiracy

        32.    The purpose of the conspiracy was for SHAPIRO, GRAMINS, PETERS and others to enrich Nomura and themselves by making materially false and fraudulent misrepresentations and omissions to Nomura's victim-customers and others in order to obtain secret and unearned compensation on RMBS trades and to deprive Nomura's victim-customers of information relevant to making a discretionary economic decision.

Manner and Means of the Conspiracy

        33.    The manner and means by which SHAPIRO, GRAMINS, PETERS and others, both known and unknown to the Grand Jury, sought to accomplish the objects of the conspiracy included the following:

a.  In certain Order and Bid List transactions,

    i.  where the buying victim-customers agreed to buy an RMBS bond at a price equivalent to that which Nomura paid for the RMBS bond plus an "on top" commission, the defendants and their subordinate traders—at the defendants' direction—would and did falsely inflate the price that Nomura had actually paid in order to fraudulently induce the victim-customers to pay a higher overall price, thereby providing Nomura with an extra and unearned profit at the buying victim-customer's expense; and

    ii.  where the selling victim-customers understood that Nomura had negotiated a sale price for an RMBS bond with a buyer, the defendants and their subordinate traders—at the defendants' direction—would and did falsely deflate the price at which the buyer had agreed to purchase the RMBS bond in order to fraudulently induce the victim-customer to sell the RMBS bond at a price lower than they otherwise would achieve, thereby providing Nomura with an extra and unearned profit at the selling victim-customer's expense.

b.  In certain sales of bonds from Nomura's inventory, the defendants would and did misrepresent and cause their subordinate traders to misrepresent to victim-customers that Nomura was buying an RMBS bond from a fictitious third party seller.  In so doing, the defendants

fraudulently induced the buying victim-customer to pay "on top" compensation, thereby providing Nomura with an extra and unearned profit at the buying victim-customer's expense.

c. The defendants trained the junior members of the RMBS trading desk in their fraudulent trading practices and caused subordinate traders to engage in the same fraudulent practices:

   i. The defendants critiqued subordinate traders' execution of trades, informing them that they could have made more profit for Nomura by lying to Nomura's customers; and

   ii. The defendants dictated specific misrepresentations to subordinate traders that the subordinates were expected to make in written electronic communications or in telephonic communications with customers.

d. The defendants and their subordinates attempted to create future business by sending emails to Nomura employees and customers advertising the bonds that the defendants and their subordinates had bought, sold and traded on a certain day, including, at times, advertising trades that the defendants made, or caused to be made, through fraudulent means.

<u>Overt Acts</u>

34.   In furtherance of the conspiracy and to accomplish its purposes and objects, the defendants and others, both known and unknown to the Grand Jury,

committed and caused others to commit at least one of the following overt acts, among others, in the District of Connecticut and elsewhere:

       a.    On or about January 5, 2010, SHAPIRO, GRAMINS, and PETERS conducted an electronic chat with a representative of Victim 1 in which GRAMINS misrepresented to Victim 1 that GRAMINS had a buyer for AHMA 2007-1A1 who was, at "best best" willing to pay "47-00."

       b.    On or about January 5, 2010, the Nomura RMBS desk sent a marketing email to various clients and traders advertising that "AS THE MKT CONTINUED TO RALLY TODAY, WE BOUGHT/SOLD/TRADED" various bonds, including AHMA 2007-1A1, "FOR OVER $150MM TOTAL VOLUME...."

       c.    On or about February 9, 2011, in connection with the purchase and sale of WAMU 2005-AR15 A1C3, GRAMINS told a representative of Victim 2 that GRAMINS was "purely looking to broker" a transaction.

       d.    On or about March 7, 2011, SHAPIRO, GRAMINS, PETERS, Trader 2 and others conducted an electronic chat with a money manager from Victim 3's PPIP fund, in which Trader 2 misrepresented to Victim 3 that Nomura bought WAMU 2007-HY3 4A1 for 86-01 when, in fact, Nomura had purchased the bond for 85-25.

       e.    On or about March 16, 2011, SHAPIRO, GRAMINS, Trader 5 and others conducted an electronic chat with a representative of Victim 1 in which GRAMINS said he would place a bid on INDX 2005-AR14 A1B2 at 18-1 on Victim 1's behalf, when, in fact, GRAMINS placed a bid at 17-17.

f.    On or about March 16, 2011, GRAMINS conducted a private chat with Victim 1 in which he asked Victim 1 to pay a quarter point commission to Nomura for the purchase of INDX 2005-AR14 A1B2, when, in fact, the price really included three-quarter points commission. GRAMINS then forwarded the relevant portions of the chat to Trader 5 and others.

g.    On or about December 14, 2011, SHAPIRO conducted an electronic chat with a representative of Victim 4 concerning its sale of GPMH 2000-3 IA, in which SHAPIRO misrepresented about a third-party buyer, "they aren't going to pay >85," when, in fact, the buyer had already told SHAPIRO "happy to get to 87."

h.    On or about December 21, 2011, PETERS chatted electronically with a representative of Victim 4 and misrepresented to Victim 4 that a third-party buyer would pay 38-04 for JPALT 2007-A2 2A1.

i.    On or about December 21, 2011, PETERS chatted electronically with a representative from Victim 5 and misrepresented to Victim 5 that Nomura was going to purchase JPALT 2007-A2 2A1 at 38-08.

j.    On or about December 21, 2011, the Nomura RMBS desk sent a marketing email to representatives of, among others, Victim 5 and Victim 6, advertising that Nomura had just traded JPALT 2007-A2 2A1 and saying "STILL WORKING HERE, LET US KNOW IF WE CAN HELP!"

k.    On or about January 19, 2012, Salesperson 2 chatted electronically with PETERS, advising him that Salesperson 2 was going to misrepresent to a buying client the status of the negotiations regarding the purchase and sale of GSAA 2006-9

A2.  Salesperson 2 specifically stated, "so I'm going w/ 39-08 story and see what she pays us," to which PETERS responded, "k."

l.   On or about February 8, 2012, Trader 2 conducted an electronic chat with Salesperson 4 in which Salesperson 4 told Trader 2 that Victim 3 bid 71-24 pay on top, for WAMU 2007-HY1 5A1.  Trader 2 responded, "Last thing [Victim 3] know[s] is 73-16 to us correct?"

m.  On or about February 8, 2012, the Nomura RMBS desk sent a marketing email to representatives of, among others, Victim 5, advertising that Nomura had just traded WAMU 2007-HY1 5A1 and saying "Seeing some new orders, let us know where we can help – we ARE open for business!!"

n.   On or about March 8, 2012, SHAPIRO, GRAMINS, PETERS, Trader 1, Trader 4 and Trader 5, among others, participated in an electronic chat with a representative from Victim 7, in which Salesperson 3 misrepresented to Victim 7 that Nomura could buy AAA 2005-1A 1A3B at 64-00 when, in fact, Nomura could purchase it for 62.

o.   On or about March 8, 2012, Trader 1 conducted an electronic chat with another Nomura employee in which Trader 1 told him that "its [Victim 7] on the other side so cant [sic] get caught."

p.   On or about March 8, 2012, Trader 4 chatted electronically with Salesperson 5, asking if a trade "is exclusive to [Nomura] b/c I shaded it."  Trader 4 also stated that "you gotta take opps when they are available" and that he "lied, i [sic] marked up 2 pts."  Salesperson 5 replied, "haha sick . . . well played."

q.    On or about May 1, 2012, Trader 4 chatted electronically with a representative of Victim 6, saying that the seller of PPSI 2004-WWF1 M3 wanted a price of 79 or above, when, in fact, the seller had already offered to sell the bond to GRAMINS for 78-16.

r.    On or about August 29, 2012, Trader 3 chatted electronically with a representative of Victim 4, misrepresenting that a seller offered WAMU 2005-AR11 A1B2 at 85-16 to Nomura, when, in fact, Nomura had already purchased the bond for 83.

s.    On or about August 29, 2012, Trader 3 emailed to SHAPIRO and GRAMINS a copy of an electronic chat between Trader 3 and a representative of Victim 4, regarding WAMU 2005-AR11 A1B2.

t.    On or about April 10, 2013, PETERS chatted electronically with Victim 4 and falsely characterized a counterparty's bid as follows: "64-04...think that is going to be best right now."

u.    On or about November 22, 2013, GRAMINS, SHAPIRO and others chatted electronically with a representative of Victim 1.  During the chat, GRAMINS misrepresented to Victim 1 that a third-party seller offered JPMAC 2006-WMC1 A4 at 81-16 when, in truth, it had been offered at 80.

v.    On or about November 22, 2013, GRAMINS spoke by phone with a representative of Victim 8, during which GRAMINS misrepresented to Victim 8 that GRAMINS had a 78.75 bid on JPMAC 2006-WMC1 A4, when, in fact, GRAMINS had been instructed by Victim 1 to put in a bid at 80.00.

w.   On or about November 22, 2013, Salesperson 1 and GRAMINS spoke by phone regarding the information that Nomura would provide to Victim 1 about JPMAC 2006-WMC1 A4. Salesperson 1 suggested that GRAMINS say "I'm sorry, I can't get them to you at 80" and to "keep it in a chat because if I (Salesperson 1) call, he (Victim 1's representative) is going to get suspicious."

x.   On or about November 22, 2013, GRAMINS, SHAPIRO, and others electronically chatted with Victim 1's representative about JPMAC 2006-WMC1 A4 and, after Victim 1's representative said that he does not "usually buy things when they get to 80," SHAPIRO responded saying, "80 is just a #!"

All in violation of Title 18, United States Code, Section 371.

## COUNTS TWO AND THREE
### (Securities Fraud)

35.   The allegations set forth in paragraphs 1 through 30 and paragraphs 32 through 34 of Count One of this Indictment are hereby re-alleged and incorporated as though set forth in full herein.

36.   On or about the dates set forth below, in the District of Connecticut and elsewhere, the defendants SHAPIRO, GRAMINS,  and PETERS, and others, known and unknown to the Grand Jury, using means of interstate commerce—that is, electronic chat and emails—did knowingly and willfully use and employ manipulative and deceptive devices and contrivances directly and indirectly to: (i) employ devices, schemes, and artifices to defraud; (ii) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engage

in acts, practices, and courses of business that would and did operate as a fraud and deceit on the purchasers and sellers of such RMBS as set forth below, each constituting a separate count of this Indictment:

| COUNT | DATE | DESCRIPTION |
|-------|------|-------------|
| 2 | December 21, 2011 | Electronic chat between PETERS and Victim 5's representative concerning JPALT 2007-A2 2A1 during which PETERS advised Victim 5 that if it would pay 38 and 16 ticks, Nomura would attempt to purchase the bond at 38 and 8 ticks and only make eight ticks, when, in truth, Nomura made 20 ticks on the sale and obscured 12 ticks in hidden commission. |
| 3 | May 1, 2012 | Electronic chat between Trader 4 and Victim 6's representative concerning PPSI 2004-WWF1 M3 during which Trader 4 advised Victim 6 that the seller wanted to sell at 79 or above, when, in fact, the seller had already offered to sell the bond to GRAMINS for 78 and 16 ticks. |

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.

## COUNTS FOUR THROUGH NINE
### (Wire Fraud)

37.     The allegations set forth in paragraphs 1 through 30 and paragraphs 32 through 34 of Count One of this Indictment are hereby re-alleged and incorporated by reference as if fully set forth herein.

38.    On or about the dates set forth below, the defendants SHAPIRO, GRAMINS, and PETERS, and others, known and unknown to the Grand Jury, knowingly and willfully and with intent to defraud devised and intended to devise a scheme and artifice to defraud bond purchasers and sellers and to obtain money and property, including the right to make a discretionary economic decision, from Nomura clients purchasing or selling RMBS bonds by means of materially false and fraudulent pretenses, representations and promises, which scheme and artifice is in substance as set forth previously in this Indictment, and did transmit, and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures and sounds for the purpose of executing such scheme and artifice, to wit, on or about the dates listed below, the defendants sent, or caused to be sent, the following electronic communications in furtherance of the scheme, each use of the wires constituting a separate count of this Indictment:

| COUNT | DATE | DESCRIPTION |
|-------|------|-------------|
| 4 | March 7, 2011 | Marketing email sent by Nomura RMBS desk to, among others, Victim 5 and Victim 6, copying SHAPIRO, GRAMINS, and PETERS, advertising that Nomura had traded WAMU 07-HY3 4A1. |
| 5 | December 21, 2011 | Email sent from Nomura to Victim 5 confirming the sale of JPALT 2007-A2 2A1 to Victim 5. |
| 6 | December 21, 2011 | Marketing email sent by Nomura RMBS desk to, among others, Victim 5 and Victim 6, copying SHAPIRO, GRAMINS, and PETERS, advertising that Nomura had traded JPALT 2007-A2 2A1 and saying "STILL WORKING HERE, LET US KNOW |

| | | IF WE CAN HELP!" |
|---|---|---|
| 7 | March 8, 2012 | Marketing email sent by Nomura RMBS desk to, among others, Victim 5 and Victim 6, copying SHAPIRO, GRAMINS, and PETERS, advertising that Nomura had traded AAA 2005-1A 1A3B. |
| 8 | May 1, 2012 | Marketing email sent by Nomura RMBS desk to, among others, Victim 5 and Victim 6, copying SHAPIRO, GRAMINS, and PETERS, advertising that Nomura had traded a portion of PPSI 2004-WWF1 M3. |
| 9 | May 1, 2012 | Email from Nomura to Victim 6, confirming the sale of RMBS PPSI 2004-WWF1 M3 to Victim 6. |

All in violation of Title 18, United States Code, Sections 1343 and 2.

A TRUE BILL

/ s /
_____
FOREPERSON


DEIRDRE M. DALY
UNITED STATES ATTORNEY

LIAM BRENNAN
ASSISTANT UNITED STATES ATTORNEY

HEATHER CHERRY
ASSISTANT UNITED STATES ATTORNEY