# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 3:15CR155 (RNC) |
| | : | |
| v. | : | |
| | : | |
| ROSS SHAPIRO, | : | |
| MICHAEL GRAMINS, and | : | |
| TYLER PETERS | : | October 19, 2016 |

## GOVERNMENT'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF ITS MOTIONS *IN LIMINE* AND RESPONSES TO DEFENDANTS' MOTIONS *IN LIMINE*

The Government respectfully submits this supplemental memorandum in support of its motions *in limine* and responses to the defendants' motions *in limine*. Specifically, the Government writes for three purposes: (1) regarding the Government's Motion *in Limine* to Preclude Evidence or Argument Regarding Fair Market Value (Dkt. # 166), to comment on *United States v. Bank of New York Mellon*, 941 F. Supp. 2d 438 (S.D.N.Y. 2013), as suggested by the Court; (2) to comment further on the defendants' repeated failures to correct their inadequate expert notices, first raised in the Government's Motion Regarding Expert (Dkt. # 172); and (3) to respond to the Court's comments regarding the Government's Motion to Exclude Evidence of Absence of Criminal Activity in Uncharged Transactions (Dkt. # 159). In all other respects, the Government and defendants continue to press their earlier motions, but do so in reliance of the existing briefing.[1]

---

[1] The parties spoke on October 7, 2016 in order to disclose to each other the subjects that each would address in this supplemental filing. The three subjects identified by the Government are those addressed herein. The defendants noted that they may address the Court's preliminary thoughts on their Motion *in Limine* to Preclude Evidence and References to the PPIP Program, Dkt. # 162, by reiterating points made in their opening brief. The Government relies on its earlier briefing on this matter; in sum, evidence related to the identity of investors, including the PPIP program, is critical to the materiality of misrepresentations made by the defendants, especially given that the defendants have made materiality a central aspect of their defense. Investor identity

## I.    *Bank of New York Mellon*

### A.    The Case

*Bank of New York Mellon* was a ruling that in large part denied a motion to dismiss a civil action by the United States against Bank of New York Mellon ("the bank") under the Financial Institutions Reform Act of 1989 ("FIRREA").  941 F. Supp. 2d at 443.  In short, the government alleged that the bank, together with managing director and head of products management David Nichols, harmed itself by engaging in a wire and mail fraud scheme wherein the bank falsely represented to its institutional clients that, among other things, the bank achieved "best execution" in the course of foreign currency trades with clients that subscribed to the bank's "standing instruction service."  *Id*.  In its ruling on the motion to dismiss, district court considered (1) whether the complaint sufficiently alleged that the conduct "affected" a financial institution (as required by

tends to establish that, rather than hypersensitive or "eggshell skull" market participants, the defrauded victims were fiduciaries for some of the most sophisticated investors in the world (such as hedge funds, sovereign wealth funds, pension funds, charities and university endowments) and trusted to safeguard their money—a responsibility the victims took very seriously.  Moreover, PPIP fund managers had particularly onerous contractual duties of care, which tend to establish that every tick was important in their trade negotiations.  While we understand the Court's concern regarding the specific identities of "passive investors," it is essential to the jury's determination of materiality that they understand the context of the fiduciary obligations owed by victims to both the PPIP funds and private investors.  As a compromise, the Government proposes to ask witnesses about the types of investors in victim funds (e.g., the U.S. Treasury through PPIP, hedge funds, sovereign wealth funds, pension funds, charities and university endowments), and the obligations that come with managing the money for those investors, *rather than* specific individual victim identities (e.g., the California Public Employees' Retirement System), and will not refer to PPIP funds as investing "taxpayer money."  This generic explanation of investor identity balances the Court's concern with the Government's need to prove materiality, and any possible prejudice can be minimized by an instruction—a solution that is consistent with Judge Hall's recent ruling on the same issue in *Litvak*.  Dkt. #432 at 14.  Finally, the defendants have indicated that they may pursue a nullification defense based on the fact that the victims were all sophisticated investors.  As described in the Government's motion, the proposed limited evidence of investor identity allows the Government to rebut such arguments. To the extent the defendants raise new arguments in support of this motion, the Government asks the Court to allow it to address these arguments at the hearing on October 26, 2016.

FIRREA, *id*. at 451-463, and (2) whether the complaint sufficiently pleaded wire and mail fraud, *id*. at 463-483.

The bank regularly engaged in foreign currency transactions with its clients in connection with the assets the bank held for them.  *Id*. at 444.  There were two ways those transactions took place—through direct negotiation at the time of the trade, or through a "standing instruction service," in which the bank would execute the currency trade automatically and would inform the client of the price at some later time. *Id*.  Although the policies and procedures for the standing instruction service were vague, the government alleged that the bank's website, a "standard comment" used with clients, and other client communications, represented that the bank would provide "best execution" of currency trades.  *Id*. at 444-46.  The government further alleged that the bank's communication provided the impression that "best execution" included getting the best price for the currency trade.  *Id*.

Despite these representations, the complaint further alleged that the bank did not provide best execution to clients using its standing instruction service. *Id*. at 447.   In fact, the bank seemingly provided its clients with the least (or close to the least) favorable rates that were available during the trading day.  *Id*.  The bank would first aggregate the currency needs of its clients, and then buy or sell what it needed on the spot market in order to fulfill those needs.  *Id*. It would then, later in the day, execute currency trades with its clients, selling at the highest price of the day to its clients, and buying at the lowest.  *Id*.  Although the bank would send monthly currency transaction reports to its clients, it would not provide time stamps, so the client would not be able to compare with the price in the market at that particular time.  *Id*.

As relevant to the Court's inquiry here, the district court in *Bank of New York Mellon* considered whether, as alleged, misrepresentations regarding best execution met the elements of

materiality, intent to deceive, and intent to harm for wire and mail fraud.  *Id*. at 464.  With regard

to "intent to deceive," the court noted that the bank had no obligation to provide pricing

transparency. *Id*. at 79-80.   However, "to the extent that the Bank is charged with making

affirmative misrepresentations about its practices, its unwillingness to provide the transparency

that might have revealed the truth arguably supports an inference of intent to deceive."  *Id*. at 469.

The court found, as to Nichols, that "the government need not allege that Nichols intended to

deceive clients into thinking that best execution meant best price.  Rather, the government must

allege that, in referring to best execution, Nichols intended to deceive clients about the nature of

[the bank]'s pricing practices."  *Id*.  In fact, the government alleged (sufficiently, the court found)

that Nichols used the term "best execution" knowing that his clients believed it to mean best price,

and also knowing that the bank's practice did not provide the best price.  *Id*.

The district court then considered whether the defendants, by misrepresenting that the bank

was providing best price for currency transactions, contemplated harm to their clients.  *Id*. at 474.

The court found that "whether the service gave customers the best available market price at the

time of execution or some other, less favorable price, is quite plainly a question that goes to the

'nature or quality of the service' the bank was providing."  *Id*. (quoting *United States v. Starr*, 816

F.2d 94, 99 (2d Cir. 1987)).   The court distinguished *Starr* and *Regent Office Supply*, finding that

"insofar as customers allegedly were misled as to the quality of [the bank]'s pricing, there was a

'discrepancy between benefits reasonably anticipated because of the misleading representations

and the actual benefits which the defendant delivered."  *Id*. (quoting *United States v. Regent Office*

*Supply*, 421 F.2d 1174, 1182 (2d Cir. 1970)).   The court then went on to pose the following

alternative hypothetical:

> Defendants' contentions to the contrary would have more force if the facts were
> somewhat different. For example, suppose BNYM had engaged a customer in a

directly negotiated transaction and quoted a price of, say, $1.31 per euro. Suppose further that the Bank represented also that this was the "best available price" at that time—or even that it was making no profit at that price—while in fact the Bank expected to make or made a significant profit. If the customer agreed to the price, the essence of the bargain would be the exchange of currencies at the agreed-upon price of $1.31 per euro and there would be no showing of an intent to harm in the absence of other circumstances. The customer generally has no interest in what profits the Bank actually made so long as it received what was agreed. But where, as here, the price was decided unilaterally by BNYM and learned by the customer only after the fact, the nature of the bargain is much different. Misrepresentations about the quality of the pricing the service provided tend to show an intent to defraud.

*Id.* This Court has asked for the parties' thoughts on this passage as it applies to the current matter.

### B. Discussion

Although the Government here does not necessarily agree with the district court's conclusion from its hypothetical in *Bank of New York Mellon*, it is likewise clear that the court did not contemplate the particular factual scenario before this Court. As such, the decision (including the hypothetical) is entirely consistent with the Government's argument that the Nomura defendants' misrepresentations regarding the price at which counterparties were willing to trade a bond, and the amount of Nomura's compensation from that trade, contemplated harm to their victims—both in the form of actual pecuniary loss and in the deprivation of potentially valuable economic information. Moreover, unlike in the currency market, where a fair market value may exist and may be known by a customer, there is no evidence of either of those characteristics in the market for thinly-traded RMBS bonds.

First, the *Bank of New York Mellon* hypothetical posits that "the customer *generally* has no interest in what profits the Bank actually made so long as it received what was agreed." 941 F. Supp. 2d at 1182 (emphasis added). While the Government takes no position as to whether a currency investor would agree with that blanket assertion, it is clearly not an accurate statement in the context of any of the RMBS trades that are the subject of this trial. Indeed, the profit that

Nomura, as the broker-dealer, made on a particular trade was specifically negotiated as a term of the deal itself. The Government explained that in detail in its earlier filings on this subject. *See* Dkt. # 229 at 3.  In that example, Shapiro specifically negotiated to be paid a spread of 0.25 of a point by Putnam, while in fact Shapiro's lies enabled him to take a spread of 2.25 points, a difference that amounted to over $1 million in additional compensation to Nomura.  As this Court recognized at the September 2nd hearing, the defendants were ultimately providing a service, *see* Dkt. # 241 at 39—making a market in an otherwise illiquid bond—and were allegedly lying to the investors about the price those investors were paying for that service.  Moreover, because each dollar of additional compensation to Nomura came out of its victim investors' pockets in this zero-sum transaction, the victim-investors' interest in Nomura's "profit" from the trade is patently obvious.

The irrelevance to this case of *Bank of New York Mellon*'s general statement about a customer's lack of interest in the bank's profits is reinforced by the sole case it cites in support, *In re Mexico Money Transfer Litigation*, 267 F.3d 743, 749 (7th Cir. 2001).  *See Bank of New York Mellon*, 941 F. Supp. 2d at 474 n. 219.  In *Mexico Money Transfer*, a RICO class action was brought against MoneyGram and Western Union for advertising a particular fee for wire transfers to Mexico ($15 for a $300 transfer is the example given in the case), but failing to alert customers that they also made a spread on the foreign currency exchange between the peso and dollar. 267 F.3d at 745.  In affirming the approval of a relatively weak settlement for class members, the Seventh Circuit opined that "the claims had only nuisance value." *Id*. at 748.  The court explained that "money is a commodity in an international market" wherein pesos are available at one price to those willing to buy in bulk and at another higher price to retail customers, who "must compensate the middlemen" for various expenses involved in running a money changing business.

*Id.* at 749.  The court concluded that there was no fraud, because MoneyGram need not tell its customer how much it profited from the spread between its wholesale price and the retail price it provided the customer, just as Neiman Marcus need not reveal how much it paid for clothes.  *Id.*

The Government does not quarrel with this general principal drawn from *Mexico Money Transfer*, i.e., that a business is not required to reveal its profit margin to a customer.  Indeed, the Government is not claiming that the defendants here had any affirmative obligation to reveal Nomura's markup in an RMBS transaction, and has not charged the defendants with simply failing to alert its customers of that markup.  However, these defendants did not stand mute, but instead made the markup—and by extension the price at which the other (anonymous) counterparty sold to or bought from Nomura—a critical piece of the negotiation with their victim counterparty.  They did this specifically to influence the price at which their victims were willing to execute a trade, misleading sellers that they had to lower their price to meet a buyer, and conversely (often in the same trade) falsely inducing buyers to raise a price to match a seller.  This is plainly different from *Mexico Money Transfer*, where the customers opted to engage in a transaction despite knowing nothing about how MoneyGram or Western Union would profit.  The court in *Bank of New York* even acknowledged this distinction earlier in the opinion when it said "the Court rejects the contention that the Bank had an independent obligation to provide time stamps or any particular form of transparency. There can be legitimate business reasons for a company not to provide its customers certain information about the services it provides to them. But to the extent that the Bank is charged with making affirmative misrepresentations about its practices, its unwillingness to provide the transparency that might have revealed the truth arguably supports an inference of intent to deceive."  941 F. Supp. 2d at 469.

Also underlying the court's decision in *Mexico Money Transfer* was the idea that, even

though not specifically revealed, MoneyGram's profits on a specific retail currency transaction were easily discernible by taking the retail rate and then simply "turn[ing] to the newspapers or the Internet to determine how much the bank has marked up" the foreign currency. *Id*. at 749. Obviously no such recourse is available to an RMBS investor, where the price on the other side of particular trade was only known to Nomura. The court in *Mexico Money Transfer* explains that this transparency is available because money is "just a commodity." *Id*. As explained above, the same cannot be said of an RMBS, where even trades of the same bond on the same day but of different sizes, typically have different prices.

Second, although the hypothetical's reference to "directly negotiated transaction[s]" makes it appear at first blush to be analogous to this case, the opposite is actually true, i.e., it is the bank's conduct in the standing instruction transactions that provide the closest comparison to these defendants' lies in their RMBS trades. Bank of New York Mellon's misrepresentations regarding its giving best execution—and therefore best price[2]—to its standing instruction customers is akin to the Nomura defendants' lies because the standing instruction trade market created by the bank was similarly opaque. Unlike a negotiated foreign currency trade, where the price on the spot market is widely available through various electronic sources and industry benchmarks, the bank

---

[2] Whether best execution equates in fact to best price was an issue for the jury in that case; the court found that the complaint sufficiently alleged that the defendants intended to give that impression. Thus, for the purpose of evaluating intent to harm, the issue is whether a misrepresentation that best price would be provided went to the nature or quality of the standard instruction service. *See Bank of New York Mellon*, 941 F. Supp. 2d at 474.

The very term "best execution" is misleading when drawing comparisons between *Bank of New York Mellon* and this case. The government here does not allege and does not expect to elicit evidence that the Nomura defendants owed a duty of best execution to their counterparties. To the extent that "best execution" as a concept is relevant to this case, it applies to the victims' fiduciary obligation to their own investors, and is relevant to (1) materiality, because it explains why paying more for a bond (or selling a bond for less) matters to an investment manager or hedge fund and (2) intent, because it explains why a broker-dealer would know that misrepresentations about price that induce a counterparty to pay more or receive less for a bond would matter to that counterparty.

set up its standing instruction service to deliberately obscure the fact that it was providing the worst intraday market price rather than the actual spot market price at the time the client needed the exchange. *Bank of New York Mellon*, 941 F. Supp. 2d at 447. As a result, while the bank normally made appropriately razor-thin margins in negotiated trades—since, unlike an RMBS, currency is a uniform commodity—in a standing instruction trade the bank made margins 10 to 20 times greater than normal. *Id*. at 448.

The Nomura defendants likewise exploited an uneven information flow similar to the standard instruction currency trade. Because RMBS were unique, and there were no open sources for the price at which the bond was being offered or sought at the moment of the transaction, the counterparties could only turn to the defendants for that information, if they chose to share it. Although the defendants—like the currency traders at Bank of New York Mellon—had no fiduciary obligation to provide their clients with the price they were receiving on the other side of the trade, they nonetheless made such representations the focal point of their negotiations with victims. Moreover, the defendants here did not simply misrepresent that they were providing "best execution" or "best price," but rather claimed to be accurately reporting what the other side of the transaction was bidding or asking. In short, just like in a standard instruction trade, where the bank obscured the time of the trade to hide the actual price (and therefore the bank's extra profit), the Nomura defendants took advantage of the lack of price transparency in the RMBS market in order to hide the lies they made to their victim counterparties.

When the veneer of the standing instruction protocol is stripped away from a foreign exchange transaction, as in the hypothetical posed by the court in *Bank of New York Mellon*, the case then becomes about a negotiated trade in a heavily traded and transparent commodity market. In the foreign exchange market, an investor would have recourse to much more transparent price

information and any number of currency dealers willing to facilitate a trade.  In contrast, in the RMBS market, there was no such real-time price information and the market was made by a broker-dealer arranging a specific trade between a buyer and a seller whose identities were known only to that broker-dealer.

Third, unlike the currency investors in *Bank of New York Mellon*, the victims in this case were not simply telling the defendants to get them the best price available in the market, and leaving it at that.  Similarly, the information being transmitted by these defendants was not simply that the price they were offering was the best available.  While the Government believes that such a misrepresentation would be material because it goes to the heart of the bargain, the Court need not decide that admittedly closer question.  In this case, the defendants misrepresented not just what they were making from the trade, they also misrepresented—using specific and false price information—what the buyer or seller was willing to bid or offer.  The evidence will show that such representations then affected what the victim investor was, in turn, willing to counter and/or settle for.  In the court's hypothetical in *Bank of New York Mellon*, the bank gives one price that it asserts is best; here, the evidence reflects an iterative bargaining process that becomes infected with the defendants' lies at every turn, such that the trade price does not reflect the price to which the victim would have agreed if it had accurate information.

Fourth, the markup that the victims were willing to pay Nomura was for a service—facilitating a purchase or sale of a lightly traded financial instrument—that the defendants simply didn't perform in the way they represented.  *See United States v. Frank*, 156 F.3d 332, 335-36 (2d Cir. 1998).  In *Frank*, a marine waste disposal company contracted with municipalities to haul raw sewage to the federally-required offshore distance, which was much more expensive than the shorter dumping routes allowed by old law.  In truth, although collecting money for the longer

routes, the defendants dumped the sewage much closer to shore.  The court rejected the defendants' claim that they did not intend harm because the victims got what they paid for—sewage dumping—holding instead that a mail fraud charge is not defeated by providing such "alternative services." *Id*. at 335.  Here, the victim investors paid for Nomura's market-making that included accurate reporting of what the other side of the purchase or sale was willing to bid or offer, if the defendants chose to report such information.  Simply put, the evidence will show that the defendants took advantage of this misplaced trust to divert more of their victims' money to Nomura.

Fifth, the hypothetical posed by *Bank of New York Mellon* assumes the only deprivation of property contemplated by the bank would be money.  The government here, however, alleges that the defendants intended to harm the victims both by inducing them to pay more or receive less in a particular bond transaction (and thereby lose money), as well as by robbing the victims of "the right to control [their] assets" by depriving them of "potentially valuable economic information" that was "necessary to make discretionary economic decisions."  *United States v. Binday*, 804 F.3d 558, 569-70 (2d Cir. 2015).  It is axiomatic that, in a price negotiation, information regarding the price the other counterparty was willing to bid or offer would be "potentially valuable economic information."[3]

Finally, because the Court inquired about this case in the context of its assessment of the Government's motion to preclude fair market value evidence, it is important to reiterate critical

---

[3] The Government also notes that the elements of criminal wire fraud are altered to some degree by *Bank of New York Mellon*'s application of civil pleading requirements under Fed. R. Civ. P. 9(b), which require "facts that give rise to a strong inference of fraudulent intent" satisfied by either "(1) alleging facts to show that defendants had both motive and opportunity to commit fraud, or by (2) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Bank of New York Mellon*, 941 F. Supp. 2d at 464.

differences between the currency market and the RMBS market in relation to fair market value: (1) unlike what *may* exist the currency market, there was no contemporaneous "fair market value" for RMBS that could have been known to reasonable investors at the time of the subject trades; (2) to the extent that the defendants now propose to re-create a "fair market value" for the subject bonds based on historical data, that value could not have been known to the victims or defendants and therefore cannot relate to either intent or materiality; and (3) even if a trade occurred at what the defendants' experts posit was a "fair market value," it does not cure the fact that the defendants' lies induced a markup far beyond what reasonable investors would have otherwise agreed to pay. That is, the defendants did not have license to steal so long as the prices were within a range their experts—based on a *post hoc* analysis—now deem "fair."

## II.    **Expert Motion**

In Dkts. # 172 and 228, the Government urged the Court (1) to limit the testimony of the defendants' expert witnesses to the opinions described in their disclosures (provided to the Court as Dkts. # 172-1 and 172-2); (2) require the defendants to provide additional information regarding the basis of their experts' proposed testimony; (3) preclude repetitive testimony on undisputed matters; and (4) preclude evidence of fair market value, profitability and victims' lack of care. Despite their assurances to the contrary, the defendants have largely failed to provide the Government with any additional notice regarding their experts.  At this late stage, after lengthy motions on the issues and following repeated assurances from the defense, any undisclosed expert testimony (including testimony whose bases remains improperly disclosed) should be excluded.

After the defendants were arraigned, the Government requested jury selection in April 2016 and for trial to commence in May 2016.  Dkt. # 64. The defendants requested trial in October 2016. Dkt. 66. The Court granted the defendants' request and ordered a pretrial schedule based on the

parties' jointly proposed pre-trial schedule. Dkts. # 69, 71 & 73.  Under the scheduling order, the parties were obligated to disclose experts, witnesses and exhibits on May 23, 2016. Dkt. # 71. On May 20, 2016, the Court amended the pretrial schedule, upon the defendants' request, ordering witnesses, exhibits and experts to be disclosed on June 13, 2016, four months before the start of trial. Dkt. # 142. On June 10, 2016, the defendants contacted the Government to request the Government's consent to extend their June 13th deadline for expert disclosures. The defendants requested additional time to find and disclose a third expert. On June 14, 2016, the defendants moved the Court to extend certain deadlines to accommodate the late disclosure of a third expert, with the Government's consent. Dkt. # 150.  Then, on June 27, 2016, the defendants disclosed that third expert witness, along with an unexpected fourth expert witness.

In Dkts. # 172 and 228, the Government urged the Court, among other things, to limit the testimony of the defendants' expert witnesses to the opinions described in their disclosures and require the defendants to provide additional information regarding the basis of their experts' proposed testimony.   The Government's overarching argument was that the defendants had breached their notice requirements under Fed. R. Evid. 702, 703 and 705.  *See, e.g.,* Dkt. # 175 at 4-8.

At the September 2, 2016 hearing the defendants agreed to provide a final notice of their experts' proposed testimony by the week of September 28th: "We've told the government that in light of their concerns about preparation, particularly with respect to the experts, that we will produce to the government by the middle of the last week of September a final summary of expert testimony that's expected to be offered. Again, plus or minus a day or two, in the event of an institution telling us that sure you could have that data but it will be 48 hours from now."  Hearing Tr. 9.2.16 13:10-17.

On September 22, 2016, the Government wrote to the defendants regarding their expert disclosures.  The Government wrote, "As you are aware, some of the Government's objections to your expert witnesses have been based on the Government's belief that your expert disclosures did not provide proper notice of the proposed testimony or proper notice of the grounds on which that proposed testimony was based.  We are also aware that you are planning to make a final supplemental disclosure of your experts' proposed testimony next week.  Following is a list of items the Government believes should be covered by your next disclosure."  Exhibit 1.  In anticipation of the present filing, the parties planned to speak on a conference call on October 7, 2016.  When the Government received no updated expert disclosure by September 30, 2016, the Government wrote an email to the defense asking, "Do you all know when you will be getting us the updated expert disclosures? We could potentially resolve some of our notice objections when we speak, depending on the disclosure. So it would be useful to have that."[4]  Then, during the October 7, 2016 conference call, when pressed by the Government, the defendants informed the

---

[4] The entirety of the September 30, 2016 email read:

   Guy, et al–

   The 25th and the afternoon of the 28th don't work, However, the rest of the week of the 24th works for us. We'd prefer to have the conference in the morning, if possible.

   Do you all know when you will be getting us the updated expert disclosures? We could potentially resolve some of our notice objections when we speak, depending on the disclosure. So it would be useful to have that.

   Also, is there any chance you all could speak before October 7th? Ideally sometime tomorrow or Friday?  As a head's up, we do think we should give the judge at least 7 days to read whatever we submit, if we submit something. So, talking sooner would be better than talking later. If this doesn't work, we can do the 7th however.

   Thanks.

Government that they had unilaterally decided to not honor their commitment to provide an updated expert disclosure by the week of September 28, 2016 and that they may not update their disclosures until January 2017.  The Government responded that it would likely raise this issue in the context of this supplemental filing.

The defendants finally responded to the Government's September 22nd  letter on October 17, 2016—nearly four weeks later, a full three weeks after the defendants had told the Court they would complete their disclosures, and a mere two days before the parties' supplemental filings were due.  Unfortunately, the defendants' letter still fails to address certain critical issues.

First, and most significantly, the defendants are still inexcusably setting their own dates and rules for disclosures, notwithstanding the Court's orders and at the expense of the Government's ability to prepare for trial.  Despite the fact that their deadline for expert notices is long past, the defendants apparently believe that they may continue to amend their disclosures, without requesting leave, for whatever period of time they deem appropriate.  The defendants—in response to the Government's expert motion—committed at the hearing to final expert disclosures by the week of September 28th.  This date was itself more than three months after the scheduling order required final disclosures.  The defendants did not condition that commitment on the timing of the trial, nor did they seek permission of the Court to delay those disclosures after the trial was continued.  Indeed, neither the Government nor the Court necessarily endorsed the prospect of complicated expert disclosures three weeks before trial. If the defendants had asked in advance for permission to extend their disclosures beyond September 28th, the Government would have argued that maintaining the September 28th date with the new trial date would have set the disclosure at five months before trial, which is precisely what was reflected in the Court's original scheduling order in this highly complicated case.  Moreover, given that the defendants have now noticed four

experts, it would be reasonable to require even more notice than was originally contemplated.

The defendants continue to contend that their disclosures, although beyond the Court's deadline, are proper because they incorporate material that is being received via Rule 17(c).  There are several problems with this rationale.  Initially, the defendants' most recent letter does not distinguish material that has already been turned over in discovery from material they have yet to receive in response to their Rule 17(c) subpoenas.  *See*, e.g., Exhibit 2 at 2 ("Dr. Fabozzi may also review and testify about additional models received during the course of discovery.").  At a minimum, the defendants should be precluded from amending their disclosures to include testimony regarding material that is already available to them, i.e., not the subject of 17(c) subpoenas.  Their letter simply ignores this distinction.  But even with regard to  materials received in the future via Rule 17(c), the defendants should not be permitted continuous amendments simply because they decided to wait to make their Rule 17(c) motion months after first interviewing and hiring their experts.  The defendants should at least be held to the September 28th deadline they set for themselves at the hearing.  In the alternative, the Government would be amenable to yet again consenting to late disclosures, and would suggest a final disclosure date of no later than November 1, 2016, which approximates the four months that was contemplated by the Court's first amended scheduling order.

The Government's request here is not made lightly.  Given the lengths of the existing disclosures and the complexity of the issues, we simply cannot be left to guess at the nature of the testimony.  Moreover, the sheer volume of discovery in this case, consisting of millions of documents, makes it virtually impossible for the Government to guess at what other "discovery" the defendants' experts will opine on.  The remedy suggested by the Government minimally protects the Government's significant interest in effective trial preparation.  Moreover, there is

very little prejudice in precluding late Rule 17(c) disclosures given the material already disclosed and that the subject matters contemplated by the Rule 17(c) requests—fair market value and trade profitability—should be excluded, *see* Dkts. # 166, 167, 205, 206.

Second, the defendants' letter still fails to cure a defect in the substance of the notice, namely, its failure to articulate what the experts' actual opinions are rather than the subject areas of their testimony.  For example, the Government not only asked for disclosures of the models that the experts will testify about, but also the actual opinions that will be offered about those models. The defendants claim it sufficient to simply note that the witnesses will testify about "the types of inputs, assumptions, and variables utilized by these models and their importance to valuation; and how these models are used by financial institutions to evaluate residential mortgage-backed securities ("RMBS") and inform their RMBS trading decisions."  Exhibit 2 at 2.  In order to properly prepare, however, the Government is entitled to know not just the general topics of the testimony, but the opinions to be offered.  For example, we are entitled to know not just *that* Fabozzi and Vahey will testify about how models were used, but also *what* they will opine on that subject.

In short, the proposed pretrial schedule and disclosure rules are designed to aid the parties in preparing for trial, to help the Court sufficiently manage the case and to address outstanding legal issue properly before trial begins.  The defendants have, however, repeatedly played games with their required disclosures under the schedule at the expense of fairly apprising the Government about critical issues affecting trial preparation.[5]  These actions should not be

---

[5] For example, in addition to the disclosure of their unexpected fourth expert witness, discussed *supra*, the defendants have continually disclosed witness and exhibit lists completely unmoored from any realistic assessment of what they intend to do at trial. On June 13, 2016, the required date for the disclosure of witnesses and experts, the Government disclosed 28 witnesses and 155

countenanced.  The defendants have had sufficient time to disclose their expert witnesses.  Subject to the Government's suggestions above, any undisclosed expert opinions or expert opinions whose bases have been insufficiently disclosed should be excluded from trial.

## III.    Uncharged Trades

In Dkts. # 159 and 205, the Government argued that the Court should exclude evidence of the absence of criminal activity in uncharged transactions—that is, the Government urged the Court to focus evidence on whether certain trades (the "charged trades") were, as alleged, fraudulent and to not allow the defendants to present irrelevant evidence of specific other trades in which there is no allegation of fraud or deception.  The defendants opposed this motion.

At the September 2, 2016 hearing, the Court said, "Unless I'm mistaken, the defense could offer evidence of this nature to rebut the government's claim concerning their financial incentive to commit fraud. I think if that's the purpose of the offer, the evidence might well be admissible." Hearing Tr. 9.2.16. 47:12-16.  The Government believes the Court should reconsider its statement on this motion for three reasons.[6]

First, in the Indictment, the Government alleges that there was a scheme to defraud investors.  The Government intends to prove the existence of the scheme through certain fraudulent trades (the "charged trades").  The existence of uncharged trades that are not fraudulent indicates nothing as to the fraudulent nature of the charged trades; the uncharged trades are simply irrelevant

---

exhibits; the defendants disclosed 183 witnesses and 3,724 exhibits. See Dkt. 153. As agreed at a July 1, 2016 status conference with the Court, the defendants amended their witness list on August 5, 2016. However, this amended list hardly addressed their lack of realistic notice of witnesses and exhibits; the revised list includes 91 witnesses and 1539 exhibits. This is not a serious disclosure.

[6] To be clear, the Government would not object to evidence concerning the total numbers of trades executed by the defendants or Nomura during the fraudulent scheme.  However, the defendants should not be permitted to assert that any trade is not fraudulent unless the Government first contends otherwise.

under Fed. R. Evid. 401.  Indeed, it is not even in controversy whether or not non-fraudulent trades exist; the Government does not dispute this point.  Presenting evidence of irrelevant, undisputed facts is more prejudicial than probative because it will likely confuse the issues, making it excludable under Fed. R. Evid. 403.

Secondly, the defendants argue that the existence of non-fraudulent trades undermines the Government's assertion that they had a financial motive to defraud their clients.  This is the standard "denying the antecedent" fallacy.  If a person walks to the store because he or she likes the weather, the fact that the person drove to the store does not logically mean that he or she did not like the weather.  The same logical principles apply here.  Here, the Government contends that the defendants lied about the purchase and sale price of the bonds because they had a financial motive to do so.  The fact that, at times, they did not lie about the price of the bonds they traded does not undermine the financial motive evidence.  The absence of fraud in certain trades does not mean the defendants do not have the financial incentive to engage in fraud.

Finally, the Court should exclude evidence of unrelated non-fraudulent trades under Fed. R. Evid. 403 because it will likely result in a significant waste of time.  Currently, the parties estimate that the trial will take roughly four weeks.  If the defendants are allowed to present evidence detailing specific trades in which they did not defraud their clients, they will have to present all the same pieces of evidence that the Government would normally present—chats describing the negotiations with the seller, chats with buyer, electronic confirmations of the purchase and confirmations of the sales.  This all takes significant time.  Moreover, if the defendants intend to overwhelm the evidence of fraudulent trades with a number of non-fraudulent trades, the Government will have to respond with additional examples of fraudulent trades.  The Government has over 150 examples of fraudulent trades that were part of the defendants' scheme

but, in an exercise of discretion and to streamline this case, are not currently part of the Government's case-in-chief.  Proceeding down this path runs the risk of extending a four-week trial into a months-long trial concerning evidence that is essentially irrelevant to the charges.  This should be avoided and evidence of uncharged trades should be excluded under Fed. R. Evid. 403.

## IV.   Conclusion

The Government respectfully requests that the Court consider the above as a supplement to the Government's earlier briefing on the various motions *in limine* in this matter.

Respectfully submitted,

DEIRDRE M. DALY
UNITED STATES ATTORNEY

             /s/
HEATHER CHERRY
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NO. PHV07037
Heather.Cherry@usdoj.gov

LIAM BRENNAN
ASSTANT UNITED STATES ATTORNEY
FEDERAL BAR NO. CT27924
Liam.Brennan@usdoj.gov

DAVID E. NOVICK
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NO. PHV02874
David.Novick@usdoj.gov

U.S. Attorney's Office
157 Church Street
New Haven, CT 06510
(203) 821-3700

**<u>Certificate of Service</u>**

I hereby certify that on October 19, 2016, a copy of the foregoing was sent electronically to counsel for Ross Shapiro, Michael Gramins, and Tyler Peters through the Court's ECF system.

_____/s/_____
DAVID E. NOVICK
ASSISTANT UNITED STATES ATTORNEY