UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 3:15CR155 (RNC) |
| | : | |
| v. | : | |
| | : | |
| ROSS SHAPIRO, | : | April 12, 2017 |
| MICHAEL GRAMINS, and | : | |
| TYLER PETERS, | : | |

**GOVERNMENT'S REPLY IN SUPPORT OF ITS OMNIBUS TRIAL MEMORANDUM AND SUPPLEMENTAL SUBMISSION REGARDING MOTIONS IN LIMINE**

The Government respectfully submits this memorandum in reply to the defendants' opposition to the Government's trial memorandum, specifically with regard to the admissibility of the "Skadden Report" regarding certain alleged activity by witness Zachary Harrison. Contrary to the defendants' argument, the Skadden Report is not relevant to Harrison's reputation for truthfulness (Rule 608(b)) and does not bear on the materiality of the lies by the defendants in this case. As a result, the defendants should be precluded from using the Skadden Report at trial.

**I.      PROPER USE OF THE SKADDEN REPORT**

The Government's Trial Memorandum requested that the defendants be precluded from making use of the so-called Skadden Report, or in the alternative asked for a proffer from the defendants regarding its potential use, so that the issue could be resolved prior to trial. The defendants have now made that proffer.

**A.      Factual Background**

While employed at Putnam, Harrison would, from time to time, be forced by external factors to sell from a client account bonds that he deemed to be good investments. On certain occasions, Harrison sold these bonds to broker-dealers, such a Nomura, only to repurchase the bonds in the next day or two for a different client account. Harrison recently separated from

1

Putnam Investments because of concerns that this conduct constituted pre-arranged trades. Skadden, Arps, Slate, Meagher, and Flom LLP ("Skadden"), Putnam's outside counsel, conducted an internal investigation into the conduct. During the investigation, Harrison admitted to Skadden that he used certain code words to indicate to broker-dealers his interest in repurchasing bonds in the short term, but disagreed that he pre-arranged a trade, maintaining that he did not guarantee that he would repurchase the bond. This position is consistent with his description of his conduct in his interviews with the Government.[1]

The Skadden Report summarized analyses of valuation and pricing data for trades it deemed Harrison had prearranged. First, the Skadden Report reviewed an analysis using BWIC data, which analyzed 28 trades where BWIC trade data was available. The Skadden Report concluded that Harrison generally received best execution on the sales he made to the broker-dealers.

> Harrison sold at the highest bid in 23 of the 28 transactions. For the remaining five transactions, the BWIC data suggested higher bids were submitted. It cannot, however, be ascertained whether those bids were still available at the time of execution or whether other factors may have resulted in Harrison not transacting at those prices. … As discussed in Section IX.B above, Putnam's Policy on Best Execution/Broker Selection did not require every transaction to occur at the highest bid and provided that Putnam traders should evaluate a variety of factors when determining whether to select a broker or counterparty to execute transactions on behalf of its clients, such as a broker's trading expertise and ability to minimize total trading costs.

---

[1] Former Nomura trader, Alejandro Feely, corroborates Harrison's position that he did not pre-arrange trades.. Feely informed the Government that even in instances where Harrison indicated that he would likely re-purchase the bonds, broker-dealers that worked with Harrison, such as Nomurea, were free to sell the bonds they purchased from Harrison to third parties if they received a good bid before Harrison repurchased the bond. NOM_USAOCT_006542 (Feely 3.20.17 Interview). In short, the re-purchases by Harrison were not arranged in advance (i.e. pre-arranged).

Skadden Report at 40.[2] In that vein, the Skadden Report does not conclude that Harrison caused any loss whatsoever to his clients.

Second, the Skadden Report discussed a bid-ask spread analysis, based on pricing data from market vendors. This analysis attempted to measure the difference between the actual prices of the trades in question and the mid-market price (the "Mid-Market Differential")"mid-point between the prevailing bid and ask levels." *Id.*. The Skadden Report cautioned that the theoretical Mid-Market Differential, which was supposed to be the "mid-point between the prevailing bid and ask levels," was likely unknowable, saying that "the reliability of this estimate is similarly hampered by the lack of available pricing and spread information." *Id.* at 41. The Skadden Report found that "[t]here is insufficient reliable data for determining with precision whether Harrison's improper traders were executed at the best execution price. If, however, [the 73 trades had] been executed at the mid-market price . . . , one estimate of that differential (which is hampered by a lack of pricing data) equals $830,000[.]" Skadden Report at 2.

The defendants argue that the Mid-Market Differential is evidence that Harrison was not interested in maximizing value for his clients and that the Skadden Report should be admissible evidence. The defendants make this claim despite the fact that the Skadden Report is replete with hearsay, Skadden's conclusions on what the Mid-Market Differential was were unknown (and unknowable) to Harrison at the time, and that the Skadden Report admits that its conclusions are unreliable because of the opaqueness of the market.

---

[2] Somewhat paradoxically, the Skadden Report states elsewhere that "[t]here is no reliable methodology for determining with precision whether Harrison's prearranged trades were executed at the "best" price. Because the securities trade in a market environment where pricing is opaque, there is no reliable data to determine whether Harrison executed his trades – either for the sale transaction or the repurchase transaction – at the "best" price." Skadden Report at 47.

**B.     Relevant Law**

Reports and other artifacts of internal investigations—including "summaries, notes, and memoranda" of employee interviews and "second-hand reflections, findings, and conclusions of investigating attorneys"—are not in themselves admissible.  *United States v. Reyes*, 239 F.R.D. 591, 600 (N. D. Cal. 2006) (rejecting Rule 17(c) subpoena for internal report because it failed the admissibility prong of *Nixon*); *see also United States v. Lee*, No. 5:06 CR 0424 JW, 2009 U.S. Dist. LEXIS 24972, at *13 (N.D. Cal. March 18, 2009) (same); *United States v. Baker*, Case No. A-13-CR-346-SS, 2014 U.S. Dist. LEXIS 89965 (W.D. Tex. July 2, 2014) ("The opinions of the previous investigators were not admissible, and would have served only to try to tell the jury how they should weigh the substantive evidence introduced at trial.").  Such reports contain, in the case of reports of interviews, one or more levels of hearsay, and in the case of attorneys' or other investigators findings, irrelevant conclusions of third parties.  *Reyes*, 239 F.R.D. at 600.  Moreover, "[d]ocuments produced in a full-fledged, one-time internal investigation into alleged corporate malfeasance" do not satisfy any hearsay objection, including as a business record—indeed, this is "for good reason: they lack the hallmarks of reliability that justify the admission of run-of-the-mill business records."  *Id*.

While an internal investigation and its findings are not relevant or admissible in themselves, it is possible that information in the report may be used (though not the report itself) to "impeach [the witness] pursuant to *Federal Rule of Evidence 608(b)*."  *United States v. Wilson*, 605 F.3d 985,1005 (D.C. Cir. 2010) (finding no *Brady* violation for failure to turn over internal police investigation, where evidence would not have been admissible and would not have been proper impeachment).  However, in order to rely on Rule 608(b), the "subject matter of the internal investigation" must have been "probative of [the witness]'s truthfulness."  *Id*.  Moreover, Rule

4

608(b) limits such use to inquiry on cross examination, and bars admission of extrinsic evidence on the subject.

Finally, statements made by a witness in the course of an internal investigation may be available for impeachment by prior inconsistent statement. *Reyes*, 239 F.R.D. at 601. In that event, extrinsic evidence is available only after the witness is given the opportunity to "explain or deny" the statement. Fed. R. Evid. 613(b). Such extrinsic evidence could *not* include a third party's notes or report (such as an internal investigation) about the statement "in the absence of the witness's endorsement of those notes as his own statement." *SEC v. Treadway*, 438 F. Supp. 2d 218, 223 (S.D.N.Y. 2006). It is the offering party's burden to show that the statements are "actually inconsistent and relevant" and that the notes "reflect the witness's own words rather than the note-taker's characterization." *Id*. (quoting *United States v. Almonte*, 956 F.2d 27, 29 (2d Cir. 1992)).

**C.    Discussion**

Here, the defendants' proffer of the Skadden Report's relevance is without legal basis, and reflects a mischaracterization of the evidence.

1.    <u>The Allegations Do Not Bear on Harrison's Character for Truthfulness</u>

First, the defendants strain unsuccessfully to sustain their burden to show that the generalized attorney-made characterizations of Harrison's prior statements in the Skadden Report are probative of Harrison's "character for truthfulness or untruthfulness" such that inquiry on cross examination should be permitted. *See* Fed. R. Evid. 608(b). According to the Skadden Report, there are two salient statements by Harrison—in January 2016, during an investigation into allegations by another Putnam employee, Harrison said that "he never prearranged trades"; and in May 2016, when Harrison continued to deny prearranging trades, but disclosed that he had used

code words with brokers in order to signal to a buyer that he would have a "good offer for them" to repurchase the following day. Skadden Report at 10. Similarly, Harrison told the Government—when it confronted Harrison about the conduct that had led to his termination—that his conduct had not amounted to prearranging trades. In all events, Harrison has remained steadfast that he did not prearrange trades. He disagrees with Skadden whether his conduct amounted to prearrangement, but that difference of viewpoint regards characterization of his practice and does not amount to evidence of prior untruthfulness. The defendants can point to no instance where Harrison denied the use of code words to signal his willingness to repurchase the following day; in fact, Skadden had no idea of the practice until Harrison acknowledged it. Skadden Report at 10.

The remainder of the argument rests purely on the defendants' and/or Skadden's after-the-fact gloss on what it perceives as being Harrison's motives and behavior. Skadden claims that Harrison only came forward with his use of code words when trial – and potential cross-examination – was imminent. Skadden Report at 10. Yet this is simply Skadden's "second hand reflection," *see Reyes*, 239 F.R.D. at 600, and—given the fact that Harrison frequently used code words with Nomura traders, according to Skadden—the subject could just have easily come up because of a more generalized interest in discussing the nature of the relationship between Harrison and the defendants. Confusing matters even further, the defendants themselves mischaracterize the Skadden Report, claiming that the report indicates that Harrison admitted he "used code words *to prearrange trades with brokers*." Def. Resp. at 22 (emphasis added). In fact, the Skadden Report is clear that Harrison consistently maintained that there was not a prearrangement. Skadden Report at 10. It is also worth noting that the Skadden Report is a particularly weak basis for cross-

6

examination—it is not a recorded statement, it is not even notes or a report from an oral statement, but rather is a paragraph or two summary from several apparent meetings with counsel.

Ultimately, all the defendants can actually show is that Harrison disagrees with Putnam as to the definition of prearrangement. Harrison has not denied the conduct at issue; he has simply disagreed with the characterization of what the conduct is. Notably, Feely's characterization aligns more with Harrison's description than the description in the Skadden Report and the defendants' opposition. The defendants cannot sustain their burden to show that the statements made to the Government and to Skadden are reflective of his character for truthfulness or untruthfulness. *See Bourjaily v. United States*, 483 U.S. 171, 175 (1987) (proponent bears the burden of showing that evidence is admissible). Given the significance of Harrison to the Government's case, it would be highly prejudicial to allow the defendants to inquire into an area where the allegations of prior false statements are not sustained even by a generous reading of the Skadden Report. Moreover, to the extent that Harrison would then be compelled to defend his truthfulness by explaining his view of prearrangement, the trial would then devolve into a side-show related to a technical securities regulation. Permitting the defendants to pursue such a line of cross-examination would make relevant *not* whether Harrison lied, but whether his view of prearrangement was proper—an entirely irrelevant subject in this trial.

    2.   <u>The Skadden Report Does Not Bear on Materiality</u>

The claimed relevance of the Skadden Report to materiality is equally unavailing because Harrison's efforts were intended for the benefit of his clients; claims that he caused loss to his clients are retrospective and are based on an unreliable and speculative internal report.

The Government understands that Harrison will testify that he would sell bonds and repurchase them into other funds in circumstances where liquidity concerns caused him to sell a

position that was otherwise advantageous for his clients. In other words, his conduct was designed to benefit his clients generally by maintaining profitable bonds. Moreover, the defendants do not purport to show that Harrison somehow personally benefitted from the practice—other than to the extent that he was presumably compensated for good performance of the portfolios he traded.

The Skadden Report does not undermine Harrison's client-benefitting intent in repurchasing so-called core positions. Rather, it engages in a strained after-the-fact analysis to assess whether Harrison's trades occurred at market price, and therefore whether the selling fund received the best price available in the transaction. The Skadden Report fastidiously avoids suggesting that Harrison caused any loss to his clients and takes great pains to qualify its calculations. First, it says that the best source of pricing information is BWIC data, but then qualifies that in three significant ways "the value and utility of the BWIC file data is significantly limited." Skadden Report at 39. In 28 Harrison trades where Putnam had BWIC information, the trades were executed at the highest bid in 23 cases, and in the other 5 cases, although there had been a higher bid, Skadden could not tell whether the bid was available at the time of the transaction or whether some other factor made it suboptimal. *Id*. Nonetheless, despite the admitted unreliability of the data, the report calculated a differential on those five trades. *Id*.[3] Even more speculative was the analysis by Skadden on trades where there was no BWIC information and Skadden used the so-called "mid-market" differential.. This process is by its own admission even more unreliable than the BWIC data. *See*, *e.g.*, Skadden Report at 41 ("We should first note, however, that the reliability of this estimate is similarly hampered by the lack of available pricing

---

[3] It is also worth noting that most of the trades in this category did not come with the use of code words, but only based on Skadden's conclusion that they were prearranged.

and spread information."). Indeed, as the Government has discussed in earlier filings, there is no "fair market value" in the opaque RMBS trading market.

Despite the Skadden Report's own admission of the unreliability of its financial estimates, the defendants propose to use the report to impeach Harrison on his care for his investors. First, the explicit unreliability of the Skadden conclusions should not be imported into this criminal trial and implicitly endorsed. Second, the defendants' proposal fails because they cannot tie Skadden's after-the-fact analysis to what would have been in Harrison's mind at the time he engaged in the overnight cross trading. Third, the conclusions offered by Skadden are its own and that of its third party investigative firm. *Reyes*, 239 F.R.D. at 600 ("second-hand reflections, findings, and conclusions of investigating attorneys" are irrelevant and inadmissible at trial). Perhaps they serve Putnam's purposes in its report to its own investors, but they do not have the "hallmarks of reliability" expected of trial evidence. *Id*.

### 3. Any Relevance Is Outweighed by Potential Prejudice

It took the Skadden Report 51 pages and 42 exhibits to try to explain its allegations against Harrison and then reach—by its own admission—"unreliable" results regarding whether and to what extent Harrison's trades occurred at "best price." Given the importance of Harrison's testimony in this trial, it is unfairly prejudicial to the Government to permit examination of Harrison on a subject matter fraught with such uncertainty and with such little probative value. *United States v. Kaiser*, 609 F.3d 556, 572 (2d Cir. 2010) (finding district court should have excluded hearsay statement on Rule 403 grounds given limited relevance of its non-hearsay purpose and the fact it went to an "important disputed issue" in the case). As discussed above, even if the defendants could convince a jury that Harrison's conduct amounted to trade-

prearrangement forbidden by SEC or Putnam rules,[4] they would not be able to show that Harrison's statements were knowingly false for Rule 608(b) purposes, rather than an honest disagreement. Similarly, even if the defendants could show that Harrison's conduct caused loss to his victims, it would still not affect Harrison's intent to do the best he could for his investors. In both instances, however, to prove their claim that Harrison actually did prearrange trades and that it caused loss, defendants would have to introduce evidence to that end, a feat the Skadden Report itself—by its own admission—could not achieve.

The defendants claim that they should be able to repeat this exercise in front of the jury because of the importance of Harrison's testimony, contending that this evidence is no more technical than the allegations against the defendants. Def. Resp. at 23. Not only do the defendants ignore the clear problems with the reliability of the report and its subject matter, they also conflate the importance of Harrison as a witness with the importance (or lack thereof) of the allegations in the Skadden Report. That conflation is laid bare by the defendants' reliance on *United States v. Blum*, 62 F.3d 63, 68-69 (2d Cir. 1995). In *Blum*, the defendant, CEO of a manufacturer of various chemical products, was charged with falsifying production logbooks in order to avoid EPA rules, based largely on the testimony of another employee. *Id*. at 65-67. At trial, the district court precluded introduction of evidence that the witness had personal motives to falsify the logbooks (he was misappropriating company property) based on Rule 608(b) and Rule 403 grounds. *Id*. at 67-68. In finding error, the court held that the testimony was not principally 608(b) evidence, but rather was admissible under Rule 404(b) to show that the witness had a motive to fabricate the

---

[4] Notably, one of Skadden's recommendations to Putnam is to "[r]evise the Adviser Cross Trade Policy to specifically state that prearranged repurchase transactions are prohibited." Skadden Report at 43.

logbook himself. *Id*. at 68. The court also held that "any confusion" would be outweighed by the probative value of the evidence, which would actually help the jury decide the central issue. *Id*.

Unlike in *Blum*, the claims against Harrison are wholly unrelated to the charged conduct against the defendants. This evidence does not help the jury evaluate the central issue in the case, i.e., whether the defendants made material misrepresentations to victims in the buying and selling of bonds. Notably, the defendants do not claim that the core of Harrison's alleged conduct—prearrangement of trades—actually undercuts his credibility as witness, because it clearly does not relate to truthfulness. Moreover, whereas in *Blum* the court was noticeably silent as to the extent of any confusion caused by the additional evidence, here there is little doubt on that score. The defendants' claim that evidence is no more technical than the allegations in the indictment is belied by the confusion inspired by the report itself. That confusion vastly outweighs any minimal probative value.

### D.     Conclusion

For the reasons discussed herein, the Government respectfully requests that the Court preclude cross examination with the Skadden Report and its subject matter.

Respectfully submitted,

DEIRDRE M. DALY
UNITED STATES ATTORNEY

_____
LIAM BRENNAN
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NO. CT27924

DAVID NOVICK
HEATHER CHERRY
ASSISTANT UNITED STATES ATTORNEY

                    U.S. Attorney's Office
                    157 Church Street
                    New Haven, CT 06510
                    (203) 821-3835

## Certificate of Service

    I hereby certify that on April 12, 2017, a copy of the foregoing was sent electronically to counsel for Ross Shapiro, Michael Gramins, and Tyler Peters through the Court's ECF system.

                                                         /s/
                                      LIAM BRENNAN
                                      ASSISTANT UNITED STATES ATTORNEY