## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 3:15CR155 (RNC) |
| | : | |
| v. | : | |
| | : | |
| ROSS SHAPIRO, | : | |
| MICHAEL GRAMINS, and | : | |
| TYLER PETERS | : | April 17, 2017 |

## GOVERNMENT'S SUPPLEMENTAL SUBMISSION ON EVIDENCE
## OF THE LITVAK INDICTMENT

The Government respectfully submits this supplemental briefing regarding the upcoming trial in the above captioned matter. At a hearing on April 13, 2017, the Court heard arguments about whether evidence of the indictment of Jesse Litvak should enter into the record at trial. Following a colloquy with both sides, the Court asked the Government to proffer the evidence related to the Litvak indictment. The Government accordingly submits the following.

## BACKGROUND[1]

In November 2011, Michael Canter of AllianceBernstein discovered that Jesse Litvak, an RMBS trader at Jefferies, was lying to him about the prices at which Jefferies bought or sold RMBS bonds in the context of negotiations (the "Litvak incident"). These lies allowed Jefferies to earn secret compensation, above what Canter had negotiated. Canter had been investing money on

---

[1] Shapiro asked the Court to strike several overt acts from the Indictment, essentially arguing that there is no proof that Shapiro was a member of the conspiracy after he warned the desk not to lie about bond prices following a compliance training that occurred in the wake of the indictment of Jesse Litvak. In addition, Shapiro, joined by the other defendants, asked the Court to preclude any reference to the charges against Jesse Litvak, arguing that they are irrelevant and highly prejudicial. At the hearing on April 13, 2017, defendants' counsel proposed striking the name "Litvak" entirely from the trial. There is little doubt, however, that the *Litvak* indictment is relevant to defendants' intent. This background section puts in context the discovery of Litvak's conduct and his eventual indictment as it relates to specific incidents regarding defendants' intent and the materiality of the defendants' misrepresentations, elements the Government must prove at trial. The *Litvak* indictment is highly probative of the defendants' intent, as it is proof that the defendants continued to willfully engage in the fraudulent conduct even after learning that the Government criminally charged another bond trader for similar conduct.

behalf of the United States Treasury and other private investors. Accordingly, AllianceBernstein reported the deception to the United States Treasury. Litvak was fired from Jefferies—which led to speculation and rumor among RMBS bond traders. On January 6, 2012, the trade journal, Asset-Backed Alert, incorrectly reported that Litvak left Jefferies "apparently out of a desire to switch to the buy side." But many in the market knew the truth—after the Litvak incident, Canter spoke with several broker-dealers asking if they had engaged in similar conduct.

Soon after Canter discovered Litvak's fraud, in February 2012, the Nomura RMBS desk and AllianceBernstein had a dispute about a bond transaction. After days of negotiating a bond transaction between AllianceBernstein (the buyer) and a seller, Nomura purchased the bond from the seller without an agreement on a sale price to AllianceBernstein. Nomura continued to negotiate with AllianceBernstein to sell them the bond, pretending that they had not yet purchased the bond. AllianceBernstein discovered that Nomura had not been truthful about the ownership of the bond and complained to Nomura. AllianceBernstein was particularly upset with this conduct, given it came on the heels of the Litvak incident. Canter spoke separately with Michael Jones, Nomura's Head of Securitized Products Sales New York[2] and Shapiro. Canter informed Shapiro that AllianceBernstein had just been through something similar with another broker-dealer, that the Nomura trade in question was a PPIP trade subject to a great deal of oversight, and informed Shapiro of the potential ramifications. Jones specifically remembers that Canter expressed surprise that Nomura would do this to AllianceBernstein knowing that Canter was the one who discovered and reported Litvak's behavior. The issue was eventually resolved; Nomura agreed to sell AllianceBernstein the bond for the price that Nomura had purchased the bond, meaning Nomura would not make any profit for facilitating the trade.

---

[2] On April 14, 2017, the Government spoke with Jones for the first time. The Government will provide defendants a memorandum of the interview and the agent's notes this week. The Government will likely call Jones to testify at trial.

In the aftermath of Jones's conversations with AllianceBernstein and senior management at Nomura, he specifically remembers agreeing with Shapiro that each would go to their respective subordinates and remind them that they were not to make misrepresentations; Jones also remembers that he and Shapiro confirmed with each other afterwards that they carried out this plan. However, given the evidence now in the parties' possession, it is obvious that Shapiro and the traders on his RMBS desk continued making misrepresentations to increase the profit of the desk.

On April 27, 2012, the true reason why Litvak was fired was confirmed and any rumors in the marketplace put to bed. Asset-Backed Alert published an article entitled, "Outraged Client Behind Jefferies Dismissals." The article stated:

> The dispute stems from a string of "contra trades" in which Jefferies acted as a middleman between a seller of mortgage bonds and its client, without taking a position in the securities. Typically, the broker in such a transaction makes money only by collecting a small fee from the buyer.
>
> In this case, the buyer approached Jefferies with a description of bonds it wanted to purchase and eventually settled on a price. Sources said that Jefferies was able to find a seller at the agreed-upon value. Instead of passing the securities along, however, Litvak apparently told the buyer that it would have to pay more than expected—with Jefferies pocketing the difference for itself.

Bates No. NSISEC00177141. The article also referenced a FINRA filing. The FINRA filing, described Litvak's conduct as follows:

> IN EARLY NOVEMBER 2011, THE FIRM WAS CONTACTED BY A CUSTOMER REGARDING CERTAIN NON-AGENCY, MORTGAGE BACKED SECURITEIS ("MBS") THAT THE CUSTOMER HAD PURCHASED FROM THE FIRM. THE CUSTOMER CLAIMED THAT THE FIRM HAD EARNED MORE ON CERTAIN TRADES THAN WAS CONTEMPLATED BY A PURPORTED ORAL ARRANGEMENT THE CUSTOMER HAD WITH THE FIRM'S TRADER AND SALESPERSON.

*Available at* https://brokercheck.finra.org/individual/summary/2921134.

Notably, even after (1) the rumors of why Litvak was fired, (2) the incident with AllianceBernstein, (3) Shapiro's agreement to remind the RMBS desk that it could not make misappropriations, and (4) learning, definitively, why Litvak was fired, Shapiro (and the traders on the Nomura's RMBS desk) continued to lie to increase their profits. For example, Shapiro facilitated a trade in November 2012, where he lied to the potential buyer of a bond about where Nomura could purchase the bond and how much compensation Nomura was making.[3]

In January 2013, Litvak was criminally indicted for, among other things, securities fraud. Making misrepresentations in the course of bond negotiations was clearly wrongful prior to Litvak's indictment. RMBS traders had long been aware of its wrongfulness and that it was a violation of federal securities laws, via a myriad of sources: FINRA licensing exams, compliance policies, internal trainings, and interactions with buy-side counterparties. But, if there was any doubt about the wrongfulness of making misrepresentations in the course of bond negotiations, it was irrevocably undermined by the indictment of Litvak.

The reaction of the market was unambiguous. Market participants wondered if others would be indicted. Broker-dealers ordered their traders to ensure that they were not engaging in similar behavior. Buy-side investors also warned traders not to engage in Litvak behavior. "Litvak" became a ubiquitous word for fraud in the RMBS market.

---

[3] Defendants continue to suggest that the only fraudulent trades were the 20 trades the Government has given notice that it intends to prove at trial. Defendants' deceit runs far beyond the noticed trades. This November 2012 trade is just one example of the over 150 fraudulent trades (out of approximately 800 reviewed trades) the Government has uncovered to date. While the Government has expressed its desire to limit its proof at trial, if defendants continue to make arguments relying on a misleading discussion of the 20 noticed trades, the Government may be required to introduce additional trades at trial. At this time, however, and in light of Shapiro's arguments in his Motion to Strike Surplusage, [Dkt. # 328] and the hearing on April 13, 2017, the Government gives notice of the November 2012 trade, which it now intends to introduce at trial.

After news of Litvak's indictment broke, Nomura's compliance department sent a clear message that succinctly reaffirmed its longstanding policy to its senior traders and salespeople, including Gramins and Shapiro—"DO Not Lie." Shapiro and Gramins then delivered a version of this message to the RMBS desk—do not discuss Nomura's purchase or sale price with counterparties. Gramins also told traders on the RMBS desk that he believed Litvak would be okay; that other broker-dealers engaged in this activity more than Nomura, and that they had nothing to worry about. Yet, knowing the possibility of criminal prosecution if caught and the Government's ability to obtain traders' chats, Nomura's RMBS desk did not stop engaging in the fraud. Instead, they brazenly sought more surreptitious ways to engage in fraud, like moving their fraudulent conduct to the phone. Just as the RMBS desk traders and supervisors (including defendants) had, up to that point, ignored their FINRA exams, their compliance manuals, their Nomura trainings, Canter's previous admonishment, and evidence of the reasons for Litvak's firing—all of which gave them reason to understand the wrongfulness of their fraudulent conduct—they continued to engage in the fraud despite now learning from the *Litvak* indictment that the Government was paying attention to fraud in the RMBS market and could obtain their chats. And while each of those prior pieces of evidence are indicators of defendants' knowledge of wrongfulness in themselves, it is self-evident that none can match the probity of a criminal indictment for similar conduct in considering its effect on the states of mind of defendants.

## DISCUSSION

### I.    Evidence of the Litvak indictment is highly probative of defendants' intent

The principal relevance of the *Litvak* case is, quite simply, defendants' knowledge of the indictment itself. The Government must prove that defendants knew that their conduct was wrongful (under the Government's proposed instructions) or unlawful (under defendants'

proposed instructions). In either event, it is difficult to overestimate the probity, in assessing whether defendants were aware of laws that could cover their conduct, of evidence that similar conduct was charged as federal securities fraud.

The Government does not seek to introduce the fact of the *Litvak* indictment for the fact of his convictions (*i.e.,* he was convicted of all counts at his first trial, and then on remand was convicted of one out of ten counts at a second trial)—the Government agrees that Litvak's actual convictions are irrelevant in this case.[4] Instead, the Government seeks to introduce defendants' knowledge of the indictment to buttress its other evidence with respect to their state of mind. Defendants are free to argue at trial that—at the time of the *Litvak* indictment—they believed that Litvak's actions did not constitute criminal fraud, that the Government would lose at Litvak's trial, and that therefore defendants believed their own conduct was not criminal or wrongful. But to allow defendants to avoid facing such profoundly probative evidence of their intent is unfair to the Government. In short, the probity of the evidence greatly outweighs any potential prejudice.

## II. Defendants' knowledge of the *Litvak* indictment puts in context defendants' post-*Litvak* conduct

The elimination of testimony regarding the *Litvak* indictment places the Government's evidence in a false context and deprives it of its probity. In addition to the indictment's effect on the state of mind of defendants, it is critical context for several other pieces of evidence as follows:

- Government Exhibit ("GX") 5 series – compliance training power point slide and sign-in sheet from February 7, 2013. The compliance training occurred in response to the *Litvak* indictment. The power point slide says, "First and

---

[4] Likewise, the Government will not put on evidence of Gramins and Peters firings, following Nomura's discovery of the fraudulent trades facilitated by each defendant after the *Litvak* indictment. Such evidence is not probative of defendants' states of mind and therefore has no bearing on the issues at trial.

foremost for everyone is <u>DO Not Lie</u>." (Emphasis in original.). Gramins and Shapiro attended the training.

- Testimony regarding a "huddle" on the RMBS desk after Shapiro and Gramins attended the post-*Litvak* training. During the huddle, Shapiro and Gramins instructed the subordinate traders to no longer disclose to counterparties Nomura's purchase or sale price from the other side of a trade.

- GX 7 – a February 5, 2013 chat in which Peters and others discuss a third-party trader being "dirtay" (i.e. "dirty"). One of the participants in the chat refers to this trader by saying, "he was the first guy to start using the phone after the litvak [sic] incident. which [sic] is fairly telling." As discussed below, one of the Government's witnesses will explain that Gramins used the phone more after Litvak's indictment.

- GX 8 – a February 6, 2013 chat in which one of Nomura's counterparties places a bid of 70-2. Peters tells the counterparty "thanks, we'll use that." The counterparty then asks, "Am I sticking out there though?" When Peters assures him of the soundness of a 70-2 bid, the counterparty states, "OK don't litvak [sic] me! Go ahead with that bid."

- GX 28 series – documents pertaining to an April 10, 2013 trade executed by Peters in which he engages in a Litvak-style lie to his counterparties to defraud them of money. This occurs three months after the *Litvak* indictment.

- GX 29 series – documents and audio recordings pertaining to a November 22, 2013 trade executed by Gramins in which he engages in a *Litvak*-style lie to customers to defraud them of money. As discussed more fully in the

Government's responsive brief, Shapiro participates in Gramins' chat with victim Joel Wollman when Gramins lies to Wollman. In particular, despite allegedly having told his traders after *Litvak* not to reveal at what price they are buying a bond, Shapiro does not interrupt Gramins as he does just that; rather, once Wollman ups his bid over 80, Shapiro reassures him that "80 is just a #."

- Testimony from Caleb Chao about Gramins' increased use of the phone following the *Litvak* indictment. Because of the *Litvak* indictment, RMBS traders became aware that the Government obtained Litvak's chats with his victims and Chao will testify that after the *Litvak* indictment, he noticed Gramins use the phone more often and he heard Gramins in a Litvak-style lie over the phone.

- Testimony from victim Joel Wollman—importantly the victim in the GX 29 series (and other trades before that)—that he discussed the *Litvak* indictment with Shapiro. While Wollman does not remember the specifics of the conversation, importantly Shapiro, who was Wollman's friend, did not admit to Wollman that he had taken advantage of Wollman in the same way.

Defendants' knowledge of the *Litvak* indictment places all the foregoing events in an important context. For example, Peters' "don't litvak me" conversation with a counterparty is highly probative of materiality, but loses its meaning without an explanation of what "litvak" signifies. Moreover, the conversation emphasizes to Peters the materiality of Litvak-style lies to counterparties, bearing directly on his intent and willfulness when, in April 2013, he engaged in the same conduct. Similarly, the willfulness of Gramins and Shapiro's fraudulent trade with Wollman in November 2013 is illuminated by their knowledge of the *Litvak* indictment, Nomura's

compliance training following the indictment, and Wollman's conversation with Shapiro about the same topic. Likewise, the fact that Gramins moved his fraudulent activity from electronic chats to the phone is direct evidence that his fraudulent conduct is not a mistake, but willful behavior. Indeed, without knowledge that the Government had obtained Litvak's chats, there is no way for the jury to understand why Gramins' move to increased trading over the phone was significant. Without introduction of his knowledge of the *Litvak* indictment, the move may appear innocuous, out of convenience, and without fraudulent intent.

There is no doubt that the Government's evidence of defendants' willfulness is greatly enhanced by their knowledge of the *Litvak* indictment. It also bears on the Government's evidence of materiality. Excluding testimony about the *Litvak* indictment significantly diminishes the strength of this evidence and unfairly prejudices the Government's case.

### III.   The Specific Concerns of the Defendants Are Unfounded

In the face of the overwhelming relevance of the *Litvak* indictment to defendants' state of mind, defendants' claims of prejudice are illusory and of the sort regularly cured by jury instructions. Specifically, the defendants have argued that: (1) that jurors would assume defendants were guilty because someone else had been charged with similar conduct; and (2) that jurors would conduct independent research about the *Litvak* case. There is no factual or logical basis for these concerns.

In the jury instructions proposed by both the Government and defendants, the Court would instruct the jurors that an indictment is simply an allegation. In the words of defendants' proposed instructions, an indictment "is merely an accusation, a statement of the charges made against a defendant that gives a defendant notice of the charges against him and informs the Court and the public of the nature of the accusation." Dkt. 316 at 35. Similarly, the proposed instructions by both

sides instruct jurors not to do any independent research on the trial. Again, in the words of defendants' proposed jury instructions, "you must scrupulously refrain from trying to access information about the case from any outside source including dictionaries, reference books, or anything on the internet. Information that you may find on the internet or in a printed reference might be incorrect or incomplete. Moreover, as I have instructed you before, you must also scrupulously avoid any media reports about the case or any other outside influences." *Id.* at 90.

As the Court is well aware, "[a] jury is presumed to follow its instructions." *Weeks v. Angelone*, 528 U.S. 225, 234, (2000). There is simply no logical reason to believe that evidence of an indictment of another RMBS trader named Jesse Litvak would cause jurors to disobey their instructions and violate their oath. There is no reason to think that jurors cannot understand that an indictment against Litvak is simply an allegation when they are being asked to believe the same thing regarding the indictment against Shapiro, Gramins and Peters. Put simply, to assume prejudice on the grounds proffered by defendants would lead to a conclusion that no trial—in which defendants are indicted and a juror could theoretically do research—could ever be fair.

**CONCLUSION**

Wherefore, the Government respectfully requests that defendants' motions to exclude reference to the *Litvak* indictment be denied.

Respectfully submitted,

DEIRDRE M. DALY
UNITED STATES ATTORNEY

_____/s/_____
LIAM BRENNAN
HEATHER CHERRY
DAVID E. NOVICK
ASSTANT UNITED STATES ATTORNEYS
FEDERAL BAR NO. CT27924

U.S. Attorney's Office
157 Church Street
New Haven, CT 06510
(203) 821-3835
Liam.Brennan3@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 17, 2017, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF System.


<u>            /s/            </u>
LIAM BRENNAN
ASSISTANT UNITED STATES ATTORNEY