# ALSTON&BIRD LLP

One Atlantic Center
1201 West Peachtree Street
Atlanta, GA  30309-3424
404-881-7000 | Fax: 404-881-7777

Michael L. Brown                Direct Dial: 404-881-7589                Email: mike.brown@alston.com

May 14, 2017

VIA ECF

Hon. Robert N. Chatigny
United States District Court
450 Main Street
Hartford, CT 06103

          Re:    *United States v. Shapiro, et al.*
                 3:15-CR-155 (RNC)

Dear Judge Chatigny:

      Defendant Peters submits this letter in response to the government's letter regarding the admissibility of Government Exhibit ("GX") 28B, a chat between Conor O'Callaghan and John Murray, offered by the government, absent any evidentiary basis during the testimony of Zach Harrison, a witness with no connection to the exhibit.  The government's letter ignores the primary issue raised by Mr. Peters: that introducing GX 28B through Mr. Harrison violates Mr. Peters's Sixth Amendment right to cross-examine witnesses against him.

      This exhibit is classic hearsay.  It involves neither Mr. Peters nor Mr. Harrison and cannot be properly entered in to evidence through Mr. Harrison.  The remedy is simple.  The government must call Mr. O'Callaghan to testify about the chat that he had with John Murray and what, if anything, he told Mr. Peters about Mr. Murray's bids and instructions.  This would ensure Mr. Peters's Sixth Amendment right to cross-examine Mr. O'Callaghan is protected.  On the other hand, the admission of the chat at this point would obviate the government's need to call Mr. O'Callaghan — an enormously prejudicial outcome that would deprive Mr. Peters of his right of confrontation.

### The Government Cites No Evidentiary Basis for Admission of GX 28B at this Time

      Exhibit 28B is pure hearsay.  The document is a chat between Mr. O'Callaghan and his customer John Murray at Arlington.  Mr. Harrison is not a party to the chat.  The government seeks to admit the evidence for the truth of the matter asserted, specifically, that Mr. Murray submitted various bids to purchase the BCAP bond that Mr. Harrison was selling.  The government seeks to admit this evidence to support its contention that Mr. Peters misled Mr. Harrison when he communicated the buyer's alleged bids.  The

Alston & Bird LLP                                                                                                                www.alston.com

Atlanta | Beijing | Brussels | Charlotte | Dallas | Los Angeles | New York | Research Triangle | San Francisco | Silicon Valley | Washington, D.C.

May 14, 2017
Page 2

government argues, and indeed would have Mr. Harrison testify, that knowledge of the buyer's accurate bids would have been important to him, and led him to conduct himself differently during the negotiation of the transaction. The government cannot argue that they are not admitting the chat for the truth of the matter asserted.

The government can cite no rule of evidence permitting the introduction of this hearsay document. Mr. Peters is not a participant in the chat. As a result, the chat cannot be admitted under Federal Rule of Evidence 801(d)(2) as a statement by a party opponent. Likewise, Mr. Harrison was not a party to the chat, thus preventing its admission as related to his state of mind at the time of the transaction. The government also has not established through proof at trial that – *on the day of the chat* – Mr. O'Callaghan was a member of any alleged conspiracy with Mr. Peters. *See e.g., United States v. Lieberman*, 637 F.2d 95, 102 (2d Cir. 1980) ("Before a coconspirator's statements are admissible against a defendant, the government must show that . . . both the defendant and the declarant participated in [the conspiracy] . . . ."). The government argues generally that Mr. O'Callaghan must have been a member of the conspiracy because salespeople would "typically" know about a misrepresentation, and Mr. O'Callaghan was a salesperson. In addition, the government cites to a chat that Mr. Dinucci discussed and in which Mr. O'Callaghan was a participant. Mr. Dinucci, however, never testified that Mr. O'Callaghan was a member of any conspiracy or even that he knew Mr. O'Callaghan made false representations to Nomura counterparties – let alone that he did so after the post-Litvak compliance training. Indeed Mr. Dinucci mentioned Mr. O'Callaghan only once during his testimony in order to identify him as a salesperson at Nomura. Mr. Dinucci never claimed that Mr. O'Callaghan made false representations. The evidence also shows that Mr. O'Callaghan continues to work at Nomura, suggesting that he was not implicated in the conduct at issue. Finally, the government chose not to indict Mr. O'Callaghan for his involvement in the BCAP trade, thus indicating that it did not believe he was colluding with Mr. Peters to defraud Nomura's customers at the time of the trade. For all of these reasons, the government cannot establish that the chat is admissible under Federal Rule of Evidence 801(d)(2)(E).[1]

The government cites no other rule that permits the admission of this hearsay statement. Moreover, in the absence of testimony that Mr. O'Callaghan accurately relayed the buyer's bids, the chat is not relevant. Without testimony from Mr. O'Callaghan about

---

[1] In its letter, the government contends that salespeople reported to or took instruction from traders. *Gov't Letter* at 3-4. No evidence supports this wide-ranging conclusion. The government takes testimony regarding the general role of traders at Nomura and suggests that this establishes a hierarchy placing the traders superior to the sales people. The government has not asked a single witness about this issue and should not be permitted to splice together unrelated statements to create this fact. The government also contends that Mr. O'Callaghan stated in the chat that he was taking instructions from Mr. Peters. *Gov't Letter* at 4-5. That is not correct. Mr. O'Callaghan stated that he would ask Mr. Peters about the seller's offers. That is normal. Mr. Peters was negotiating with the seller while Mr. O'Callaghan was negotiating with the buyer. Of course he had to ask Mr. Peters about possible offers. These statements do not indicate that Mr. Peters was directing or instructing Mr. O'Callaghan's conduct.

the accuracy of the chat and the manner in which it was communicated to Mr. Peters, the chat cannot be properly admitted.

### **No Evidence Suggests Mr. O'Callaghan Accurately Relayed Bids to Mr. Peters**

In its letter to the Court, the government focuses on evidence suggesting that Mr. Peters and Mr. O'Callaghan communicated during the trade. Mr. Peters concedes that the chat itself shows that the two Nomura employees were communicating with each other up until a certain point in the transaction. The best evidence of this is the fact that offers Mr. Harrison communicated to Mr. Peters were accurately relayed by Mr. O'Callaghan to his buyer. By way of example, at 13:09:38 and 14:04:35, Mr. Harrison gave Mr. Peters offers of 65.5 and 65.25, respectively. Mr. O'Callaghan presented both offers to his buyer. This indicates that (1) Mr. Peters and Mr. O'Callaghan were communicating with each other and (2) Mr. Peters was giving Mr. O'Callaghan accurate information.

Mr. Harrison presented a third offer of 65 at 14:31:41 and that offer was conveyed by Mr. O'Callaghan to Mr. Murray. There is no evidence that Mr. Peters and Mr. O'Callaghan had any further communication before the final prices were negotiated at 16:33:53 – *more than two hours later.* In fact, the chat itself shows that they were *not* in communication during this time as Mr. Peters was in a meeting and unavailable to speak with Mr. O'Callaghan. During this two hour time frame, Mr. O'Callaghan negotiated the final sales price over the phone with his buyer.

In addition to the fact that the government cannot show communication between Mr. Peters and Mr. O'Callaghan *at the time Nomura's customers decided to sell and buy the bond*, the larger issue is that the government has presented no evidence whatsoever to suggest that Mr. O'Callaghan provided accurate information to Mr. Peters. Juxtaposition of the chat between Mr. Peters and Mr. Harrison and the chat between Mr. O'Callaghan and Mr. Murray establishes only that Nomura did not present the full bid to Mr. Harrison. In other words, Nomura "backed up" the bid. The chats provide no evidence as to whether Mr. Peters got the full bid from Mr. O'Callaghan and backed it up himself or whether Mr. O'Callaghan presented Mr. Peters a bid that he had already backed up. In the latter situation, Mr. Peters could not be blamed for presenting a bid that he believed was accurate. There are also other possibilities besides deception. What if Mr. O'Callaghan and Mr. Murray had an understanding that Mr. O'Callaghan was permitted to back up Arlington's bid as he saw fit? Or perhaps Mr. O'Callaghan did this without express authorization but with the intention of passing along any savings to Mr. Murray, his customer whom he hoped to please. In any of these situations, it would have been totally appropriate for Nomura to present Mr. Harrison a lower bid.[2]

The government is assuming facts not in evidence and seeks to have the jury draw inferences from documents not admitted in evidence. In the absence of testimony from Mr. O'Callaghan as to his arrangement with Mr. Murray, his intentions during the bid, and whether he provided Mr. Peters accurate information, Mr. Harrison should not be permitted

---

[2] It is worth noting again that this trade took place in the post-Litvak time period. Additionally, Mr. Peters does not suggest that there was anything improper about "backing up a bid" and is simply providing a few reasons why this could have occurred in the subject trade.

to testify as to his alleged reliance on hypothetical facts. There is simply no evidentiary foundation for the question. The government seeks to introduce the chat between Mr. O'Callaghan and his customer without any explanation as to how the chat fits into the representations allegedly made to Mr. Harrison. The government will then hang that chat around Mr. Peters's neck, claiming that Mr. Peters deceived Mr. Harrison because he did not present Mr. Harrison with the buyer's accurate bids. At this point in the trial, there is no basis for this allegation.

### Admitting GX 28B Now Would Permit the Government to Escape Calling Mr. O'Callaghan to Testify in Violation of Mr. Peters's Sixth Amendment Rights

If the government wants to present evidence suggesting that Mr. Peters deceived Mr. Harrison by backing up the bid, the government should have to establish a foundation that Mr. Peters received accurate bid information. Otherwise, Mr. Peters cannot defend himself through the cross-examination of Mr. O'Callaghan. Indeed, allowing the government to introduce this chat through Mr. Harrison will obviate the need for the government to call Mr. O'Callaghan whatsoever – thus preventing any cross-examination by Mr. Peters, and violating Mr. Peters's right to confront the evidence against him. The government should not be permitted to shield its case from cross-examination in this manner.

The government's letter to the Court suggests that the government is trying to avoid calling Mr. O'Callaghan. The government, for example, claims that Mr. Dinucci testified about a "practice" at Nomura to keep salespeople informed so that they could "keep their stories straight." *Gov't Letter* at 5. The government further contends that "the jury is entitled to infer from this testimony that [Mr.] Peters and [Mr.] O'Callaghan followed Nomura's practice and stayed in communication throughout the BCAP bond trade." *Id.* The government is clearly trying to pin the alleged misstatement on Mr. Peters without calling Mr. O'Callaghan. The government seems to have decided that Mr. Peters was responsible for the alleged misrepresentation at issue in the BCAP trade. It apparently did so because – in interviews with government agents – Mr. O'Callaghan claimed that he told Mr. Peters the truth about Mr. Murray's bids. Mr. Peters now stands accused of fraud in regards to this trade. Mr. O'Callaghan should be required to come to court to make the same allegations and face cross-examination by Mr. Peters's attorneys. The government cannot be permitted an end-run around Mr. Peters's Sixth Amendment rights.

The government also makes the bold and baseless claim that "constant communication between [Mr.] Peters and [Mr.] O'Callaghan during a trade is consistent with Peters' (sic) practice of using [Mr.] O'Callaghan as a mouthpiece in negotiating another fraudulent trade." *Gov't Letter* at 5. Importantly, the other trade to which the government points occurred before Mr. Litvak's indictment. Its relevance to the post-Litvak BCAP trade is, therefore, limited. In addition, the government's claim that Mr. Peters, in connection with that earlier trade, "used Mr. O'Callaghan as a mouthpiece" is plainly wrong. Mr. O'Callaghan was fully responsible for the alleged misrepresentations in that trade and has admitted his responsibility in interviews with government agents. *See* March 3, 2017 Memorandum of Investigative Activity at 2, attached hereto as Exhibit A ("[Mr.] O'Callaghan acknowledged that he provided inaccurate information to [Ms.] Anisgarten in this trade"). The government, however, contends that this other trade shows

May 14, 2017
Page 5

that "[Mr. Peters and Mr. O'Callaghan] had a practice of communicating and working together as co-conspirators to negotiate trades using misrepresentations" and that "the jury is entitled to infer that [Mr. Peters and Mr. O'Callaghan] carried out that practice in the BCAP bond trade."[3]  *Id.*

Likewise, the government argues that it has presented evidence that Mr. Peters misrepresented bids to Mr. Harrison in other trades and that "the jury is entitled to infer from this evidence of [Mr.] Peters' (sic) *modus operandi* that he once again carried out that scheme in the BCAP bond trade." *Id.* at 6. All of these arguments support Mr. Peters's claim that the government seeks to introduce GX 28B through Mr. Harrison (and without laying the proper foundation) in order to avoid calling Mr. O'Callaghan—a witness who is available to testify—and subjecting him to cross-examination. This should not be allowed.

The government can claim no prejudice for having to follow the rules of evidence. Mr. Harrison has already testified that information he received from Nomura traders about the prices at which they could buy or sell bonds was important to him. That testimony applies to the BCAP trade. In addition, the government can ask Mr. Harrison whether he relied upon Mr. Peters's representations about bids when he sold the BCAP bond to Nomura. If Mr. O'Callaghan later testifies that he provided Mr. Peters accurate bid information and that Mr. Peters subsequently misrepresented the bids to Mr. Harrison, the government will have closed the loop on their theory of this trade. Mr. Peters does not concede that this is sufficient to establish fraud, let alone that he committed fraud, but would put the government in the same position as if it had been able to show this chat to Mr. Harrison, while still protecting Mr. Peters's Sixth Amendment rights. The government, therefore, should be required to go through these steps so that Mr. Peters can confront his accuser.

For the reasons set forth above – as well as the arguments of counsel at trial – Defendant Peters objects to the admission of GX 28B at this time.

Sincerely,

Michael L. Brown

---

[3] The documents that the government argues the jury should be able to draw this inference from have not been admitted into evidence. The jury cannot draw an inference from evidence that has not been put before them.