## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) CRIM NO. 3:15-CR-155 (RNC) |
| | ) |
| vs. | ) |
| | ) |
| | ) May 30, 2017 |
| ROSS SHAPIRO, MICHAEL GRAMINS, AND | ) |
| TYLER PETERS. | ) |
| | ) |

### MEMORANDUM OF DEFENDANT TYLER PETERS
### IN SUPPORT OF A
### MOTION FOR JUDGMENT OF ACQUITTAL UNDER FED. R. CRIM. P. 29(A)

Defendant Tyler Peters respectfully submits this memorandum in support of his motion for acquittal pursuant Federal Rule of Criminal Procedure 29(a).  This motion should not be construed as a waiver of any argument concerning the sufficiency of the evidence that Mr. Peters may raise at the close of all the evidence, in post-trial motions, or on appeal.

### INTRODUCTION

Mr. Peters seeks an order pursuant to Federal Rule of Criminal Procedure 29(a) entering a judgment of acquittal on all counts of the Third Superseding Indictment, as the government has failed to present evidence sufficient to sustain a conviction as to any count.  Among other things:

- With regard to the wire fraud counts (Counts 4–9), the government cannot prove that any of the six emails underlying those counts was sent "in furtherance of" any fraud. Each was sent *after* a trade was completed, and the government did not present any evidence that these communications enticed a counterparty to enter into an allegedly fraudulent transaction.

- With regard to the wire fraud counts (Counts 4–9), the government also cannot sustain its burden of proving beyond a reasonable doubt that Mr. Peters acted with "intent to defraud." The government has adduced no evidence at all to suggest that Mr. Peters intended to defraud his trading counterparties. Indeed, all of the testimony in this case makes plain that the counterparties received the exact bond that they bargained for at the negotiated price to which they agreed.

- With regard to the securities fraud counts (Counts 2 & 3), the government has presented no evidence that Mr. Peters acted with the requisite degree of willfulness – that he knew his conduct was unlawful. As the Court has made clear, the government cannot use a criminal indictment to define what is lawful and unlawful; the defendant must have that knowledge at the time of the charged conduct. Mr. Peters had no notice before Mr. Litvak's indictment that the government might deem his conduct criminal, and the government presented no evidence to suggest that Mr. Peters – or anyone else – understood the conduct at issue to be unlawful.

The government forfeits its right to have a jury decide its case when it fails to back up its allegations with sufficient proof. The proof that Mr. Peters violated federal criminal law is wanting. Mr. Peters is therefore entitled to a judgment of acquittal.[1]

### BACKGROUND

The Third Superseding Indictment in this case – filed in March 2017 – charges Mr. Peters and his co-defendants with nine counts: one count of conspiracy to commit offenses against the United States under 18 U.S.C. § 1343 and 15 U.S.C. §§ 78j(b) and 78ff(a); two counts of securities

---

[1] Mr. Peters expressly joins in the Rule 29 motion filed by Defendant Ross Shapiro, to the extent it asserts that the government has failed to adduce evidence sufficient to support a jury verdict that the misstatements alleged in the indictment were material to a reasonable investor in the RMBS market at the time those misstatement were made.

fraud under 15 U.S.C. §§ 78j(b) and 78ff; and six counts of wire fraud under 18 U.S.C. § 1343. *See* Third Superseding Indictment, ECF No. 307. The charges are based on two types of alleged misrepresentations: (1) misrepresentations to Nomura's counterparties about the price at which Nomura was going to buy a bond from a third party or was going to sell it to the third party (Nomura's "acquisition price" or "sales price"); and (2) misrepresentations to buyers that Nomura was obtaining a bond from a third party when, in fact, Nomura was holding the bond in its inventory. *See id.* at 9. None of the charges alleges that Mr. Peters sold a different bond than the one that he promised to sell or that he paid a price different from the one he promised to pay. As charged in the indictment, Mr. Peters's alleged misrepresentations occurred between January 2010 and April 2013. The trade referenced in paragraph 35(t) of the Indictment is the sole allegation that Mr. Peters engaged in the conduct at issue after the precedent-setting indictment of Jesse Litvak in January 2013. *See id.* at 10–14.

In an attempt to prove up its allegations, the government presented testimony from ten witnesses at trial. Those included Frank Dinucci (former RMBS trader at Nomura), Jonathan Raiff (managing director at Nomura and Mr. Shapiro's supervisor during the relevant time period), Zachary Harrison (former RMBS trader at Putnam Investments, a counterparty of Nomura's), Aadil Abbas (portfolio manager and senior vice president at Hartford Investment Management, another counterparty), Caleb Chao (former RMBS trader at Nomura), Alejandro Feely (former RMBS trader at Nomura), Joel Wollman (portfolio manager at QVT Investments, a counterparty of Nomura's), and Eric Marks (portfolio manager at Ellington Management Group, a counterparty of Nomura's).

The government's case lasted eleven days.

## STANDARD OF REVIEW

Federal Rule of Criminal Procedure 29(a) provides that "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).  Therefore, in order to survive a Rule 29 motion, the government must "introduce sufficient evidence to allow the jury to reasonably infer that each essential element of the crime charged has been proven beyond a reasonable doubt."  *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  In other words, the government's failure to prove even one element of a crime requires dismissal of the count.

Although the government need not refute every possible theory of innocence to survive a Rule 29 motion, "a conviction based on speculation and surmise alone cannot stand."  *Id.* (citing *United States v. Wiley*, 846 F.2d 150, 155 (2d Cir.1988)).  "[I]t is not enough that the inferences in the government's favor are permissible."  *United States v. Abu-Jihaad*, 600 F. Supp. 2d 362, 383 (D. Conn. 2009) (quoting *United States v. Triumph Capital Grp., Inc.*, 544 F.3d 149, 159 (2d Cir. 2008)).  As the Second Circuit has reasoned, "if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt."  *United States v. Cassese*, 428 F.3d 92, 99 (2d Cir. 2005).

<u>ARGUMENT</u>

**I.** **The Government Has Not Adduced Evidence that the Wire Communications Underlying the Wire Fraud Counts Were "In Furtherance Of" the Alleged Fraudulent Scheme**

Rule 29 requires a judgment of acquittal in cases where the government fails to introduce evidence in its case-in-chief to support one or more elements of an offense.  The government has failed to introduce any evidence to support a finding that the six emails described in the wire-fraud counts were "in furtherance of" the alleged fraudulent scheme.  Mr. Peters is therefore entitled to a judgment of acquittal on Counts 4–9.

To prove wire fraud, the government must present evidence that the charged wire transmission was "in furtherance of" the alleged criminal scheme.  *See United States v. Altman*, 48 F.3d 96, 101 (2d Cir. 1995).[2]  A communication is in furtherance of a criminal scheme only if the communication was "for the purpose of executing" the scheme or was "incident to an essential part of the scheme."  *See id.* at 101–02; *see also United States v. Porcelli*, 865 F.2d 1352, 1359 (2d Cir. 1989) (holding that the mailing at issue was not "sufficiently closely related" to the defendant's criminal scheme).  The purpose of a communication is critical, as a communication "cannot be said to be in furtherance of a scheme to defraud when it occurs *after* the scheme has reached fruition."  *Altman*, 48 F.3d at 103 (emphasis added) (citing *Kann v. United States*, 323 U.S. 88, 94 (1944)).  Nor can a wire communication be in furtherance of a criminal scheme if "there is no indication that the success of [the] scheme depended" on the wire.  *United States v. Maze*, 414 U.S. 395, 402 (1974).

---

[2]   Although *Altman* was a mail-fraud case, the mail-fraud elements apply equally to the wire-fraud context.  *See United States v. Reifler*, 446 F.3d 65, 95 (2d Cir. 2006).

The Third Superseding Indictment charges Mr. Peters with six counts of wire fraud based on six post-trade emails sent from Nomura.  Two of those emails were communications from Nomura to a counterparty that confirmed the fact of a trade (the "Trade Confirmation" emails, Counts 5 & 9).  *See* Third Superseding Indictment, ECF No. 307, at 17–18.  The remaining four emails advertised to third parties the fact that a trade had been completed (the "Marketing" emails, Counts 4, 6, 7 & 8).  *Id.*  None of the wire-fraud counts alleges that the Trade Confirmation or Marketing emails contained a misstatement.  Nor does the Indictment explain how the emails promoted the alleged criminal scheme.

The government has not made up for these pleading deficiencies during its case-in-chief. No evidence shows that the Marketing emails or Trade Confirmation emails promoted the allegedly fraudulent scheme or were otherwise essential to that scheme.  All six emails were sent after a trade had been completed.  The emails were therefore not "in furtherance of" any scheme.

### A. The government has introduced no evidence suggesting that the Marketing emails were sent in furtherance of the alleged criminal scheme

None of the government's witnesses testified that the Marketing emails were necessary to the alleged criminal scheme or that any of those emails resulted in an allegedly fraudulent transaction.  The criminal scheme – as charged in the Indictment – involved misrepresentations in the course of particular trades.  Once those misrepresentations were made and the trade was completed, Nomura and the counterparty did not need to send an advertising email to *other potential customers* to finalize the deal.  As Mr. Marks testified, the Marketing emails were sent only after a trade was complete.  Tr. Trans. Day. 11 at 97–98 (Marks) ("the trade is completed, and then the [Marketing email] comes after").  According to Mr. Marks, moreover, the emails were

blast emails sent to Nomura's "entire distribution list probably."[3]  *Id.* at 98; *see also id.* (testifying that the emails were sent to "hundreds" of email addresses).

As other government witnesses testified, the purpose of the Marketing emails was to promote the general trading activity of the desk.  Mr. Dinucci, for example, testified that the purpose of the Marketing emails was "[t]o potentially solicit more business.  When clients saw what types of bonds we were trading, it would allow them to look through their portfolio and see if they had anything that they would like to sell that was similar to these two bonds, or to tell us that they would also be interested in purchasing bonds such as these."  Tr. Trans. Day 1 at 196.

The government's other witnesses similarly testified that the emails promoted only the general business of the RMBS desk.  *See* Tr. Trans. Day 7 at 96, 126 (Abbas) (Marketing emails gave market participants potential leads on future trades and the recipients were required to engage in their own negotiations if they wanted a slice of the same bond or a similar one); *id.* at 124 (Abbas) ("[I]f after this bid list there are other accounts who want to transact in any of these bonds, they could contact Nomura"); Tr. Trans. Day 8 at 117 (Chao) (purpose of the Marketing emails was to "try to do more business on the follow," and "we'd like to send out an email to our clients highlighting the bonds that we had traded . . . and the reason being, you know, clients would . . . maybe come back to us and say we want to sell some bonds, we want to trade some more bonds"); Tr. Trans. Day 9 at 135–36 (Feely) (Marketing emails were intended to "hopefully bring more trades to the desk"); Tr. Trans. Day 11 at 19 (Marks) (Marketing emails were "a form of advertising" for Nomura's RMBS business).

---

[3] Mr. Marks further admitted on cross-examination that he could not recall whether he even opened the Marketing emails that he had testified about on direct examination.  Tr. Trans. Day 11 at 96–97.

None of that testimony suffices to prove that the emails were "in furtherance of" the alleged criminal scheme under Supreme Court and Second Circuit precedent. The focus of the Marketing emails was only on Nomura's general trading activity, which, even under the government's theory, included a completely non-fraudulent business operation. It is well-settled that a communication designed to generally promote a lawful business is not sent "in furtherance of" an alleged unlawful scheme. *See Maze*, 414 U.S. at 402; *see also Porcelli*, 865 F.2d at 1359 (mail fraud cannot be premised on a mailing that is not closely related to the alleged scheme); *United States v. Castile*, 795 F.2d 1273, 1281 (6th Cir. 1986) (holding that mailings from insurance company – the alleged victim of a scheme – could not be predicate mailings for mail fraud counts). There is ***no evidence*** that the completion of the alleged fraudulent scheme depended on the four Marketing emails. *Cf. Castile*, 795 F.2d at 1278 (reversing mail-fraud conviction on this basis). Nor is there ***any evidence*** that the emails were "for the purpose of executing" the scheme or were "incident to an essential part of the scheme." *Cf. Altman*, 48 F.3d at 101–02. Acquittal on Counts 4, 6, 7, and 8 is therefore warranted.

B.   The Marketing emails were not "in furtherance of" the alleged scheme, because they increased the likelihood that the scheme would be discovered

The government also cannot prove the "in furtherance" element for the independent reason that the four Marketing emails increased the likelihood that the alleged fraudulent scheme would be discovered. The RMBS market does not involve publicly traded securities. *See* Tr. Trans. Day 1 at 124 (Dinucci). When Nomura disclosed to market participants that it had traded a specific RMBS, it induced those participants to inquire about the trade in an attempt to discover the price at which Nomura and its counterparty had traded the RMBS. Mr. Marks confirmed the point at trial: after receiving a Marketing email, he testified, recipients might go to Nomura "[i]n order to acquire the [pricing] information." Tr. Trans. Day 11 at 19 (Marks); *see also* Tr. Trans. Day 7 at

124 (Abbas).  This type of investigation carried the potential to reveal to investors a discrepancy between the price at which the bond actually traded and the price at which the alleged victim believed the bond had traded.  Such a discovery would expose the scheme that the government alleges was fraudulent.

A communication cannot be in furtherance of a criminal scheme if the communication increases the likelihood that the scheme would be discovered.  In *Maze*, the Supreme Court thus held that the mailings charged in the indictment's mail-fraud counts were not "for the purpose of executing [the] scheme" because "the successful completion of the mailings . . . *increased the probability* that [the defendant] would be detected and apprehended."  *Maze*, 414 U.S. at 404 (emphasis added); *see also Lundy v. Catholic Health Sys. of Long Island, Inc.*, 711 F.3d 106, 119 (2d Cir. 2013) (mailing was not "in furtherance of" any scheme because it "would have revealed (not concealed)" the scheme); *United States v. Redcorn*, 528 F.3d 727, 742 (10th Cir. 2008) (same). This case is no different.

C. The Trade Confirmation emails were sent after the completion of the allegedly fraudulent transaction, and could not be "in furtherance of" the alleged criminal scheme

The government's witnesses testified that the two Trade Confirmation emails – like the Marketing emails – were sent by Nomura following completion of a particular trade.  *See* Tr. Trans. Day 1 at 136 (Dinucci) (Nomura sent Trade Confirmation emails after a trade "[j]ust to effectively confirm the trade with our client"); Tr. Trans. Day 8 at 150 (Chao) (Trade Confirmation email memorialized the fact of a trade and thanked the counterparty).  Although the Indictment alleges that the Defendants made false or misleading statements in connection with the transactions identified in the Trade Confirmation emails, no evidence suggests that the emails were a necessary part of those transactions.  No evidence suggests that the emails contained a misrepresentation, provided any additional information to a counterparty, or did anything else to advance the alleged

fraud.  By the time that the Trade Confirmation emails were sent, the deed (if any) had already been done.

That precludes the government from arguing that the emails in Counts 5 and 9 are proper predicates for wire fraud.  Communications that are sent after the completion of a fraudulent scheme – in other words, "after the scheme has reached fruition" – "cannot be said to be in furtherance of a scheme to defraud."  *Altman*, 48 F.3 at 103; *see also McCormack Int'l Corp. v. Vohra*, 858 F. Supp. 415, 421 (2d Cir. 1994) (dismissing wire fraud counts because the "fraudulent acts . . . were completed" before the mailing on which the mail and wire-fraud counts were predicated).  As the Supreme Court has explained, the "in furtherance" element applies where a mail or wire communication is "used prior to, and as one step toward, the receipt of the fruits of the fraud."  *Kann*, 323 U.S. at 94.

The government's proof indicates that the alleged scheme reached fruition when the two parties agreed on a trade that was allegedly tainted by the Defendants' misrepresentations.  Indeed, the government's own trade chronologies and charts end at or around the time-stamp of the relevant Trade Confirmation email.  The Trade Confirmation emails were not "used prior to" the alleged fraud.  Mr. Peters is therefore entitled to a judgment of acquittal on Counts 5 and 9.

## II.    **The Government Has Not Adduced Evidence Sufficient to Prove Mr. Peters's Intent to Defraud**

Mr. Peters is also entitled to acquittal on the wire fraud counts for the separate reason that the government has offered no evidence that Mr. Peters acted with an intent to defraud, as required to convict him of a wire fraud charge.  *Cf. United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987) (citations omitted).  As the Second Circuit has explained, to prove an intent to defraud, "[i]t is not sufficient that [the] defendant realizes that the scheme is fraudulent and that it has the capacity to cause harm to its victims.  Instead, the proof must demonstrate that the defendant had a 'conscious

knowing intent to defraud [and] that the defendant contemplated or intended some harm to the property rights of the victim.'" *United States v. Autuori*, 212 F.3d 105, 116 (2d Cir. 2000); *see also United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999) (same).  An intent to deceive is not enough.  Where customers receive "exactly what they paid for," the Second Circuit has instructed, a defendant cannot have intent to defraud if the government proves only that he deceived the customers into entering into a transaction.  *Starr*, 816 F.2d at 98.  "Misrepresentations amounting only to deceit are insufficient to maintain a mail or wire fraud prosecution."  *Id.*

*United States v. Regent Office Supply Co.*, 421 F.2d 1174 (2d Cir. 1970), is on all fours here.  In that case, the defendants' salesmen misrepresented facts to potential customers that made the customers more likely to enter into dealings with the defendants.  *Id.* at 1176.  Among those were misrepresentations that the defendants had been referred to the customer by a friend, that they had a large inventory to sell because of a death, or that the seller was a doctor who needed to dispose of his stationary.  *Id.*  Even though the Second Circuit characterized those statements as deceitful, it held that the statements did not amount to intent to defraud, because the customers received exactly what they bargained for.  *Id.* at 1181.  In other words, none of the misrepresentations went to the "quality, adequacy, or price of the goods themselves."  *Id.* at 1182.

The same is true here.  The Indictment is built on allegations of deceit, not fraud, and that is not enough under Second Circuit precedent.  Mr. Peters and the other Defendants are alleged to have overstated the prices at which they were able to purchase bonds from third-party sellers, understated the prices at which they were able to sell bonds to third-party purchasers, and dissembled about whether particular bonds were owned by Nomura.  *See* Third Superseding Indictment, ECF No. 307, at 8–9.  None of these alleged misrepresentations, however, pertains to

the "quality or nature of the goods being sold," and they "therefore [do] not go to the basis of the customers' bargain" with defendants. *Starr*, 816 F.2d at 98.

The testimony at trial confirms that Mr. Peters's alleged conduct – even if deceitful – did not deprive his counterparties of the benefit of the bargain. The government failed to elicit any evidence that in the trades involving Mr. Peters: (i) Nomura ever delivered a bond other than the bond that was the subject of the negotiation with Mr. Peters; (ii) Nomura ever paid less than the purchase price that Mr. Peters had negotiated; or (iii) Mr. Peters ever misrepresented the quality or nature of a bond he sold. In fact, the evidence shows just the contrary.

The evidence shows that, when Mr. Peters negotiated the sale of a bond, Nomura always delivered that exact bond to the relevant counterparty. Mr. Harrison, for one, testified about a number of bonds that he bought from Nomura, but he never complained that Nomura did not deliver the correct bond. Nor did Mr. Wollman. *Cf.* Tr. Trans. Day 10 at 137 (Wollman) (he "got the bonds [he] wanted at the price [he] agreed to pay"). And Mr. Dinucci testified that he never told "a counterparty that [he] w[as] selling them a particular bond and then deliver[ed] a different bond," and that he also never observed any other trader at Nomura doing so. Tr. Trans. Day 2 at 68 (Dinucci).

Similarly, when Mr. Peters negotiated the purchase of a bond, the evidence shows that Nomura always paid the negotiated price to the counterparty. *See, e.g.*, Tr. Trans. Day 10 at 58 (Wollman) (testifying that the price on a Trade Confirmation email was "the price [he] just agreed to pay"); *id.* at 137 (he "got the money that [he] agreed to get in return from the sale). Mr. Dinucci confirmed this point as well, agreeing on cross-examination that neither he nor anyone else at Nomura "ever shortchange[d] the counterparty by sending less money than agreed upon." *Id.*

Most importantly, the evidence shows that Mr. Peters never misrepresented the quality or nature of the bonds he sold.  As Mr. Wollman testified, no one "involved with Nomura ever misrepresented in any way anything about the mortgages or collateral that secured or were pooled together for the RMBS bond."  Tr. Trans. Day 10 at 136 (Wollman).  Mr. Wollman also testified that no one at Nomura ever misled Mr. Wollman about the nature of a bond or withheld any information in that respect.  *Id.* at 137.  No witness testimony is to the contrary.

The evidence points to one conclusion: in each of the transactions examined at trial, Nomura's counterparty received exactly what it bargained for.  The counterparties also traded only when they were satisfied with the price level.  *See, e.g.*, Tr. Trans. Day 5 at 113 (Harrison).  Where that is the case, Mr. Peters cannot be held to have acted with intent to defraud.  *Cf. Starr*, 816 F.2d at 98; *Regent Office Supply*, 421 F.2d at 1181.

It does not change the analysis that counterparties would have liked to know how much profit Nomura realized on a trade.  As the Second Circuit explained in *Starr* and in *Regent Office Supply*, the key question remains whether a discrepancy exists between the "benefits reasonably anticipated" and "the actual benefits [received]."  *Starr*, 816 F.2d at 96 (quoting *Regent Office Supply*, 421 F.2d at 1182).  That is the essence of fraud: it causes a discrepancy between the value the victim received and the value the victim anticipated that he would receive based on the representations made to him.  In this case, by contrast, a discrepancy exists merely between the profits Nomura realized and the profits that counterparties anticipated that Nomura would realize based on the Defendants' alleged misrepresentations.  Yet a "defeated expectation alone [does] not affect the nature or quality of the services that [were] the basis of the customers' bargain."  *Id.* at 99–100.  At the close of the evidence, there is no daylight between this case and the Second Circuit's decisions in *Starr* and *Regent Office Supply*.  The government cannot prove that Mr.

Peters had the requisite intent to defraud; the Court should enter a judgment of acquittal on the wire fraud counts (Counts 4–9).

## III.   The Government Has Failed to Adduce Evidence that Mr. Peters Willfully Committed Securities Fraud

On the second day of trial, this Court underlined the "fundamental" constitutional rights imperiled by the government's decision to prosecute Tyler Peters:

> [D]ue process doesn't allow [the government] to use the criminal justice system to draw lines. The lines have to be clear. . . . We're talking about the line that separates criminal from non-criminal. It has to be clear. You can't use the criminal law to establish it. It's got to be there beforehand.

Tr. Trans. Day 2 at 49. Through the prosecution of Mr. Peters, the government seeks to engage in the exact type of impermissible *post hac* line drawing that the Court described and that due process proscribes.

In a criminal securities fraud prosecution, the government must prove that the defendant acted "willfully." *See United States v. Schlisser*, 168 F. App'x 483, 485 (2d Cir. 2006); *see also United States v. Litvak*, 808 F.3d 160, 189 (2d Cir. 2015) (*Litvak I*). In light of clear Second Circuit precedent, the Defendants have jointly proposed a jury instruction that defines "willfully" as "to act knowing and purposely, with an intent to do something the law forbids, that is to say, with bad purpose either to disobey or to disregard the law." *See* Defendants' Joint Requests to Charge, ECF No. 316, at 67. The government has elicited no evidence that meets that standard, as no testimony suggests that Mr. Peters knew – either before or after the indictment of Jesse Litvak – that his conduct was unlawful. Acquittal is required.

### A.   The government has presented no evidence that Mr. Peters knew that he was acting unlawfully.

According to the testimony of the government's witnesses – including Mr. Peters's former co-workers – the January 2013 indictment of RMBS trader Jesse Litvak shocked the industry. [4] And for good reason: no one in that industry had ever been prosecuted for the tactics that form the basis of the government's Indictment, despite the fact that the RMBS industry had been around since the mid-1980s.  *See* Tr. Trans. Day 3 at 113 (Raiff) (testifying about the formation of the industry); *see also* Tr. Trans. Day 3 at 105 (Raiff) (no one had ever been prosecuted for this action); Tr. Trans. Day 8 at 189 (Chao) (same).  The government's witnesses testified to the shock that resulted.  Mr. Raiff, for instance, testified that he "recall[ed] that people were obviously surprised and it was at the point in time I was unaware of anyone having been indicted for that previously." Tr. Trans. Day 3 at 107 (Raiff).  Mr. Chao further agreed on cross-examination that the indictment "was considered a major development," that "[i]t was brought up in most of the conversations," and that "it received a significant amount of attention."  Tr. Trans. Day 8 at 188 (Chao).  Indeed, every one of Mr. Peters's former co-workers who testified in this case made clear that they had no understanding that they were acting potentially unlawfully:

- ***Frank Dinucci*** – A government cooperator who pled guilty to the conspiracy charged in this case, Mr. Dinucci testified repeatedly that he used the sales tactics at issue *because he thought that they were legal*.  *See* Tr. Trans. Day 2 at 68 (agreeing that he did not think his conduct was illegal); *id.* at 104 (same); *id* at 105 (he engaged in conduct "because [he] thought it was legal."); *id* at 114 (agreeing that he did not believe the tactics were illegal); *id* at 117 (same); *id.* at 135

---

[4] Although the indictment of Mr. Litvak provided the first notice of potential criminal liability, an indictment contains only allegations.  The indictment did not effect a change in the law on its own.  *Cf.* Tr. Trans. Day 1 at 24 (jury instruction that "an indictment is merely an accusation).  It was not until a jury returned a guilty verdict in *Litvak I* that traders in the industry knew that there was legal precedent for holding a trader criminally liable for these misrepresentations.  The conspiracy charged in this case was alleged to have terminated in early 2013, long before the jury in *Litvak I* returned a verdict.

("Basically, while I was actually doing these deceptive trading tactics, I didn't think they were illegal tactics.").

- ***Caleb Chao*** – Another former co-worker of Mr. Peters, Caleb Chao, testified that it never crossed his mind whether the trade practices at issue here were legal or illegal, *because he did not even view them as wrong* in any way.  Tr. Trans. Day 8 at 104 ("I wasn't thinking about . . . it in legal terms."); *id.* at 189 (until Mr. Litvak's indictment, Mr. Chao "didn't think that using those kinds of negotiating tactics was wrong"); *id.* ("I didn't think it was wrong.").  Mr. Chao also testified that, in light of his supervisors' approval of these practices, he had no reason to question their legality.  Tr. Trans. Day 8 at 98, 100, 103 (testifying that he learned tactics in question from his supervisors).

- ***Alejandro Feely*** – Even Mr. Feely, the sole government witness to testify that he felt "uncomfortable" misrepresenting facts to counterparties and that he felt that this conduct was generally "wrong," *never* testified that he believed any practice in which he engaged at Nomura was *unlawful*.  *See* Tr. Trans. Day 9 at 140–43, 149.

What is more, there is a complete lack of evidence that any one of the witnesses sought to conceal his conduct.  As Mr. Dinucci testified, "[n]o one told me to conceal the tactics from compliance."  Tr. Trans. Day 2 at 61–62; *see also* Tr. Trans. Day 8 at 189–90 (Chao) (same).[5] Despite the fact that these practices took place in the open, Nomura's compliance and legal departments never reprimanded any member of the RMBS desk for any of these tactics.  Tr. Trans. Day 8 at 114 (Chao); *see also* Tr. Trans. Day 3 at 42 (Raiff) (he did not "recall Ross Shapiro or

---

[5] This stands in contrast to instances where a trader knew that his conduct might potentially violate a firm's policy, such as when Mr. Harrison used code words to conceal from Putnam Investments his practice of "parking" bonds. *See* Tr. Trans. Day 7 at 23–25 (Harrison).

anybody else on the RMBS desk [being] disciplined for a trade involving a potential misrepresentation").

Finally, Mr. Peters's co-workers also testified that, prior to Mr. Litvak's indictment, the only anticipated consequence for engaging in such tactics was the loss of a counterparty's future business, not prison.  *See* Tr. Trans. Day 2 at 62–63 (Dinucci) (counterparties would sometimes put a trader "in the box" for making a misrepresentation); Tr. Trans. Day 8 at 13 (Chao) (Goldman Sachs put Nomura "in the box" for a period of time); *see also* Tr. Trans. Day 3 at 42 (Raiff) (no recollection of anyone being disciplined for a misrepresentation).  There is simply no evidence to suggest that Mr. Peters – or anyone else on the RMBS desk – understood that the product of their conduct might be a criminal prosecution.

Under the Second Circuit's reasoning in *Litvak I*, all of this evidence is directly relevant to Mr. Peters's scienter.  In that appeal, the Second Circuit vacated Mr. Litvak's 2014 conviction, reasoning in part that Mr. Litvak had been improperly precluded from presenting evidence that his supervisors had approved of the same type of conduct by other traders.  *Litvak I*, 808 F.3d at 189–90.  As the court put it, Mr. Litvak's proposed evidence "would support [his] attempt to introduce reasonable doubt as to his intent to defraud, *i.e.*, that he held an honest belief that his conduct was not improper or ***unlawful***, a belief the jury may have found more plausible in light of his supervisors' approval of his colleagues' substantially similar behavior."  *Id.* at 190 (emphasis added).  In vacating Mr. Litvak's conviction, the Second Circuit also quoted with approval the district court's instruction that, in order to establish that Mr. Litvak acted "willfully," the

government must "prove . . . that [Mr. Litvak] was aware of the generally ***unlawful*** nature of his acts." *Id.* at 189 (emphasis added).[6]

By contrast, the Government argues that willfulness requires merely proof that Mr. Peters acted with knowledge that his conduct was in some way "wrongful." *See* Gov't Letter to the Court Dated May 5 at 1–2.  The government thus argues that if Mr. Peters understood that society as a moral matter generally frowns upon lying in negotiations, he acted willfully for purposes of the criminal securities laws.

That is not the law.  The single case that the government cites in support of its argument, *United States v. Kaiser*, involved a senior executive who among other things, helped falsify documents to hide his company's true financial condition from investors.  609 F.3d 556, 568 (2d Cir. 2010).  That is a far cry from the facts here, where all witnesses testified that the conduct at issue was standard in the industry and was not perceived as illegal.  Willfulness here requires more than proof that a defendant knew lying was morally wrong.  As this Court made clear to the parties: "I think you can rest assured that I will not allow the jury to convict anybody on any charge on the premise that telling a lie is wrong.  The government's burden is heavier than that." *See* Tr. Trans. Day 1 at 15.

At any rate, in four cases decided both before and after the Second Circuit's decision in *Litvak*, the Second Circuit has abandoned *Kaiser*'s rationale, adopting a definition of willfulness that requires knowledge of unlawfulness.  For example, in *United States v. Tagliaferri*, 820 F.3d 568, 574 (2d Cir. 2016), the Second Circuit explained that "[t]o violate a [securities fraud statute]

---

[6] At the second trial of Mr. Litvak, the district court again instructed the jury that willfulness requires knowledge of unlawfulness. *See United States v. Litvak*, No. 13-cr-19 JCH, ECF No. 523, at 50 (D. Conn. Jan. 13, 2017) (jury instructions).  The government had proposed an instruction on remand that would have defined "willful" as knowledge "of the general wrongfulness of [Mr. Litvak's] conduct." *See United States v. Litvak*, No. 13-cr-19 JCH, ECF No. 363, at 47 (D. Conn. May 12, 2016) (proposed jury instructions).  The district court denied that request. *Cf. Litvak I*, ECF No. 523, at 50.

'willfully' is to do so with a bad purpose or with knowledge that such conduct was unlawful." The Second Circuit also gave the same description of the willfulness element in *United States v. McGinn*, 787 F.3d 116 (2d Cir. 2015), reasoning that "willfulness in this context [means] a realization on the defendant's part that he was doing a wrongful act *under the securities laws*." *Id.* at 124 (emphasis added). Other cases have adopted that definition as well, including *United States v. Cassese*, 428 F.3d 92, 98 (2d Cir. 2005) and *United States v. Schlisser*, 168 F. App'x 483, 485 (2d Cir. 2006). In the light of this precedent, the government has a right to submit its case to the jury only if it has elicited evidence that Mr. Peters acted with knowledge that his conduct was unlawful.

None of the evidence in this case supports the conclusion that Mr. Peters knew that his conduct was unlawful. The charged conduct was common among Mr. Peters's colleagues before the indictment of Mr. Litvak. No colleague testified that he doubted the legality of the conduct. And that conduct was also approved by Mr. Peters's supervisors, a fact that under the Second Circuit's reasoning bears directly on Mr. Peters's willfulness. *Cf.* Tr. Trans. Day 8 at 98–104 (Chao) (testifying about supervisor approval of these tactics); *see also* Tr. Trans. Day 3 at 42 (Raiff) (similar). All of the evidence thus shows that no Nomura trader – let alone Mr. Peters – knew before Mr. Litvak's indictment that making these sorts of misrepresentations could be considered unlawful.

    B.    <u>Mr. Peters is entitled to acquittal on due process grounds because he had no notice that his conduct was prosecutable.</u>

As trial testimony has made clear, Mr. Peters had no knowledge that the conduct for which he has been charged was unlawful. As a result, this prosecution does not comport with due process. For the reasons presented in Defendants' Motion to Dismiss the Indictment on Due Process Grounds (ECF No. 400), Mr. Peters is entitled to a judgment of acquittal.

## IV.    <u>Conclusion</u>

For all of these reasons, the Court should enter a judgment of acquittal on all counts.


Respectfully submitted,

**ALSTON & BIRD LLP**

By: <u>*/s/ Michael Brown*</u>
Brett D. Jaffe (PHV07701)
Michael Brown (PHV08372)
Joseph G. Tully (PHV07702)
90 Park Avenue
New York, NY 10016
Telephone: (212) 210-9493
Facsimile: (212) 210-9444
brett.jaffe@alston.com
mike.brown@alston.com
joe.tully@alston.com

*Counsel for Tyler Peters*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF system.

Dated: Hartford, Connecticut
       May 30, 2017

Respectfully submitted,

**ALSTON & BIRD LLP**

By: *<u>/s/ Michael Brown</u>*
        Brett D. Jaffe (PHV07701)
        Michael Brown (PHV08372)
        Joseph G. Tully (PHV07702)
        90 Park Avenue
        New York, NY 10016
        Telephone: (212) 210-9493
        Facsimile: (212) 210-9444
        brett.jaffe@alston.com
        mike.brown@alston.com
        joe.tully@alston.com

        *Counsel for Tyler Peters*