UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | No. 15-cr-00155 (RNC) |
| | : | |
| ROSS SHAPIRO and | : | October 30, 2017 |
| MICHAEL GRAMINS | : | |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
POST-TRIAL MOTION OF ROSS SHAPIRO FOR JUDGMENT OF ACQUITTAL
PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 29(c) AND
MOTION TO DISMISS THE INDICTMENT ON DUE PROCESS GROUNDS**

PETRILLO KLEIN & BOXER LLP
655 Third Avenue, 22nd Floor
New York, New York 10017
Telephone: (212) 370-0330
*Attorneys for Ross Shapiro*

## **TABLE OF CONTENTS**

**PAGE**

I. The Government's Proof Did Not Establish Criminal Intent ............................................. 4

    A. The Government Failed to Prove that Mr. Shapiro Entered Into an Agreement to Violate the Law ................................................................................................................. 4

    B. The Government Failed to Prove that Mr. Shapiro Intended to Harm Nomura's Trading Counterparties ................................................................................................. 8

II. The Government Failed to Prove Materiality .................................................................. 11

III. Mr. Shapiro Was Not On Notice That His Conduct Could Violate Federal Law ............ 13

# **TABLE OF AUTHORITIES**

**CASES** **PAGE(S)**

*Bryan v. United States*,
  524 U.S. 184 (1998) .................................................................................................. 6

*Chatin v. Coombe*,
  186 F.3d 82 (2d Cir. 1999) ...................................................................................... 14

*Inturri v. City of Hartford, Conn.*,
  365 F. Supp. 2d 240 (D. Conn. 2005) ..................................................................... 13

*Feinman v. Dean Witter Reynolds, Inc.*,
  84 F.3d 539 (2d Cir. 1996) ...................................................................................... 12

*United States v. Alvarez*,
   658 F.3d 666 (9th Cir. 2011) .................................................................................. 14

*United States v. Bank of New York Mellon*,
  941 F. Supp. 2d 438 (S.D.N.Y 2013) ................................................................. 9, 10

*United States v. Carr*,
  557 F.3d 93 (2d Cir. 2009) ........................................................................................ 5

*United States v. Binday*,
  804 F.3d 558 (2d Cir. 2015) ...................................................................................... 9

*United States v. Finazzo*,
  850 F.3d 94 (2d Cir. 2017) ...................................................................................... 11

*United States v. Gjurashaj*,
  706 F.2d 395 (2d Cir. 1983) ...................................................................................... 5

*United States v. Jabar*,
  No. 09-CR-170, 2017 WL 4276652 (W.D.N.Y. Sept. 27, 2017) ........................... 10

*United States v. Knauer*,
  707 F. Supp. 2d 379 (E.D.N.Y. 2010) .................................................................... 10

*United States v. Lanier*,
  520 U.S. 259 (1997) ................................................................................................ 13

*United States v. Litvak*,
  808 F.3d 160 (2d Cir. 2015) ............................................................................... 3, 11

*United States v. McGinn*,
    787 F.3d 116 (2d Cir. 2015)..................................................................................... 6

*United States v. Novak*,
    443 F.3d 150 (2d Cir. 2006)..................................................................................... 8

*United States v. Quintieri*,
    306 F.3d 1217 (2d Cir. 2002)................................................................................... 5

*United States v. Rowland*,
    No. 3:14-CR-79 JBA, 2014 WL 7399358 (D. Conn. Dec. 30, 2014)........................ 5

*United States v. Regent Office Supply Co.*,
    421 F.2d 1174 (2d Cir. 1970)................................................................................... 9

*United States v. Starr*,
    816 F.2d 94 (2d Cir. 1987)................................................................................... 8, 9

*United States v. Tagliaferri*,
    820 F.3d 568 (2d Cir. 2016)..................................................................................... 6

*United States v. Walsh*, No. 15-CR-91 (ADS),
    No. 15-CR-91 (ADS), 2016 WL 6603187 (E.D.N.Y. Nov. 7, 2016) ....................... 5

*United States v. Weimert*,
    819 F.3d 351 (7th Cir. 2016) ................................................................... 3, 12, 14, 15

Defendant Ross Shapiro respectfully submits this reply memorandum of law in further support of his motions (i) for a judgment of acquittal on Count One of the Indictment under Rule 29(c) of the Federal Rules of Criminal Procedure (Dkt. 440) and (ii) to dismiss the Indictment as a violation of the Due Process Clause (Dkt. 400).

As set forth in more detail below, the government's opposition brief ("Gov't Br.," Dkt. 482) largely fails to address the intent and materiality issues presented by Mr. Shapiro's motion, and where it attempts to do so, effectively enhances the argument for a judgment of acquittal on Count One and alternatively for dismissal under the Due Process Clause.

First, the government's argument that the Court's intent instruction was erroneous, and that this motion should be reviewed under different legal standards from those presented to the jury, ignores that Mr. Shapiro's motion is made under Rule 29(c). Under the Rule, the issue is whether a rational jury could convict under the Court's instructions, not legal instructions that were not issued.

Second, the government's procedurally barred challenge to the Court's instructions is misplaced even if considered on the merits. The government appears to ignore that in attempting to prove its case it had the burden to establish the absence of good faith on Mr. Shapiro's part – an issue that was central to the trial given (a) the cooperating witnesses' testimony that they believed their negotiating tactics were market-accepted and not unlawful, and that untruths in negotiations could generate *business* problems, not *legal* problems, and (b) the testimony of the trading counterparties that untruths in nonagency RMBS trade negotiations were commonplace and informed their negotiation posture. Yet, *no* proof was presented by the government that Mr. Shapiro believed he had crossed a defined line in engaging in the challenged trade negotiation tactics.

1

Third, under the wire fraud statute, the government is incorrect that *Starr* and its successor cases are not dispositive on the issue of intent to harm. Given the evidence, no rational jury could have found that the counterparty trading firms failed to achieve the benefit of the bargain, thus negating such intent.

Fourth, the government did not preserve its argument that a "right to control" theory of wire fraud applied here because it failed to object to exclusion of such a charge in the Court's instructions and did not argue this theory to the jury. But even if the government had preserved the argument, its position would fail. The "right to control" line of cases does not bar parties negotiating as principals from misleading in a negotiation, and the parties here were not prevented one iota from deciding at every turn in the negotiation to walk away, further negotiate, or trade on terms agreed to by the parties. There was also no contract proven by the government establishing special legal duties between the parties; and no requirement that Nomura trade any of the subject nonagency RMBS with these counterparties, much less at any specific price tied to Nomura's cost.

Indeed, in view of the evidence, the government's intent arguments all rest on a flawed premise, namely, the now disproven assertion that the trading counterparties in this case were "deprived" of value that "belonged" to them (*see* Gov't Br. at 37), when they, as principals, made unilateral decisions to trade at specific prices following negotiations in which their counterparty, Nomura, also a principal, did not truthfully disclose Nomura's profit and/or whether it was sourcing the bond from a third party or its inventory. Notwithstanding that the evidence failed to support this premise, the government continues to rely on this fallacy to argue that deception in a negotiation to increase profit is always a fraud, and that this somehow is mere common sense. Not so. Indeed, if the government were correct, there would be no place for the

2

willfulness element in a securities fraud prosecution, and, in the wire fraud context, *Starr, et al*. would have come out the other way.

Fifth, the government is incorrect that the defense has argued contrary to the Court of Appeals' statement in *Litvak* that "on the trial record before us, a rational jury could have found that Litvak's misrepresentations were material." *United States v. Litvak*, 808 F.3d 160, 175 (2d Cir. 2015). This case is not *Litvak*. Here, no rational jury could find materiality based on the evidence presented; importantly, the counterparty witnesses testified that they could not recall the factors considered in the total mix of information, much less that dealer markup would have significantly altered the mix of information in connection with any of the subject trades. Their testimony that knowing Nomura's reserve price during price negotiations would have been "important" – a fact they would not have known in the ordinary course and took no steps whatsoever to attempt to verify, revealing immateriality – does not show that transparent dealer margin would have significantly altered the total mix of information in relation to the investment decisions made by these counterparties.[1]

Lastly, the government's attempt to meet the Due Process challenge in this case relies on mere generalities and the false claim that Mr. Shapiro is supposedly arguing that his motion should succeed because no previous case is directly on point. The government simply fails to address what the *Weimert* Court's research has already established, namely, as the Court wrote: "[W]e know of no other case in which a court has found that deceptive statements about negotiating positions amounted to a scheme to defraud under the mail or wire fraud statutes." *United States v. Weimert*, 819 F.3d 351, 358 (7th Cir. 2016). Accordingly, Mr. Shapiro was not

---

[1] Moreover, in *Litvak*, the Second Circuit specifically avoided resolving the question whether misstatements unrelated to value can ever be material and noted that the Supreme Court had never addressed this issue. *See* 808 F.3d at 178 n.20.

on notice that statements in principal-to-principal price negotiations could be viewed as criminal fraud, and this prosecution violates his right to notice under the Due Process Clause.

Mr. Shapiro thus respectfully requests that a judgment of acquittal be entered on Count One of the Indictment under Rule 29(c), and in the alternative, that the Count be dismissed as a violation of the Due Process Clause.

## I. The Government's Proof Did Not Establish Criminal Intent

### A. The Government Failed to Prove that Mr. Shapiro Entered Into an Agreement to Violate the Law

Based on the evidence at trial, no rational jury could have concluded that Mr. Shapiro knowingly and willfully agreed with others to violate the federal securities or wire fraud statutes. Not a single participant in the alleged conspiracy testified that he believed he had acted contrary to law, even – incredibly – Dinucci, who pleaded guilty. *See* Shapiro Rule 29(c) Br. at 9-11 (summarizing testimony of cooperating witnesses). Now, the government claims that its own witnesses, one of whom admitted on cross-examination to having been coached in the grand jury on this very point (*see* 5/9/17 Vol. II Tr. 366:15-367:2 (Dinucci)), gave testimony that was "self-serving and implausible" (Gov't Br. at 32) when they denied intentionally entering into a criminal agreement, and urges the Court to disregard their testimony. Of course, the "self-serving" approach would have been to go along with the government's coaching. These were witnesses called by the *government*, after all, with whom the government had entered into cooperation or non-prosecution agreements. In any event, the government fails to explain how, if the cooperating witnesses lacked criminal intent, a rational jury could conclude otherwise as to Mr. Shapiro. No such conclusion could be reached based on the evidence.

Not only does the government urge the Court to disregard facts conclusively proven at trial, but it urges the Court to evaluate those facts under a legal standard that differs from the one

4

the Court applied to the charges in this case. *See* Gov't Br. at 4-10. This is improper. It is well-established that the ***only*** ground for a Rule 29 motion for judgment of acquittal is a challenge to the sufficiency of the evidence. *United States v. Gjurashaj*, 706 F.2d 395, 399 (2d Cir. 1983) (The "very nature" of a Rule 29 motion for judgment of acquittal is "to question the sufficiency of the evidence to support a conviction."); *United States v. Rowland*, No. 3:14-CR-79 JBA, 2014 WL 7399358, at *1 (D. Conn. Dec. 30, 2014) ("a Rule 29 motion involves factual and not legal questions"); *United States v. Walsh*, No. 15-CR-91 (ADS), 2016 WL 6603187, at *2-3 (E.D.N.Y. Nov. 7, 2016) (declining to revisit prior rulings of law on a defendant's motion for a judgment of acquittal under Rule 29). Accordingly, the ***sole*** issue presented by Mr. Shapiro's post-trial motion is whether the evidence was sufficient to support Count One under the Court's instructions to the jury.

The government's persistent attempt to override this Court's legal instructions would also violate the "law of the case" doctrine. As applicable here, the doctrine provides that "when a court has ruled on an issue, such ruling should generally be adhered to by that court in subsequent stages in the same case unless 'cogent' and 'compelling' reasons militate otherwise." *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002) (citations omitted). Such compelling reasons "consist[ ] principally of (1) an intervening change in controlling law, (2) new evidence, or (3) the need to correct a clear error of law or to prevent manifest injustice." *United States v. Carr*, 557 F.3d 93, 102 (2d Cir. 2009).

No such reasons exist here. The Court's well-considered willfulness instructions followed extensive briefing by the parties and argument before the Court over more than three months. *See, e.g.*, Dkts. 314, 316, 394, 399, 414, 415, 416, 419; 5/5/17 Gov't Ltr. (Ex. A); 5/7/17 Def. Ltr. (Ex. B); 5/7/17 Def. Ltr. (Ex. C); 5/9/17 Vol. II Tr. 274:12-275:14, 276:9-18;

5

6/1/17 Vol. XIII Tr. 2616:7-2618:14. As the Court stated at one point during argument, while the government "has no obligation to prove that a defendant knew he was violating Rule 10(b)(5)," one cannot be convicted "unless you had a sufficiently culpable state of mind such that you made a conscious choice to cross an important line and expose yourself to potential imprisonment." 6/1/17 Vol. XIII Tr. 2617:5-10; *see also* 3 Leonard B. Sand, *et al.*, Modern Federal Jury Instructions, Instr. 57-24 (to act willfully means to act "with knowledge that one's conduct is unlawful and with the intent to do something the law forbids, that is to say with the bad purpose to disobey or disregard the law"). The Court's final instructions embodied this well supported reasoning. *See* 6/1/17 Vol. XIII Tr. 2649:23-2650:6. And, when the government in rebuttal improperly told the jury that a different intent standard applied (6/5/17 Vol. XIV Tr. 2941:6-10; 2961:5-11) – the standard it once again advances in its opposition brief – the Court provided the jury with a curative instruction (6/6/17 Vol. XV Tr. 3007:16-3009:20).[2]

The remaining government arguments are equally unavailing. The government first inaptly relies on the Nomura compliance materials and Raiff's testimony. It was undisputed that the compliance materials were silent with regard to the alleged negotiation tactics. As Raiff testified, Nomura never conducted any pre-*Litvak* compliance training on the topic of price negotiation tactics between arm's-length principals in fixed income markets. 5/10/17 Vol. III Tr. 569:6-23. Raiff further testified that the dictates of Nomura's compliance policies did *not* lead him to believe that making misrepresentations in negotiations with sophisticated counterparties was impermissible "under the law." 5/10/17 Vol. III Tr. 625:4-9, 646:19-647:1. Even post-

---

[2] The government's repeated assertion – both during trial (*see* 6/1/17 Vol. XIII Tr. 2675:21-25) and in its opposition brief – that the jury was entitled to rely on "common sense that lying to cheat other people out of money is both wrong and illegal" (Gov't Br. at 26), and its suggestion that the Court can sustain Count One on this basis (*id.*), is simply another attempt to have the jury and this Court apply an incorrect legal standard (or no legal standard at all) in evaluating the trial evidence. *See, e.g.*, *Bryan v. United States*, 524 U.S. 184, 191-92 (1998); *United States v. Tagliaferri*, 820 F.3d 568, 571 (2d Cir. 2016); *United States v. McGinn*, 787 F.3d 116, 124 (2d Cir. 2015) (discussed in Gramins Reply Brief at 3).

*Litvak*, the guidance provided by Compliance conveyed that dealer cost information was immaterial. Specifically, Raiff testified that the February 2013 compliance training (which occurred shortly after Litvak was indicted) prohibited the "omission of material facts" when using Nomura's electronic platform, ***but*** directed traders to "omit facts about the price at which they could buy a bond from their counterparties." 5/10/17 Vol. III Tr. 643:2-644:4. Thus, Nomura Compliance continued to advise Nomura traders, even post-*Litvak*, that information regarding the price at which Nomura could purchase bonds from counterparties was ***immaterial***. Accordingly, the evidence relating to Nomura's compliance materials not only failed to sustain the government's position, but actually bolstered Mr. Shapiro's good faith argument.

Furthermore, the government presented no proof that Mr. Shapiro used or endorsed the use of the subject negotiation tactics after Litvak was indicted. To the contrary, Chao testified that, following Litvak's indictment, he never observed Mr. Shapiro engaging, or directing others to engage in, any negotiation tactic that he viewed as questionable. 5/23/17 Vol. IX Tr. 1879:13-1880:4. This testimony, coupled with the cooperating witnesses' testimony that they viewed negotiation misrepresentations as posing "a business risk" that "might lead to bad relationships with clients" or a loss of business, rather than a legal risk (*see, e.g.*, 5/8/17 Vol. I Tr. 168:21-169:5, 5/9/17 Vol. II Tr. 289:6-14, (Dinucci))[3], provided ample evidence of Mr. Shapiro's good faith belief that his conduct was not unlawful. The government offered nothing to counter this evidence.[4]

---

[3] *See also* 5/22/17 Vol. VIII Tr. 1753:1-11 (Chao testimony that WAMCO might put Nomura in the penalty box for lying about the spread on a trade).

[4] The admission of evidence relating to FINRA licensing exams similarly cuts ***against***, not in favor of, the government's position. That all of the government's cooperating witnesses, despite studying for and passing the FINRA licensing exams, did not believe the alleged negotiation tactics crossed any legal boundary, vitiates the government's groundless claim that "the jury was entitled to consider the licenses of defendants and their co-conspirators as proof that they understood their conduct to be illegal and wrongful." Gov't Br. at 28.

### B. The Government Failed to Prove that Mr. Shapiro Intended to Harm Nomura's Trading Counterparties

The government's proof also failed to demonstrate that Mr. Shapiro intended to harm the counterparties with whom Nomura traded. The government's argument that Nomura's counterparties were deprived of money that "belonged" to them is a fallacy that was disproven by the absence of any evidence that the counterparties could have traded any of the bonds in issue at better prices. *See, e.g.*, 5/17/17 Vol. VI Tr. 1173:17-20 (Harrison); 5/24/17 Vol. X Tr. 2195:21-2196:4 (Wollman). Moreover, there was no evidence that Nomura was required to trade the bonds with these particular counterparties, much less at prices more favorable to the counterparties than those to which the parties agreed. Nor was a single document admitted at trial to support the existence of this mythical "entitlement." *Cf.* DX 1741 at 77 (prospectus for the Putnam diversified income trust informs investors that "an undisclosed amount of profit or 'markup' is included in the price the fund pays" for principal transactions). Laid bare, the government's argument is really that engaging in deception in negotiations is wrong. This is not the law. *See United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987) ("Misrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution."); *see also United States v. Novak*, 443 F.3d 150, 159 (2d Cir. 2006).

The counterparty witnesses understood that Nomura traders had a fiduciary obligation to maximize profits for Nomura and its shareholders (5/16/17 Vol. V Tr. 939:13-17 (Harrison); 5/22/17 Vol. VIII Tr. 1592:18-22 (Abbas)), and until agreement was reached on total price and quantity, either party was free to decline to proceed or negotiate further. 5/22/17 Vol. VIII Tr. 1590:25-1591:14 (Abbas); 5/24/17 Vol. X Tr. 2195:7-20 (Wollman); 5/25/17 Vol. XI Tr. 2351:4-15 (Marks). Thus, the bargain struck by the parties in each case was reached at the conclusion of trade negotiations, when final terms were agreed. And, the object of the bargain

8

was the purchase and sale of nonagency RMBS bonds at particular prices and in specific quantities. *See, e.g.*, 5/11/17 Vol. IV Tr. 714:1-12, 5/16/17 Vol. V Tr. 988:5-15, 989:2-22, 1005:10-18 (Harrison); 5/18/17 Vol. VII Tr. 1441:6-1442:1 (Abbas); 5/25/17 Vol. XI Tr. 2297:5-13, 2422:6-17 (Marks). Contemporaneous, enforceable trade confirmations recorded the essential terms of the bargain, such as the CUSIP number, the total price, the quantity of the bonds, and the settlement period. *See, e.g.*, 5/18/17 Vol. VII Tr. 1532:15-1533:1 (Abbas). **None** of these essential terms was the subject of misrepresentations. *See, e.g.*, 5/25/17 Vol. XI Tr. 2355:22-2356:11 (Marks); 5/24/17 Vol. X Tr. 2206:22-2208:12 (Wollman); 5/9/17 Vol. II Tr. 294:5-295:5 (Dinucci); 5/23/17 Vol. IX Tr. 1848:17-1849:19 (Chao). *Cf. United States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015) ("Our cases have drawn a fine line between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid—which do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an essential element of the bargain—which do violate the mail and wire fraud statutes.") (quoting *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007) (internal quotation marks omitted).

Because the government presented no evidence from which a rational jury could find beyond a reasonable doubt that there was a "discrepancy between benefits reasonably anticipated" by the counterparties and the "actual benefits" delivered and intended to be delivered by Mr. Shapiro and Nomura, there was insufficient proof of intent to harm to sustain Count One. *See Starr*, 816 F.2d at 98; *see also United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1182 (2d Cir. 1970) (finding no intent to harm where defendants "did not attempt to deceive their prospective customers with respect to the bargain they were offering; rather, they gave a false reason to being able to offer the bargain"); *United States v. Bank of New York*

9

*Mellon*, 941 F. Supp. 2d 438, 474 (S.D.N.Y. 2013) (explaining in *dictum* that there would be "no showing of an intent to harm" if the counterparty received what they bargained for at the negotiated price, even if defendant falsely represented that this was the "best available price" or that it was "making no profit at that price" when in fact it "made a significant profit").

Perhaps recognizing the weakness of its argument, the Government has now pivoted, months after trial, to argue that the jury could have found Mr. Shapiro and his alleged co-conspirators guilty under the "right to control" wire fraud theory. But, this theory was never argued or charged to the jury and is therefore not preserved. *See United States v. Jabar*, No. 09-CR-170, 2017 WL 4276652, at *8 (W.D.N.Y. Sept. 27, 2017) (government precluded from asserting the right to control theory in opposing a motion for a judgment of acquittal where it "did not pursue such a theory at trial" and where the Court "did not charge the jury on this theory."); *United States v. Knauer*, 707 F. Supp. 2d 379, 390 (E.D.N.Y. 2010) ("It is well established that after a jury trial, a criminal conviction cannot be upheld on the basis of a theory not presented to the jury.").

While the government referred to the "right to control" theory in the Indictment (Dkt. 307 ¶ 32(a)) and included requests for instructions on this theory in its initial proposed jury instructions (Dkt. 314 at 42-43), it abandoned its application at trial. Specifically, the government (1) failed to raise this theory in any submissions to the Court concerning jury instructions (*see, e.g.*, Dkts. 399, 414; 5/5/17 Gov't Ltr. (Ex. A)); (2) failed to object to the Court's draft instruction that did not embrace the right to control theory (6/1/17 Vol. XIII Tr. 2607-2625); and (3) failed to argue this theory to the jury in summation (6/1/17 Vol. XIII Tr. 2675:13-2745:3). Accordingly, the Court did not charge the jury on this theory of culpability

(6/1/17 Vol. XIII Tr. 2658:18-2663:12), and the government is precluded from retroactively asserting it at this late stage of this proceeding.[5]

## II.     The Government Failed to Prove Materiality

The government claims that the Second Circuit's opinion in *Litvak* sets the "low bar" against which the trial proof on materiality should be evaluated. Gov't Br. at 2. But the facts of this case are not the same as those adduced at the first *Litvak* trial, and the Court of Appeals in its opinion did not announce a broad theory of materiality that decides this case; rather it found that on the trial record before it, Judge Hall properly left the question of materiality for the jury to determine, rather than determining the issue as a matter of law. *Litvak*, 808 F.3d at 177-178.

By contrast, in this case, a rational juror could not have found that the representations made by Mr. Shapiro and the other traders during price negotiations were material to a reasonable investor in the nonagency RMBS market.

The government's theory of materiality rested on the proposition that a misrepresentation to a counterparty by Nomura concerning the price at which Nomura had purchased or could purchase a bond that it was negotiating to sell, or the price at which it expected to sell a bond, would be "important" to the counterparties in the total mix of information concerning their decisions whether to trade, and therefore, the government continues, must be "material" under the law. This theory was not proven by the evidence at trial, and is not legally supported. The counterparty representatives testified that whether dealer markup, disclosed or undisclosed, would be important to them in a price negotiation depended on whether they believed a bond was

---

[5] Even had the government pursued the "right to control" theory, however, it would not have mattered. There was no evidence that the misrepresentations at issue "result[ed] in tangible economic harm" as required. *See United States v. Finazzo*, 850 F.3d 94, 111 (2d Cir. 2017) ("[M]isrepresentations or non-disclosure of information cannot support a conviction under the 'right to control' theory unless those misrepresentations or non-disclosures can or do result in tangible economic harm."). Rather, the evidence was uncontested that the counterparties obtained the bonds they sought at the price they had agreed to pay, which was the best available price at the time of the trade, and they were not entitled to a better price. That is, the proof showed that the counterparties received the benefit of their bargain.

11

worth the all-in price (*see* 5/16/17 Vol. V Tr. 1011:25-1012:4, 1015:1-9 (Harrison)); whether they believed the bond might be offered by the dealer to another participant in the market at the total price (*see* 5/16/17 Vol. V Tr. 1009:16-25 (Harrison)); whether they believed the bond might not be available at less than the total price because, at a lower price, the dealer would decide not to trade but rather to hold the bond in inventory (*see* 5/22/17 Vol. VIII Tr. 1591:15-1592:3 (Abbas)); and whether the counterparty had a compelling portfolio need to purchase or sell the bond in circumstances in which the counterparty could not trade on more favorable terms in the market (*see* 5/11/17 Vol. IV Tr. 714:1-12; 5/16/17 Vol. V Tr. 988:5-990:10 (Harrison)).  The counterparty witnesses, however, did not recall the trades or negotiations and thus could not point to the factors of significance in their consideration.  *See, e.g.*, 5/16/17 Vol. V Tr. 1008:18-22, 1011:19-24 (Harrison); 5/18/17 Vol. VII Tr. 1518:20-1519:7 (Abbas); 5/25/17 Vol. XI Tr. 2338:19-22 (Marks).

The counterparty witnesses also testified that they would deem *any* information, not just material information, "important" to a negotiation (*see* 5/18/17 Vol. VII Tr. 1522:17-19 (Abbas testimony that he would have wanted to know whatever information he could "get [his] hands on"); 5/25/17 Vol. XI Tr. 2334:11-13 (Marks testimony that "every additional piece of information would be important to me and could affect my future negotiations")), further demonstrating the flaw in the government's theory that "importance" marks the end of the analysis.  Deeming ***any*** fact potentially useful in the course of a negotiation as material fails the legal test ("significant" alteration of the mix of information), renders the concept of materiality meaningless, and would criminalize run-of-the-mill negotiation utterances.  *See Feinman v. Dean Witter Reynolds, Inc.*, 84 F.3d 539, 540 (2d Cir. 1996); *Weimert*, 819 F.3d at 370.

12

Thus, the government failed to prove the materiality of the Nomura traders' negotiation statements.

### III. Mr. Shapiro Was Not On Notice That His Conduct Could Violate Federal Law

This prosecution is an attempt to use the criminal justice system to draw new lines and standards of conduct rather than punishing violations of existing legal norms.  As this Court reminded the government (*see* 5/8/17 Vol. I Tr. 18:9-19:1; 5/9/17 Vol. II Tr. 275:3-14; 276:9-18), use of a criminal indictment in such fashion is a violation of Due Process.  *See United States v. Lanier*, 520 U.S. 259, 266 (1997) ("[D]ue process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope.").

Although the government attempts to frame Mr. Shapiro's Due Process claim as one that argues merely that "there was no case precisely on point prior to *Litvak*," Gov't Br. at 56, his argument is not so limited.  Rather, as the *Weimert* court noted:  "[W]e know of no other case in which a court has found that deceptive statements about negotiating positions amounted to a scheme to defraud under the mail or wire fraud statutes.  This absence is consistent with more general understandings in the law." 819 F.3d at 358.  The issue is not whether there is a prior case directly on point, but rather whether the entire category of alleged fraud charged by this District's United States Attorney's Office finds any legal precedent.

The trial evidence underscored the unprecedented nature of the government's novel theory of fraud.  *See Inturri v. City of Hartford, Conn*., 365 F. Supp. 2d 240, 254-55 (D. Conn. 2005) (a court "must consider the context in which the regulation was enforced, *i.e*., it must evaluate the underlying conduct by reference to the norms of the subject community").  Litvak's indictment was "shocking" to the bond trading community.  (5/23/17 Vol. IX Tr.

13

1894:14-18).  And, ***not one*** of the government's cooperating witnesses believed his conduct to be unlawful at the time.  *See, e.g.*, 5/23/17 Vol. IX Tr. 1830:4-8, 5/23/17 Vol. IX Tr. 1892:23-1893:7 (Chao testimony that he did not think the negotiating tactics he used at Nomura were wrong); 5/23/17 Vol. IX Tr. 1935:7-9 (Feely testimony that he did not ever "think about this practice in legal terms"); 5/9/17 Vol. II Tr. 293:22-294:4, 340:5-8, 343:4-11, 356:7-12 (Dinucci testimony that, because "the tactic[s] did not involve a misrepresentation as to the cash flows of the bond" or the "metrics of the actual bond," he did not think they were wrong or illegal).

Given the evidence from its own witnesses, the government cannot articulate how, in the environment of fixed income trading by sophisticated principals, a "person of ordinary intelligence" should have been expected to understand that engaging in the subject negotiation tactics would expose them to criminal prosecution.  *See Chatin v. Coombe*, 186 F.3d 82, 87 (2d Cir. 1999).  The government's only response is to intone that "lying is wrong."  But lying is not always *legally* wrong.  *See Weimert*, 819 F.3d at 357 ("Buyers and sellers negotiate prices and other terms.  To state the obvious, they will often try to mislead the other party about the prices and terms they are willing to accept.  Such deceptions are not criminal."); *United States v. Alvarez*, 638 F.3d 666, 674-75 (9th Cir. 2011) (Kozinski, C.J., concurring in denial of reh'g *en banc*).

The government's attempt to distinguish *Weimert* by driving a wedge between Weimert's concealment of the "true goals" of his "negotiating positions," 819 F.3d at 354, and the Nomura traders' misrepresentations of "objective, external facts" (Gov't Br. at 57), does not make sense. First, the dispositive question is not whether the misrepresented facts were objective and external, but whether they were material (and for the reasons already set forth above, the misrepresentations in this case were not material).  Second, the government does not try to

14

engage with the facts of *Weimert*, neglecting to mention that Weimert ***also*** misrepresented ***objective, external facts*** when, for example, he "deliberately misled his board and bank officials to believe that the successful buyer would not close the deal if he were not included as a minority partner," 819 F.3d at 353, and that as a result of such misrepresentations of objective fact, he received additional compensation including a four percent fee totaling over $300,000. *Id.* at 362. The court held that this misrepresentation did not constitute fraud, not because it did not concern an objective, external fact, but because the company "was not misled as to the nature of the asset it was selling or the consideration it received." *Id.* at 366.

\* \* \*

For the reasons set forth above, and in Mr. Shapiro's opening brief, this Court should enter a judgment of acquittal on Count One of the Indictment as to Ross Shapiro pursuant to Federal Rule of Criminal Procedure 29(c), or, alternatively, dismiss Count One under the Due Process Clause.

        Respectfully submitted,

        PETRILLO KLEIN & BOXER LLP

        By: /s/ Guy Petrillo
            Guy Petrillo (CT19924)
            Joshua Klein (PHV07748)
            Amy Lester (PHV08919)
            655 Third Avenue, 22nd Floor
            New York, New York 10017
            Telephone: (212) 370-0330
            Facsimile:  (315) 873-2015
            *Attorneys for Ross Shapiro*

**CERTIFICATION OF SERVICE**

  I hereby certify that on October 30, 2017, a copy of foregoing Reply Memorandum Of Law In Further Support Of Post-Trial Motion Of Ross Shapiro For Judgment Of Acquittal Pursuant To Federal Rule Of Criminal Procedure 29(c) and Motion to Dismiss the Indictment on Due Process Grounds was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

Dated: New York, New York
    October 30, 2017

                   /s/ Leonid Sandlar
                 Leonid Sandlar (PHV07700)
                 655 Third Avenue, 22nd Floor
                 New York, New York, 10017
                 Telephone: (212) 370-0330
                 Facsimile:  (315) 873-2015
                 lsandlar@pkbllp.com